IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Mahari Bailey, et al., | : | |
| Plaintiffs | : | C.A. No. 10-5952 |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia, et al., | : | |
| Defendants | : | |

PLAINTIFFS' THIRD REPORT TO COURT AND MONITOR
ON STOP AND FRISK PRACTICES

## I.  Introduction

### A.  Procedural History

On June 21, 2011, the Court approved a Settlement Agreement, Class Certification, and

Consent Decree ("Agreement") in this matter.   On February 6, 2012, plaintiffs submitted their

First Report which analyzed stop and frisk data for the first two quarters of 2011.   The First

Report focused on Fourth Amendment issues, and specifically whether there was sufficient cause

for the stops, frisks, and searches reported by the Philadelphia Police Department ("PPD").   The

audits showed very high rates of stops and frisks undertaken without reasonable suspicion.

Plaintiffs' Second Report was submitted in July 2012, and included (1) a Fourth

Amendment analysis of the Third Quarter 2011 stop and frisk data, (2) a racial analysis of the data

for the First and Second Quarters, 2011, and (3) a racial analysis of possession of marijuana arrests

for the period September 15-November 15, 2011.   Plaintiffs reported continued high rates of stops

and frisks without reasonable suspicion.   On the question of racial disparities, plaintiffs' expert,

Professor David Abrams, considered the benchmarks that had been agreed upon by the parties as

metrics that should be used in this analysis.   Professor Abrams also conducted a series of

regression analyses and concluded that the racial disparities in stops and frisks (numbers by race

compared to census data) were not fully explainable by non-racial factors.   Further, the analysis of marijuana arrests showed even more pronounced disparities, with African-Americans and Latinos constituting over 90% of all marijuana arrests.[1]

Plaintiffs' Third Report focuses on stop and frisk practices for the first two quarters of 2012, from the perspective of compliance with Fourth Amendment standards.   We will also present our analysis of the marijuana arrests for the period September 15-November 15, 2012. The Fourth Report, slated for May 2013, will present the racial analysis for stops and frisks for the first two quarters, 2012.

This Third Report considers stops conducted after the PPD had completed re-training of officers, issued new protocols on stop and frisk practices, and implemented accountability measures, as required by the Agreement.   The 2012 data provides the first opportunity to determine the degree to which the remedial measures in the Agreement have been implemented.

Finally, by way of background, in December 2012, the parties agreed to a plan for the development of a new PPD electronic data system that is designed to provide more accurate information on stops and frisks and which will enable the parties to more effectively conduct audits and analysis of the data.   The parties also agreed to a new schedule for the City's submission of stop and frisk data to the plaintiffs. *See* Stipulated Order for Compliance with Consent Decree, entered December 18, 2012 (Document 43).

---

[1] In June, 2012, the City filed its First Report and asserted that the rates of impermissible stops and frisks were lower than reported by plaintiffs.   However, the PPD recognized that the Inspectors who conducted the audits should not be crediting many stops based on allegations of loitering or other conduct that does not constitute reasonable suspicion.

**B.   The Data Review Process**

Plaintiffs have established a careful and comprehensive review process of the stop and frisk data provided by the Police Department.   Each quarter, we are provided data from approximately 3200 randomly selected pedestrian and car stops.   For the Fourth Amendment analysis, we consider only pedestrian stops.   Counsel for plaintiffs and trained law students independently review each pedestrian stop and frisk under guidelines that incorporate the standards set forth in the Agreement and by the United States and Pennsylvania Supreme Courts.[2] We accept at face value the reasons stated by police officers for the stops and frisks, and make assessments based solely on whether these reasons comport with standards established by the Agreement and the Fourth Amendment.   In close cases, we credit the stated basis for the stop and frisk.

