IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | C.A. No. 10-5952 |
| | : | |
| v. | : | |
| | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

# DEFENDANTS' SECOND REPORT TO COURT AND MONITOR[1]

## I. Introduction

### A. Procedural History

The City, rather than restating Plaintiffs' Procedural History in its entirety, is in agreement with Plaintiffs' recitation, except for the following issues.

1. Plaintiffs' averments that high rates of stops and frisks undertaken by the Philadelphia Police Department ("PPD") were done so without reasonable suspicion is disputed by the City. The disparity in statistics between the parties is in large part due to incomplete paperwork, improper narratives used by police officers, and an overall lack of credibility in the electronic data because of a faulty electronic tracking and auditing system.[2]

2. The stops considered by Plaintiffs' Third Report were conducted after the PPD began a re-training of police officers; however, that re-training is not complete. In fact, Plaintiffs' counsel will have an opportunity to participate in further training of Police Inspectors on March 28, 2013. In addition to these measures, the PPD has also undertaken an initiative to

---

[1] Defendants submit their Second Report in response to Plaintiffs' Third Report. Because Defendants' did not send a report in response to Plaintiffs' Second Report, the Defendants will address the issues outlined in that report in response to Plaintiffs' Fourth Report, which Defendants anticipate will include the same analysis.

[2] The parties have held several meetings to discuss the City's plan to develop a comprehensive electronic tracking system for the 75-48A Forms, as well as a revamping of the auditing process.

promote and train more Inspectors and designate personnel solely committed to the management of the electronic 75-48A process.

## B. The Data Review Process

The PPD has established a process where all stops recorded on 75-48A forms either completed electronically or by paper forms, which are then manually data entered in the PPD database. PPD Inspectors then conduct audits of a random sample of data to determine whether a stop and frisk was recorded properly and conducted with reasonable suspicion. Those Inspector Audits then go through another level of review, where the Internal Affairs Division conducts their own audit of the Inspectors' work. At the end of each quarter, the PPD randomly selects approximately 3200 pedestrian and car stops that are subsequently turned over to the Plaintiffs.[3]

In response to Plaintiffs' findings of significant problems in the implementation of the electronic database, the City has investigated those issues and has concluded that the electronic database, as it exists, is not capable of producing comprehensive and error free data for the purposes of the Consent Decree ("Agreement").

The City can produce the relevant data as required by the Agreement; however, it cannot do so without delay and without electronic 75-48A files missing from the database. The Philadelphia Police Department ("PPD") has implemented patches in order to improve its ability to comply with the Agreement. For example, the PPD is compiling hard copies of the 600 or so missing electronic 75-48A files, and forwarding them to Plaintiffs for their review. In addition to this work, the City and the PPD have found that it is necessary to create an entirely new

---

[3] As Plaintiffs noted in their Third Report, the data is provided by the PPD in accordance with a stipulated schedule signed into Order by the Court.

database that will function more efficiently and be capable of producing more complete sets of data as required by the Agreement.

The process of creating a new electronic database has begun, with the enlistment of an IT Project Manager, who has interviewed all pertinent parties to gather requirements for the new system. The Project Manager is now creating the new electronic 75-48A form, which will then be followed by the creation of a new mechanism that will assist the Inspectors with their Audits of the data on a quarterly basis.[4] The PPD plans to have a new electronic system implemented by December 31, 2013, and will provide Plaintiffs with periodic progress reports and access to the PPD personnel charged with the creation of the new system.

## II. Police Review of 75-48A Forms in First and Second Quarters, 2012

### A. Fourth Amendment Analysis

Pursuant to the Agreement, PPD Inspectors were provided a random sample of 75-48A Reports to review and audit on a quarterly basis. These samples were provided to Plaintiffs for their review. For the first and second quarters of 2012, each PPD Inspector reviewed and audited approximately 400 75-48A Reports each quarter. As a result, the eight PPD Inspectors reviewed a total of approximately 3,200 75-48A Reports per quarterly audit. In addition, Internal Affairs conducted quarterly reviews and audits of a random sampling of the approximately 3200 75-48A Reports audited by the Inspectors. See Audit Statistics Citywide for 1Q and 2Q 2012 incorporated at pages 5 – 6 of this Report.

For purposes of this Report, the City will provide information based on the City-wide audits and reviews conducted by the Internal Affairs Division. The audits conducted by Internal Affairs provide an analysis of whether the stops and frisks for the period of January through June 2012 were supported by the requisite reasonable suspicion consistent with the Fourth and

---

[4] The City and PPD have committed to allotting sufficient funds to create and implement this new electronic system.

3

Fourteenth Amendments.[5] Further, the audits provide a racial breakdown of the individuals subjected to stops and frisks for the period of January – June 2012.