Plaintiffs are confident that their audits are accurate and, therefore, are troubled by the contrary findings of the PPD.   In an effort to determine the reasons for these different findings, counsel for plaintiffs met with the Department's Inspectors to discuss the appropriate Fourth Amendment standards.   Along the same lines, plaintiffs have provided to the City a breakdown of the categories of stops and frisks that were found to have most frequently resulted in improper police interventions.[3] The City has stated that changes are being made in the Department's audit process, including the assignment of Deputy Commissioner Nola Joyce to oversee the implementation of the Agreement, the assignment of new Inspectors to ensure more accurate reviews, and a more effective system of accountability.   While we do not expect that the reviews

---

[2] These reviews show a very high level of agreement between counsel and the law students as to the propriety of stops and frisks.   This Report is based on counsel's reviews.

3 See, _infra_, 11-12.

by plaintiffs' counsel and by the Police Department will be perfectly aligned, unless there is a sharp reduction in both the number of impermissible stops and frisks *and* in the stark disparities reflected in the audits conducted over the first 18 months of data analysis, plaintiffs will request the intervention of the Monitor and the Court.

## II.   Review of 75-48a Forms in First and Second Quarters, 2012

### A.  Fourth Amendment Analysis

In this section, plaintiffs set forth their findings and assessments on the issue of whether stops and frisks for the first two quarters of 2012 were supported by the requisite reasonable suspicion.[4]   As in previous audits, in assessing whether reasonable suspicion existed for the stop or frisk, we fully credited the narrative information provided by the officer and in "close" cases found that reasonable suspicion was present.[5]

There is one positive development: the number of pedestrian stops has been reduced.   In 2009, there were 253,000 pedestrian stops; in 2012 there were 215,000 stops, a decrease of almost 15%.   Unfortunately, there has been no significant improvement in the quality of stops and frisks. By our analysis, pedestrian stops are being made without reasonable suspicion in approximately 43-47% of the cases, depending on how certain "stops" are categorized.   Frisks are being conducted without reasonable suspicion in over 45% of the cases, again depending on categorization of frisks and searches.   By race, 76% of the stops were of minorities

---

[4] The review process was the first using the PPD electronic database. As noted, this system had design deficiencies and the City is currently developing a new electronic data base to enable the parties to make more timely and efficient audits.

[5] With respect to frisks, we have created a third category for analysis.   Where the stop was impermissible, but the reasons for the frisk were otherwise proper, we recorded the frisk as "the fruit of the poisonous tree."   Under this doctrine, the evidence that was seized would likely be suppressed due to the improper stop.   *See* note 8, *infra*.

(African-Americans and Latinos) and 85% of the frisks were of minorities.[6]   The findings as to impermissible stops and frisks are particularly disturbing given the fact that the Police Department had the time and resources following the entry of the Agreement to re-train its officers on stop and frisk practices and to establish supervisory reviews to ensure accountability for practices that failed to meet clear mandates under the Agreement.   Moreover, as detailed below, the Department continues to report very low levels of improper stops and frisks, thus calling into question whether the Inspectors (and IAD) are currently applying the appropriate standards.

_____

[6] This data shows significant disparities by race as compared to the census data.   The question of whether non-racial factors explain the disparities will be addressed in the Fourth Report, based on application of benchmarks and regression analysis.

## First and Second Quarters, 2012

*Pedestrian Stops*[7]

| | |
|---|---|
| Number of Pedestrian Stops | 1852 |
| Stops with Reasonable Suspicion | 976 |
| Stops without Reasonable Suspicion | 876 |
| "Non-Stops" (e.g., arrests, request for assistance) | 186 |

*Pedestrian Frisks*[8]

| | |
|---|---|
| Number of Pedestrian Frisks | 265 |
| Frisks with Reasonable Suspicion | 97 |
| Frisks without Reasonable Suspicion | 115 |
| Frisks with RS following Stop w/o RS ("Fruit of the Poisonous Tree") | 53 |
| "Non-Frisks" (searches incident to arrest) | 26 |





---

[7] From the data base provided by the City, we have excluded "stops" that were sight arrests (based on probable cause) or "stops" that were not investigative in nature, e.g., a person turning herself in on an outstanding warrant.   We understand that further discussion with the City is necessary to resolve how these stops should be analyzed.   In any event, even if these stops are considered the rates of improper stops remains very high (43% as opposed to 47%).