---

[5] Under the Section titled "Error Rates", the PPD lists several error types that provide the basis for this Report. Specifically, "Basis for Stop Missing" is an analysis of whether reasonable suspicion for a stop existed; "Reasonable Suspicion Missing" is an analysis of whether reasonable suspicion for a frisk existed; and "Probable Cause Missing" is an analysis of whether probable cause for a search existed.

# Audit Statistics Citywide for 1Q2012

Total Number of Audits performed for 1Q2012: 3625

## Counts by Race

| | |
|---|---|
| White | 1129 |
| Black | 2126 |
| Asian | 98 |
| American Indian | 18 |
| Other* | 254 |
| Total | 3625 |

* - (Includes Latino(no race selected), UNK, Unknown or missing)

## Actions Taken

| Action | Total | White | Black | Asian | American Indian | Other* |
|---|---|---|---|---|---|---|
| Arrested | 286 | 84 | 187 | 4 | 0 | 11 |
| Searched | 352 | 140 | 192 | 9 | 1 | 10 |
| Frisked | 459 | 104 | 324 | 5 | 0 | 26 |
| TVR Issued | 667 | 256 | 307 | 39 | 7 | 58 |
| Livestop | 2 | 0 | 2 | 0 | 0 | 0 |

* - (Includes Latino(no race selected), UNK, Unknown or missing)

## Error Rates

| Error Type | Total | White | Black | Asian | American Indian | Other* | % of Total Audits |
|---|---|---|---|---|---|---|---|
| Race Info Misisng | 14 | 6 | 3 | 0 | 0 | 5 | 0.39% |
| Location Missing | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| Basis for Stop Missing | 107 | 16 | 82 | 0 | 0 | 9 | 2.95% |
| Reasonable Suspicion Missing | 30 | 7 | 23 | 0 | 0 | 0 | 0.83% |
| | | | | | | | 7.89% |
| | | | | | | | 9.71% |
| | | | | | | | 12.66% |
| | | | | | | | 18.40% |
| | | | | | | | 0.06% |

5

| | | | | | |
|---|---|---|---|---|---|
| Probable Cause Missing | 4 | 1 | 3 | 0 | 0 | 0.11% |
| Subjects Personal Info Missing | 24 | 5 | 19 | 0 | 0 | 0.66% |
| Officer Payroll Missing | 3 | 2 | 1 | 0 | 0 | 0.08% |
| Officer Signature Missing | 2 | 2 | 0 | 0 | 0 | 0.06% |
| Supervisor Payroll Missing | 169 | 42 | 120 | 3 | 4 | 4.66% |
| Supervisor Signature Missing | 180 | 29 | 143 | 6 | 2 | 4.97% |
| Other Information Missing | 324 | 61 | 226 | 14 | 22 | 8.94% |

\* - (Includes Latino(no race selected), UNK, Unknown or missing)

## Audit Statistics Citywide for 2Q2012

Total Number of Audits performed for 2Q2012: 3516

### Counts by Race

| Race | Count |
| --- | --- |
| White | 1054 |
| Black | 2164 |
| Asian | 66 |
| American Indian | 13 |
| Other* | 219 |
| Total | 3516 |

* - (Includes Latino(no race selected), UNK, Unknown or missing)

### Actions Taken

| Action | Total | White | Black | Asian | American Indian | Other* |
| --- | --- | --- | --- | --- | --- | --- |
| Arrested | 257 | 61 | 179 | 1 | 0 | 16 |
| Searched | 316 | 101 | 195 | 1 | 1 | 18 |
| Frisked | 425 | 83 | 309 | 2 | 0 | 31 |
| TVR Issued | 595 | 211 | 317 | 22 | 3 | 42 |
| Livestop | 2 | 0 | 0 | 0 | 0 | 2 |

* - (Includes Latino(no race selected), UNK, Unknown or missing)

### Error Rates

| Error Type | Total | White | Black | Asian | American Indian | Other* | % of Total Audits |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Race Info Misisng | 11 | 4 | 5 | 0 | 0 | 2 | 0.31% |
| Location Missing | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| Basis for Stop Missing | 75 | 15 | 57 | 0 | 0 | 3 | 2.13% |

7

| | | | | | |
|---|---|---|---|---|---|
| Reasonable Suspicion Missing | 33 | 7 | 25 | 0 | 0.94% |
| Probable Cause Missing | 2 | 0 | 2 | 0 | 0.06% |
| Subjects Personal Info Missing | 20 | 6 | 14 | 0 | 0.57% |
| Officer Payroll Missing | 7 | 3 | 4 | 0 | 0.20% |
| Officer Signature Missing | 1 | 1 | 0 | 0 | 0.03% |
| Supervisor Payroll Missing | 209 | 46 | 134 | 2 | 27 | 5.94% |
| Supervisor Signature Missing | 191 | 50 | 137 | 2 | 2 | 5.43% |
| Other Information Missing | 350 | 84 | 233 | 7 | 3 | 23 | 9.95% |