[8] Where the police conducted a search based on probable cause or a search incident to an arrest, we did not count that activity as a "frisk."   The "fruit of the poisonous tree" category includes frisks that follow impermissible stops, but which were otherwise based on permissible factors. That is, the officers had no legal reason to make a stop, but having done so, the suspect's conduct would otherwise justify a frisk. The Fourth Amendment would usually require exclusion of any evidence found in this situation.   Again, we will discuss with the City how best to analyze these cases.

***Contraband***

| | |
|---|---|
| Contraband Recovered Total | 29[9] |
| Guns Recovered | 3 |

***Hit Rates* (fraction of stops)**

| | |
|---|---|
| Contraband Recovered | 1.57% |
| Guns Recovered | 0.16% |
| Arrests[10] | 5.29% |





---

9  This number may over-count contraband secured as a result of a stop and frisk, as total contraband recovered includes cases of searches and frisks.

10  We recognize the limitations in using arrest data as a benchmark for "hit-rates."   On one hand, the number may be too low as officers may have probable cause to arrest for very minor offenses, but properly exercise their discretion not to make a custodial arrest (as opposed to a citation or verbal warning).   On the other hand, the number may be inflated since some arrests are based not on the conduct observed, but on post-stop information received, such as an outstanding warrant.

### B.   Commentary

There are a number of significant findings from the data review.

1.   It is remarkable that 43-47% of all stops and over 45% of all frisks were made without the requisite reasonable suspicion.   These results are not appreciably different from the data reviews for 2011, as set forth in the First and Second Reports.   Thus, tens of thousands of persons in Philadelphia continue to be stopped each year (and a significant number frisked) without reasonable suspicion.   Moreover, in our view, the audits conducted by the City for these two quarters are flawed.   As the following data shows, Inspectors' audits reported very low numbers of stops or frisks without reasonable suspicion.

First Quarter, 2012

Central Police Division: 392 stops.[11]

No reasonable suspicion for stop: 4% (adjusting for car stops, 8%)

No reasonable suspicion for frisk: 2%

East Police Division: 391 stops.

No reasonable suspicion for stop: 4% (adjustment=8%)

No reasonable suspicion for frisk: 0%

Northeast Police Division: 393 stops

No reasonable suspicion for stop: 1% (adjustment=2%)

No reasonable suspicion for frisk: 2%

---

[11] Since the police audits included car stops, we have adjusted the reported rates of impermissible stops and frisks to reflect pedestrian stops only.   On the assumptions that there are an equal number of car and pedestrian stops and that almost all car stops are made with reasonable suspicion, we have doubled the percentages of pedestrian stops made without reasonable suspicion.   But even with this upward adjustment, the PPD and plaintiffs are still far apart in their conclusions.

Second Quarter, 2012

Central Police Division: 390 stops.

      No reasonable suspicion for stop: 1% (adjustment=2%)

      No reasonable suspicion for frisk: 1%

East Police Division: 394 stops

      No reasonable suspicion for stop: 2% (adjustment=4%)

      No reasonable suspicion for frisk: 1%

Northeast Police Division: 393 stops

      No reasonable suspicion for stop: 0%

      No reasonable suspicion for frisk: 2%

 As this data makes clear, the differences between the PPD and plaintiff analysis is stark. Under plaintiffs' assessments of the stops and frisks, not only is there an intolerably high level of unlawful stops and frisks, but the Inspectors and IAD are improperly crediting a substantial number of stops and frisks.

    2.  As with the data for 2011, the number of recorded frisks continues to be very low, with only14.4% of stops resulting in a frisk.   Indeed, this ratio is substantially lower than the low rates (20-25%) reported in 2011.   And, similar to the data review for 2011, a review of stops in which the police reported suspicion regarding possession of a gun or a violent crime revealed a large number of cases in which the police reported *no* frisk of the suspect.   Thus, of 149 stops in which guns, gunshots, or a robbery is mentioned as a basis for the stop, there were no frisks recorded on 79 stops (53%).