\* - (Includes Latino(no race selected), UNK, Unknown or missing)

Over the first and second quarters of 2012, Internal Affairs reviewed and audited a total of 7,141 75-48A Reports. As a result of the Internal Affairs audit process, the City contends that 6959 pedestrian/vehicle stops were made with the requisite reasonable suspicion and 182 pedestrian/vehicle stops were made without the requisite reasonable suspicion. Of 884 frisks conducted by PPD, 821 were made with the requisite reasonable suspicion and 63 were made without the requisite reasonable suspicion. In addition, the Audit Statistics Citywide forms provide a racial breakdown of those individuals subjected to frisks, searches and arrests. This racial breakdown includes a category labeled "Other", which accounts for the Latino population.

### B. Commentary

The City will address each of Plaintiffs' conclusions and concerns in the order as they appear in Plaintiffs' Third Report:

1.  The disparity between Plaintiffs' and the PPD's analysis of the data should *not* lead to the conclusion that about half of all stops and frisks are conducted without reasonable suspicion and thus unlawful. Clearly, a disconnect exists between the analyses conducted by Plaintiffs' and the PPD personnel tasked with auditing the data. Inspectors and IAD Investigators possess a knowledge and training to read and understand the narratives provided by police officers. While these narratives may not at times comport to the requirements established in the Agreement, they do not in and of themselves constitute an unconstitutionality of the stops and frisks. The Inspectors and IAD Investigators comprehend what the officers are describing and are crediting stops as lawful based on their familiarity with the verbiage used by the officers.

The City and the PPD have made many strides towards bringing police officers' reporting of stops and frisks in line with constitutionally required standards. First, Directive 54 of the PPD Directives has been amended to provide more guidance and clarity into what information is

9

required on 75-48A forms. Second, the PPD has installed newly promoted Inspectors who have been trained to audit stops and frisks. These new Inspectors are dedicated to this process, and are being provided with the resources and oversight capabilities required to successfully carryout their functions. Finally, in addition to the re-training provided to police officers, the PPD provided a forum for Plaintiffs' counsel to offer their interpretation of what are constitutional stops and frisks directly to PPD personnel. On March 28, 2013, together with the PPD Plaintiffs' counsel participated in a training session designed to further educate police personnel on lawful stops and the proper way to articulate the reasons for stops and frisks.

2. The lack of recording of frisks in reports of gun possession, gun shots fired, and burglary is indicative of the difficulty the PPD has had in having the 75-48A Forms properly created. Clearly the recording system needs to be re-vamped and officer re-training is required, because frisks do occur when suspects are stopped for gun-related offenses, and those frisks arise from reasonable suspicion.

3. The City renews its reservations with respect to the significance of "hit-rates" in assessing the legality and effectiveness of stop and frisk practices. Assessing and utilizing a "hit-rate" in the analysis of stops and frisks would also have to take into consideration an officer's discretion to not arrest an individual for what is considered or perceived as minor/nuisance offenses. By removing this type of discretion, the "hit-rate" could be substantially increased. Plaintiffs themselves even acknowledge that courts have not quantified the reasonable suspicion standard in terms of expected hit rates for contraband, yet still surmise that reasonable suspicion did not exist for a large number of stops without offering any standard to support their conclusions.

Plaintiffs' counsel has mischaracterized the purpose of stops and frisks, which is a well-recognized law enforcement tool. The PPD has made a concerted effort to implement many law enforcement strategies in order to reduce crime, specifically violent crime. While the recovery of illegal weapons is something any law enforcement agency strives for, it is not in and of itself the only reason why the police department conducts its investigative techniques. Plaintiffs have put the cart before the horse when they state a low recovery rate for contraband can only be explained by a high rate of unconstitutional stops and frisks. When conducting audits, the analysis begins with the determination of whether there exists reasonable suspicion for the stop and frisk, and not whether contraband was recovered thus validating the stop and frisk.

Finally, Plaintiffs point to data that a reduced number of stops and a drop in violent crime can only lead one to conclude that the reducing stops further will not risk public safety. What this data actually shows is that stop and frisk, as a law enforcement technique, is working and the reduction in violent crime can be explained by the implementation of several police tactics. Plaintiffs themselves even admit that Philadelphia has reduced the number of stops, but to go a step further and say a further reduction in stops will not harm public safety is conclusion offered without the support of empirical evidence.