    3.  Of substantial significance, the hit rates were again quite low.   Contraband of any kind was recovered in only 29 stops (1.57% of all stops) and only 3 guns were seized (.16 of 1 %).

Further, 112 stops were made where the police indicated that the suspect possessed a weapon, yet in only 3 of these stops was a weapon recovered.   Arrests occurred in 5.29% of all stops.   While the courts have not quantified the reasonable suspicion standard in terms of expected hit rates for contraband (or for guns and other weapons), the hit rates in Philadelphia appear to be well below a reasonable threshold.   In other words, if there was reasonable suspicion for all stops, and frisks, there should be far more than a 1.57% chance of recovering contraband.   Moreover, in a program designed to remove guns from the street, there should be a far higher percentage of stops that yield guns or other weapons than the current 0.16%.

Reduction in the number of impermissible stops and frisks does not create a risk to public safety.   New York City has recently released data on its stop and frisk practices for 2011, reporting a 28% reduction in the number of stops *and* a decrease in violent crime, and in particular homicides. As noted, Philadelphia has also reduced the number of stops, but the number of impermissible stops can be further substantially reduced without risk to public safety.

4.   Analyzing improper stops and frisks by category, the results were quite similar to those for 2011.   As we have reported to the City, there continue to be significant numbers of stops for conduct which the Agreement and case law make clear are not justifiable grounds for police stops or frisks.   These include:

- loitering (or persons hanging out; congregating)

- investigation of passenger in stopped car

- involved in a disturbance

- single person "obstructing" the sidewalk

- anonymous information (e.g., man with gun; man with drugs)

- person on steps or porch of "abandoned" property

10

- person involved in verbal dispute (non-domestic)[12]

- high crime area/roll call complaints

- panhandling

- flash information (e.g., theft or robbery), but where officer states that suspect did not match the flash information

- curfew or bar checks where person was well over 21 years of age

As for frisks, problematic grounds include:

- frisk for officer protection

- frisk based on narcotics investigation

- frisk because suspect stopped in high crime or high drug area

Plaintiffs did not expect that the transition from a stop and frisk practice that lacked any meaningful oversight to a system that accurately tabulates all stops and frisks and in which there is substantial compliance with the Constitution would be immediately successful.   On the technology front, the initial design of the data base was flawed, but the City is moving to implement a new system.   On the issue of whether stops and frisks are being conducted consistent with established legal standards, and in particular only where reasonable suspicion supports the stop or frisk, the results of our audits through the first two quarters of 2012 reflect persistent and unacceptably high rates of improper actions.   Unless there is a dramatic change in practices, we will be compelled to seek judicial relief.

---

[12] We credit reports of "domestic" disputes.

**III.   Racial Disparities In Possession Of Marijuana Arrests**

In Plaintiffs' Second Report, our analysis of police arrest reports for a two month period (September 15-November 15, 2011) for cases in which the only charge was possession of marijuana disclosed substantial racial disparities.   Plaintiffs have reviewed police arrest reports for the same two month time frame in 2012.   We conducted a City-wide analysis of arrests and then examined the data by police district.   The results show even greater racial disparities than the 2011 data.

**A.   Possession of Marijuana Arrests in the City of Philadelphia**

In the time frame subject to analysis, there were 798 arrests solely for possession of marijuana, a slight increase from 2011 when there were 785 arrests.   There were four circumstances that led to the seizures of marijuana:

- pedestrian stops/arrests: 60% (compared to 49% in 2011);[13]

- observed street purchases:   22% (23% in 2011);

- car stops: 14%   (22% in 2011); and

- routine school security searches: 4% (6% in 2011).