4.  The City and the PPD agree that "loitering" and "loitering-related" narratives account for a high percentage of improper stops. As a result, we have undertaken substantial steps to address this area of concern. Specifically, PPD implemented Bridging the Gap Curriculum, which is mandatory training to be taken by all police officers. The course has been offered from October 2011 through the present. As of May of 2012, 3,649 sworn personnel have been trained through this program. After several meetings with Plaintiffs' counsel, the PPD agreed to provide counsel with an opportunity to participate in a training program designed to

further identify narratives being used that do not adequately describe the basis for lawful stop.[6] It has long been the PPD's position that such faulty narratives are not the result of an unlawful stop, but that of improper paperwork.

The City and the PPD have worked tirelessly to implement a proper and reliable method for recording stops and frisks in order to provide dependable data to Plaintiffs' counsel and the ACLU. In addition to these efforts, the PPD has implemented, and continues to establish, further training of police personnel in the form of written directives, memoranda, and actual classroom style training. Plaintiffs agree with the City and PPD that the electronic database is particularly flawed. The PPD continues to work on the creation and implementation of a new database, devoted to providing reliable data not only to Plaintiffs but also for the benefit of police officers to assist in carrying out their duties.

### III. Racial Disparities In Possession Of Marijuana Arrests

Pursuant to the Stipulated Order for Compliance with the Consent Decree, the PPD has provided marijuana related arrest reports for a two-month period (September 15 – November 15) and will continue to provide those reports on an annual basis for the same two-month period. The City and the PPD have not conducted a statistical analysis of the data as of yet, but take issue with Plaintiffs characterization of the arrests as being a harbinger of racial discrimination.

#### A. Possession of Marijuana Arrests in the City of Philadelphia

Plaintiffs point to a chart included in their Second Report as evidence that marijuana use is higher among Whites than African Americans. However, the characterization of this data is misleading. The chart shows that in 2008-2009 almost 60% of Whites stated they had ever used marijuana in their lives, as opposed to 50% of African Americans. However, when both Whites

---

[6] As noted above in this report, Plaintiffs' counsel participated in a March 28, 2013 training session where a discussion of what a proper narrative for a stop and frisk should articulate.

and African Americans were asked if they used marijuana in the last month, according to the chart both demographics registered at 20%. Assuming these numbers are indicative of marijuana use in Philadelphia[7], to claim that marijuana is consistently used more by Whites than African Americans because those persons asked admitted to have tried marijuana at least once in their lives is erroneous.

### B. Possession of Marijuana Arrests By Philadelphia Police District

Besides reciting the raw data surrounding the number of marijuana arrests by police district, Plaintiffs fail to provide any analysis that would lead to a reasonable conclusion. Plaintiffs admit in their Third Report that other factors such as crime patterns and increased police deployment in high crime areas play a role in examining the factors leading to marijuana arrests. Yet these factors are not ultimately considered when Plaintiffs assert that police protocols are linked to racial discrimination.

In addition to police deployment, there are other factors that must be taken into consideration. A further evaluation into how, where, and when marijuana is used by race and socio-economic factors could more accurately provide an understanding as to why the data shows more African Americans are being arrested for possession of marijuana. Also, Plaintiffs' breakdown of the marijuana arrest data also does not take into account the usage of marijuana "off the street". This type of use and possession of course cannot be accounted for via stops and frisks conducted by police officers on the street.

### C. Commentary

Plaintiffs' have suggested the City and PPD to take steps to further train and supervise officers with respect to the City's stop and frisk police, and with marijuana arrests. As stated

---

[7] The data provided by Plaintiffs' counsel is not tailored to the City of Philadelphia, but instead constitutes a National study into marijuana use.

13

previously in this report, the City and PPD have amended police directives, issued memoranda, and implemented training programs for existing officers and for new recruits. The City and the PPD have made Inspectors and IAD Investigators available to Plaintiffs' counsel in order to achieve a better understanding among the parties and to bridge the gap between each sides' interpretations of the data.

In addition to training and investment into human capital, the PPD has and continues to improve its technological capabilities in order to more accurately capture the data required by the Consent Decree. Ultimately, the data that is now being provided to Plaintiffs' counsel is not as accurate as it can and should be. Until we have a working database with data integrity, the statistics cannot be relied upon to support a conclusion that over half of the stops and frisks conducted in the City of Philadelphia are done so without reasonable suspicion, and thus are unconstitutional.

Respectfully Submitted,

/s/ Craig M. Straw
Craig M. Straw, Esquire
Chief Deputy City Solicitor

Dimitrios Mavroudis, Esquire
Pa. Attorney ID No. 93773
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5433
dimitrios.mavroudis@phila.gov