As depicted in the chart below, 673 or 84.4% of the arrests were of African Americans (compared to 83.4% in 2011), 69 or 8.6% were of Latinos (8.2% in 2011), 46 or 5.8 % were of Whites (7.4% in 2011), and 10 (or about 1%) were others (the same as in 2011).   According to U.S. Census Data in 2010 the racial composition of Philadelphia County is 43.4% African American, 36.9% White, 12.3% Latino, 6.3% Asian, and 1.1% other.   Thus, in a City where Whites represent

---

[13] The arrests resulted from either investigatory stops that led to seizure of marijuana or actual arrests based on observations or information that established probable cause.

36.9% of the population, only 5.8% of those arrested for marijuana possession were White. This finding is of particular concern in light of evidence (discussed in Plaintiffs' Second Report, at 32) that marijuana use is higher among Whites than among African Americans.   Conversely, while African Americans represent 43.4% of the population, nearly double or 84.4% of those arrested for possession of marijuana were African Americans.





### B.   Possession of Marijuana Arrests By Philadelphia Police District

There are twenty-one police districts that report arrest data in Philadelphia.   The demographics of each district vary along socio-economic and racial lines.   The data on marijuana arrests by district in 2012 is quite similar to the arrest patterns observed in 2011, though there has been an increase in the proportion of pedestrian stops that led to the seizure of small amounts of marijuana.   In predominantly African American districts (Districts 12, 14, 16, 19, 22, 35 and 39), almost all of the possession of marijuana arrests were of African American, principally young men. In many predominantly white districts (Districts 3, 6, 9, 15, 24, 25 and 26), most of the arrests were also of young African American men.   As in 2011, in one largely White district (District 5), there were **no** arrests for possession of marijuana.

### C.   Commentary

The 2012 data bears a striking similarity to the data set analyzed in 2011.   The nature of the arrests, the overall racial disparities, and the disparities by police districts with markedly different racial compositions show that these disparities are directly linked to policing protocols.   While other factors may influence the extent of racial disparities in the overall stop and frisk data (e.g., crime patterns; deployment of more police in "high crime areas"), the stunning disparities found in even predominantly White police districts supports the conclusion that racial factors are impermissibly influencing the decision to stop, search and arrest.   As noted, plaintiffs will be filing a Fourth Report that examines the racial implications of stop and frisk data.

Plaintiffs' Second Report urged the City to take remedial steps.   We suggested that the PPD enhance protocols related to training and supervision to ensure that officers are not making arrests for possession of marijuana in a racially discriminatory manner.   To that end, we requested that a

Commissioner's Memorandum and appropriate training curriculum for use at the Police Academy and for PPD officers and officials.

Plaintiffs also suggested that the PPD carefully monitor police practices in this area with supervisory and, if necessary, disciplinary actions to correct patterns of race-based enforcement. To accomplish that goal, we suggested that the PPD create a data base on possession of marijuana arrests that includes the date and place of occurrence, biographical information about the arrestee (including age, race and gender), and the circumstances that gave rise to the stop, seizure of the marijuana, and arrest.   We requested that the data be provided to the plaintiffs' counsel on a quarterly basis. The City failed to adopt the remedial measures proposed by plaintiffs or to undertake any steps to remedy the racially disparate practices related to marijuana arrests.

Respectfully submitted,

/s/ David Rudovsky, Esquire

/s/ Paul Messing, Esquire

Kairys Rudovsky Messing & Feinberg, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400

/s/ Mary Catherine Roper, Esquire
ACLU of Pennsylvania
PO Box 40008
Philadelphia, PA 19106

/s/ Seth Kreimer, Esquire
University of Pennsylvania Law School
3900 Chestnut Street
Philadelphia, PA 19104

Counsel for Plaintiffs[14]

---

[14] Counsel express their appreciation to a number of volunteer lawyers and law students who have donated hundreds of hours of time in this project.   Special thanks to Solena Laigle and Jonathan C. Dunsmoor who have organized and structured the data collection and student reviews.