# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Mahari Bailey, et al., | : | |
| Plaintiffs | : | C.A. No. 10-5952 |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia, et al., | : | |
| Defendants | : | |

## PLAINTIFFS' FOURTH REPORT TO COURT AND MONITOR
## ON STOP AND FRISK PRACTICES

## I. Introduction

### A. Procedural History

On June 21, 2011, the Court approved a Settlement Agreement, Class Certification, and Consent Decree ("Agreement") in this matter.   On February 6, 2012, plaintiffs submitted their First Report which analyzed stop and frisk data for the first two quarters of 2011.   The First Report focused on Fourth Amendment issues, and specifically whether there was sufficient cause for the stops, frisks, and searches reported by the Philadelphia Police Department ("PPD").   The audits showed very high rates of stops and frisks undertaken without reasonable suspicion.

Plaintiffs' Second Report was submitted in July 2012, and included (1) a Fourth Amendment analysis of the Third Quarter 2011 stop and frisk data, (2) a racial analysis of the data for the First and Second Quarters, 2011, and (3) a racial analysis of possession of marijuana arrests for the period September 15-November 15, 2011.   Plaintiffs reported continued high rates of stops and frisks without reasonable suspicion.   On the question of racial disparities, plaintiffs' expert, Professor David Abrams, considered the benchmarks that had been agreed upon by the parties as metrics that should be used in this analysis.   Professor Abrams also conducted a series of regression analyses and concluded that the racial disparities in stops and frisks (numbers by race

compared to census data) were not fully explainable by non-racial factors.   Further, the analysis of marijuana arrests showed even more pronounced disparities, with African-Americans and Latinos constituting over 90% of all marijuana arrests.

Plaintiffs' Third Report focused on stop and frisk practices for the first two quarters of 2012, from the perspective of compliance with Fourth Amendment standards.   Plaintiffs also presented an analysis of the marijuana arrests for the period September 15-November 15, 2012. In the Third Report plaintiffs found a rate of non-compliance with Fourth Amendment standards of over 40%.   In response, the City has stated that the PPD is providing additional training, issuing revised auditing protocols, and instituting new accountability measures.

The Fourth Report presents a Fourth Amendment analysis for the First Quarter, 2013 and a racial analysis for stops and frisks for the first two quarters, 2012.[1]

### B.   The Data Review Process

Plaintiffs have established a careful and comprehensive review process of the stop and frisk data provided by the Police Department.   Each quarter, we are provided data from approximately 3200 randomly selected pedestrian and car stops.   For the Fourth Amendment analysis, we consider only pedestrian stops.   Counsel for plaintiffs and trained law students independently review each pedestrian stop and frisk under guidelines that incorporate the standards set forth in the Agreement and by the United States and Pennsylvania Supreme Courts.[2] We accept at face value the reasons stated by police officers for the stops and frisks, and make

---

[1] The lag time is attributable in part to the flaws in the current electronic data system, but the parties are hopeful that a new system will be in place in early 2014.

[2] These reviews show a very high level of agreement between counsel and the law students as to the propriety of stops and frisks.   This Report is based on counsel's reviews.

assessments based solely on whether these reasons comport with standards established by the Agreement and the Fourth Amendment.   In close cases, we credit the stated basis for the stop and frisk.

Counsel for plaintiffs have discussed the appropriate Fourth Amendment standards with Inspectors in the PPD.   Along the same lines, plaintiffs have provided to the City a breakdown of the categories of stops and frisks that were found to have most frequently resulted in improper police interventions.[3]  As noted, the City has stated that changes are being made in the Department's audit process, including the assignment of Deputy Commissioner Nola Joyce to oversee the implementation of the Agreement, the assignment of new Inspectors to ensure more accurate reviews and a more effective system of accountability, and reviews by the PPD Office of Standards and Accountability.   A September 6, 2013 audit of stops made for 2013, Second Quarter, by the Office of Standards and Accountability reported an improper stop rate of 37% for patrol officers.

## II.   Review of 75-48a Forms, First Quarter, 2013

### A.  Fourth Amendment Analysis

In this section, plaintiffs set forth their findings and assessments on the issue of whether stops and frisks for the first quarter of 2013 were supported by the requisite reasonable suspicion.[4] As in previous audits, in assessing whether reasonable suspicion existed for the stop or frisk, we fully credited the narrative information provided by the officer and in "close" cases credited the

---

[3] See, infra, 8-9.

[4] The review process was the first using the PPD electronic database. As noted, this system had design deficiencies and the City is currently developing a new electronic data base to enable the parties to make more timely and efficient audits.

assertion of reasonable suspicion.[5]

Pedestrian stops were made without reasonable suspicion in approximately 43% of the cases.   Frisks were conducted without reasonable suspicion in over 50% of the cases.   By race, 76% of the stops were of minorities (African-Americans and Latinos) and 79% of the frisks were of minorities.

---

[5] With respect to frisks, we have created a third category for analysis.   Where the stop was impermissible, but the reasons for the frisk were otherwise proper, we recorded the frisk as "the fruit of the poisonous tree."   Under this doctrine, the evidence that was seized would likely be suppressed due to the improper stop.   *See* note 7, *infra*.

## First Quarter, 2013

| *Pedestrian Stops*[6] | | *Pedestrian Frisks*[7] | |
|---|---|---|---|
| Number of Pedestrian Stops | 1126 | Number of Pedestrian Frisks | 196 |
| Stops with Reasonable Suspicion | 639 | Frisks with Reasonable Suspicion | 77 |
| Stops without Reasonable Suspicion | 487 | Frisks without Reasonable Suspicion | 106 |
| "Non-Stops" (e.g., arrests, request for assistance) | 203 | Frisks with RS following Stop w/o RS ("Fruit of the Poisonous Tree") | 13 |



First Quarter, 2013: Presence of Reasonable Suspicion to Stop

Reasonable Suspicion 57%
NO Reasonable Suspicion 43%

First Quarter, 2013: Presence of Reasonable Suspicion to Frisk

Reasonable Suspicion 39%
NO Reasonable Suspicion 54%
Fruit of the Poisonous Tree 7%

---

[6] From the data base provided by the City, we have excluded "stops" that were sight arrests (based on probable cause) or "stops" that were not investigative in nature, e.g., a person turning herself in on an outstanding warrant.

[7] Where the police conducted a search based on probable cause or a search incident to an arrest, we did not count that activity as a "frisk." The "fruit of the poisonous tree" category includes frisks that follow impermissible stops, but which were otherwise based on permissible factors. That is, the officers had no legal reason to make a stop, but having done so, the suspect's conduct would otherwise justify a frisk. The Fourth Amendment would usually require exclusion of any evidence found in this situation.

***Contraband***

Contraband Recovered Total        36

Guns Recovered                    3

***Hit Rates* (fraction of stops)**

Contraband Recovered              2.93%

Guns Recovered                    0.27%

Arrests[8]                        4.14%





---

[8] We recognize the limitations in using arrest data as a benchmark for "hit-rates."   On one hand, the number may be too low as officers may have probable cause to arrest for very minor offenses, but properly exercise their discretion not to make a custodial arrest (as opposed to a citation or verbal warning).   On the other hand, the number may be inflated since some arrests are based not on the conduct observed, but on post-stop information received, such as an outstanding warrant.   Further, a number of arrests were made on probable cause of criminal activity and thus are not counted in this report as arrests that resulted from a stop and frisk. The parties will further discuss this data question before we issue the next Report.

**B.   Commentary**

There are a number of significant findings from the data review.

1.   43% of all stops and over 50% of all frisks were made without the requisite reasonable suspicion.   These results are not appreciably different from the data reviews for 2011 and 2012, as set forth in the First, Second, and Third Reports.   Thus, tens of thousands of persons in Philadelphia continue to be stopped each year (and a significant number frisked) without reasonable suspicion.

2.   As with the data for 2011 and 2012, the number of recorded frisks continues to be very low, with only 20% of stops resulting in a frisk.   And, similar to previous data reviews, a review of stops in which the police reported suspicion regarding possession of a gun or a violent crime revealed a large number of cases in which the police reported *no* frisk of the suspect.   Thus, of 79 stops in which guns, gunshots, or a robbery is mentioned as a basis for the stop, there were no frisks recorded on 33 stops.

3.   The hit rates were again quite low.   Contraband of any kind was recovered in only 36 stops (2.93% of all stops) and 3 guns were seized (.27 of 1 %).   Arrests occurred in 4.14% of all stops, excluding arrests made on observations that amounted to probable cause even before a stop or frisk was conducted. While the courts have not quantified the reasonable suspicion standard in terms of expected hit rates for contraband (or for guns and other weapons), the hit rates in Philadelphia appear to be well below a reasonable threshold.   In other words, if there was reasonable suspicion for all stops and frisks, there should be far more than a 2.93 % chance of recovering contraband.   Moreover, in a program designed to remove guns from the street, there should be a far higher percentage of stops that yield guns than the current 0.27%.

Reduction in the number of impermissible stops and frisks does not create a risk to public safety.   New York City has recently released data on its stop and frisk practices for 2012, reporting a significant reduction in the number of stops *and* a decrease in violent crime, and in particular homicides.

4.   Analyzing improper stops and frisks by category, the results were quite similar to those for 2011.   As we have reported to the City, there continue to be significant numbers of stops for conduct which the Agreement and case law make clear are not justifiable grounds for stops or frisks.   These include:

- loitering (or persons hanging out; congregating)[9]

- investigation of passenger in stopped car

- involved in a disturbance

- single person "obstructing" the sidewalk

- anonymous information (e.g., man with gun; man with drugs)

- person on steps of "abandoned" property

- person involved in verbal dispute (non-domestic)[10]

- high crime area/roll call complaints

- panhandling

- flash information (e.g., theft or robbery), but where officer states that suspect did not match the flash information

- curfew or bar checks where person was well over 21 years of age

As for frisks, problematic grounds include:

---

[9]  The PPD has again instructed officers that "loitering" is not a valid basis for a stop.   And while the number of such stops has decreased, the PPD has recognized that officers are using other vague narratives (e.g. blocking buildings) to justify stops.   PPD, September 6, 2013 Audit.

[10]  We credit reports of "domestic" disputes.

- frisk for officer protection

- frisk based on narcotics investigation

- frisk because suspect stopped in high crime or high drug area

We have previously written:

> "Plaintiffs did not expect that the transition from a stop and frisk practice that lacked any meaningful oversight to a system that accurately tabulates all stops and frisks and in which there is substantial compliance with the Constitution would be immediately successful.   On the technology front, the initial design of the data base was flawed, but the City is moving to implement a new system.   On the issue of whether stops and frisks are being conducted consistent with established legal standards, and in particular only where reasonable suspicion supports the stop or frisk, the results of our audits through the first two quarters of 2012 reflect persistent and unacceptably high rates of improper actions.   Unless there is a dramatic change in practices, we will be compelled to seek judicial relief." Third Report, at 11.

Plaintiffs adhere to this position and are concerned by the lack of significant progress. With a new electronic data system for 2014 and new audit and accountability measures in places, we expect significant improvements in 2014, and will seek sanctions from the Court if necessary.

### III.   Racial Analysis of Stop and Frisk Practices, January-June, 2012

#### A. Introduction

This section sets forth a statistical analysis of the "Stop and Frisk" practices of the PPD for the first half of 2012, conducted by plaintiffs' consultant and economics' expert, David Abrams.   The benchmarks to be used in the analysis were described in detail in a Memorandum dated November 9, 2011, and attached to Plaintiffs' First Report.

In creating benchmarks to measure compliance of the PPD with the terms of the Agreement, we considered several criteria. First, the benchmarks are designed to be straightforward in terms of computation and interpretation.   Second, they are designed to

measure characteristics at the core of the Agreement, namely compliance with the Fourteenth Amendment.   Third, they consider other potential explanations for patterns in the data beyond suspect race.   The benchmarks are based on a combination of those discussed and used in *NAACP v. City of Philadelphia,* academic literature on the topic, and those used recently in other jurisdictions, as described in Plaintiffs' Second Report.

In a recent opinion in *Floyd v. City of New York*, 2013 U.S. Dist. LEXIS 113271 (S.D.N.Y. August 12, 2013), *stayed pending appeal, Second Circuit Court of Appeals,* November 13, 2013, the court engaged in an intensive analysis of competing benchmarks submitted by the plaintiffs and the City in the New York City class action stop and frisk litigation.   The court credited the approach of plaintiffs' expert, Professor Jeffrey Fagan (Columbia Law School) who examined data on all stops in New York City from 2004 through 2009. Professor Fagan used a regression technique similar to that detailed in the benchmarks that have been approved by the parties in *Bailey*.   Professor Fagan considered the impact of the racial composition of a district on the likelihood of being stopped, arrested, or issued a citation.   Additional outcomes included gun and other weapon seizures, and contraband seizures. Professor Fagan controlled for various district characteristics, including age composition, racial composition, crime complaints, police patrol strength, socioeconomic status, population, foreign born population, business district status, and time controls.

**B. Summary of Differences from 2011 Analysis**

The results of the 2012 Q1 and Q2 analysis are detailed below, but we first provide a brief summary of differences between this time period and that of the year prior.   The demographic makeup of individuals stopped is substantially the same as before, with young black males still comprising the largest portion.   The location of stops in the sample has changed somewhat, with some districts, like the 1st, 6th, and 17th, comprising a substantially higher share of the data, and others, like 12th, 14th, 15th, and 25th, a substantially smaller share.

The biggest difference between 2011 and 2012 is the large decline in arrests, frisks, and discovery of contraband resulting from stops.   Each of these rates has dropped almost in half in a year's time.   While these declines are substantial, as detailed in Section II, supra, the rate of unfounded stops and frisks remains extremely high at a rate over 40%.

The regression results show some similarities and some differences from 2011 as well. As in 2011, Blacks are stopped at higher rates than Whites, a fact that is undiminished by controlling for a multitude of individual and district characteristics.   Blacks are also frisked at substantially higher rates than Whites, a result that was found in 2011 as well. In 2012 we find evidence that the rate of unfounded stops of Blacks is significantly greater than that of Whites, something that was not the case in 2011.

## C.   Summary of the Stop and Frisk Data

We examined data from Q1 and Q2 2012 pedestrian stops. The sample dataset includes 1,848 total pedestrian stops.   The median age of a detainee is 28 and 85% of detainees are male (Figure 1).   Blacks account for 67% of those stopped, Whites comprise 23%, and 9% are (non-Black) Latinos. The demographic characteristics of individuals stopped are similar to those from the 2011 pedestrian stops.   The number of stops varies substantially by district, with the 24th, encompassing the Port Richmond area (Figure 2), accounting for the most, with 10%.   As in 2011, the fewest stops are in the 5th, which includes Roxborough, and accounts for just 1% of all stops.

Table 1 reports stop, frisk and arrest rates for pedestrian stops broken down by race. Approximately 17% of stops of Black or Latino suspects lead to a frisk, considerably higher than the 11% rate for Whites.   Blacks and Latinos are also searched at a substantially higher rate than Whites, about 10% and 13% of the time versus 6%.   8.8% of stops of Blacks lead to arrest; Whites are at 5.3%; and Latinos at 12.7%.   As noted above, arrest rates are imprecise measures of the legality of stops and frisks.   The decision to arrest is highly discretionary (e.g., where a person may be acting in a disorderly fashion, has an open liquor container, curfew or truancy violations).   Further, to determine whether

the arrest rates are related to improper racial considerations, a more precise analysis of the reasons for the stops by race is necessary.

## D.   The Fourteenth Amendment Analysis

The question of whether race is impermissibly used as a factor in the decision to stop, frisk, search or arrest from cannot be answered by a simple comparison of stop and frisk rates to census data.   Non-racial factors may explain the disparities.   However, the stop rate/census comparison is the first step in this process.   As set forth in Table 1, the stop rate by race in comparison to the census is as follows:

Black stops=67%; Black census=43.4%

White stops=23%; White census=41%

Latino stops=9%; Latino census=12.3%

To inform the Fourteenth Amendment analysis regarding racial fairness of stops, we examined whether the number of stops lacking reasonable suspicion varied by race or Latino identity.   Table 2 shows little variation by race in the share of stops lacking reasonable suspicion, which ranged from 40% for Latinos to 42% for Whites to 44% for Blacks.   While the differences for the racial groups do not appear to vary significantly, this analysis does not include relevant control variables that are considered below.   There is more variation by race in frisks, with 44% of frisks of Latinos lacking reasonable suspicion, compared with 56% of frisks of Blacks and Whites that lack reasonable suspicion.

## 1.   Regression Analysis

To address non-racial influences, we move to a multivariate regression analysis.   This approach is more robust than a comparison of averages because it examines the relationship among multiple variables simultaneously.   To determine the impact of suspect race on the likelihood of a stop or frisk, we controlled for factors that include the demographic makeup and crime rate of the neighborhood.

**(a) Addition of Census and Crime Data**

In this section, we add data collected from the U.S. census as well as Uniform Crime Report data on reported crimes, by district. We begin by examining differences in overall stop rates by race in Table 5.   This table and those that follow share the same format: each column in the table reports results from a separate regression that identifies the relationship between the variables listed in the first column and the dependent variable.   For example, regression 2 can be written as:

$$(1)$$

*Stop Rate* is the number of stops in the sample examined per 10,000 residents in a district and *Black* is coded 0 if the detainee is White and 1 if the detainee is Black.   Similarly, *Hispanic* is coded 1 if the detainee is Hispanic and zero otherwise.   Age is the detainee's age in years.   By including 3 variables in the equation, this regression can better isolate the impact of race and Hispanic identity on the likelihood of being stopped, even if age is an important factor in stop rate.   The coefficient on *Black* found in column 2 is 7.702, which means that in the sample about 7.7 more Black individuals were stopped than White individuals for every 10,000 residents of a district.   The standard errors are reported in parentheses below the coefficient and the double stars on the standard error indicates that this result is statistically significant at better than the 1% level.   This means that there is less than a 1% chance that the difference in stop rates between Blacks and Whites is zero.

At first blush 7.7 extra stops per 10,000 residents, out of hundreds of thousands of annual stops in Philadelphia, may not seem significant.   The 2010 Census counted 1,526,006 residents of Philadelphia, so this would translate to a difference of 1,175 stops city-wide in the first two quarters of 2011.   But these numbers are from the randomly selected sample of all stops.   In order to determine the total difference we must adjust for the share of overall stops included in the sample.   The total number of pedestrian stops in 2012 was approximately 216,000 and, therefore, the expected disparity in annual stops citywide is

approximately 69,600 or 32% of the total annual stops.

A racial disparity in stops should be expected based on differences in population composition. The 2010 Census reports similar levels of Black and White population shares in Philadelphia, with Blacks accounting for 43.4% and Whites 41.0%.   It is possible to examine variation in the share of Black stops by district, reported in Table 6.   The table reports the share of stops in each district that are of Blacks as well as the Black population share.   The final column computes the ratio of Black stop share to Black population share. Significantly, in all districts Blacks are stopped at rates higher than their population share. In some districts Blacks are stopped at several times the rate of the population share. There is substantial variation across districts in the ratio of Black stops to Black population. As discussed below, it is unlikely that crime rate variation can explain the extent of the differences.

There may be reasons other than race that Blacks are stopped at higher rates.   For example, if Blacks tend to be younger on average, since more crime is committed by younger individuals, one might expect a higher stop rate for blacks.   We controlled for this factor (as in equation 1 above) and others relevant to this issue.   Column 2 in Table 5 controls for detainee age and adds Latino identity.   Column 3 controls for the district racial composition as well as the share of the male population under 24 years of age.   Even after adding these controls, the coefficient on Detainee Black (7.345) is still very similar to what it was with only two controls.   The 4th column includes a control for whether flash information led to the stop, which does not have a statistically significant influence on the stop rate.   Column 5 adds the district racial composition as well as employment rate to the regression.   Since poor economic conditions are associated with higher crime, higher stop rates could be explained by low employment rates.   The effect is statistically significant, but does not mitigate the impact of race, as the coefficient on *Black* in this regression is 8.153.

The final four columns add different controls for district crime rates.   The crime rates are based on crimes reported to the police (not arrests) in 2010.   It is preferable to use lagged

crime because current crime levels could be influenced by policing policies.   In each case, districts with higher crime rates have more stops, but controlling for crime rates does not affect the influence of detainee race on stop rate.

Another potential explanation for higher stop rates of minorities is that they commit crimes at higher rates.   Addressing this concern raises several challenges.   First, we do not have accurate data as to crime rates by race.   There is *arrest* data, but even if arrest data was an accurate measure of crime rates by race, an issue we discuss below, we would need this breakdown on a district by district basis to engage in the proper statistical analysis, and this information was not available.

Second, there is a methodological problem: arrest rates are not independent of stop rates; that is, they are not an unbiased measure of crime.   Higher stop rates of one group will almost certainly lead to higher arrest rates.   Thus, as we explained in Plaintiffs' Third Report to the Court patterns of drug enforcement have far more to say about the racial breakdown of persons arrested for drugs than actual drug use or possession.   This is not to say that arrest rates are solely a function of enforcement, but that the measure is almost certainly a function of stop rates.

Third, there is a legal problem with using crime rates by race to explain disparities in stop rates: as a matter of Equal Protection doctrine, race is an impermissible factor to use when making stops, absent a racial description of a suspect.   Thus, even if race-specific crime rates were available, it may not make sense to use them as controls in the regressions.   *See, Floyd v. City of New York*, *supra*.   Even in high crime areas, the commission of crimes is by relatively few persons and therefore it is problematic to justify higher rates of stops in these communities based on a kind of group-actuarial basis.

**(b)   Reasonable Suspicion for Stops and Frisks**

As the Plaintiffs' previous Reports and Section I of this Report demonstrate, a substantial number of the pedestrian stops do not meet the reasonable suspicion standard.   For the first six months of 2012, approximately 43% of the stops were made without reasonable

suspicion, an improvement of about 9 percentage points from 2011.   *See* Table 2.
Further, we found that the share of frisks without reasonable suspicion increased from 48%
in 2011 to 55% in 2012.

On the issue of race and reasonable suspicion for pedestrian stops, each column in Table 7
reports the results from a separate regression.   In each regression the variable of interest is
Detainee Black and various control variables are added in the different columns.   In most
of the columns the coefficient on Detainee Black is between -.01 and -.07 indicating that
reasonable suspicion was found in 1 to 7 percentage points fewer cases when the detainee
was black.   After including controls for district racial composition, employment rate and
crime rates, these differences become statistically significant (columns 5-9).   The rate of
unfounded Black detainee stops is 6.5 percentage points higher than the comparable rate
for Whites.

Table 8 reports the results of a regression of the rate of pedestrian frisks on detainee race
and various controls.   In each regression, the coefficient on Detainee Black is statistically
significantly different from zero and ranges from about $0.05 - 0.06$.   This indicates that
the frisk rate for Black detainees is $5 - 6$ percentage points higher than for Whites.   Since
the pedestrian frisk rate for Whites is 11%, this translates to a $45 - 56\%$ greater likelihood
for Blacks to be frisked than Whites.   None of the control variables, including age, district
demographic variables, or crime rates diminish this effect.

Table 9 is similar to Table 7 and describes regressions about the rate of reasonable
suspicion, but now for a frisk rather than a stop.   The coefficient on Detainee Black ranges
from about -.04 to -.12 meaning reasonable suspicion is 4 to 12 percentage points less
likely to be found for a frisk when the detainee is Black.   The coefficients on Detainee
Hispanic range between 0 and -.09.   These coefficients are of a substantial magnitude, but
none are statistically significant.   This means there is not enough data to determine
whether these are actually different from zero.

Table 10 reports the results of regressions of the rate of pedestrian arrests on detainee race

and control variables.   Black and Hispanic detainees are substantially more likely to be arrested following a pedestrian stop than White detainees, but unlike in 2011, most of the coefficients on Detainee Black and Detainee Hispanic are not demonstrably significant. Still, the magnitude of the differences are large: a Black detainee is between 28 and 63% more likely to be arrested, depending on what control variables are included, and Latino/non-Latino disparities are even larger.11

## 2.   Hit-Rate Analysis

An important measure of the propriety of stops is the rate at which they lead to the discovery of contraband, and particularly weapons, since frisks are permitted only where the officer reasonably believes that the suspect is armed and dangerous.   Moreover, seizures of weapons are often cited as justification for a robust stop and frisk program. The rates of discovery of contraband are reported in Table 4.   Contraband is categorized as firearms, other weapons, drugs, or other.   "Other" is not included in the table as it is a very rare event, consisting either of small amounts of cash or unspecified materials.

As Table 4 reports, the overall detection rate for firearms is extremely low, with fewer than 1 in 900 pedestrian stops yielding a firearm.   Including other weapons raises the rate to 0.16%, which means a weapon is found fewer than once in 600 stops.   Slightly more than 1 stop in 40 yields drugs.   All of these hit-rates are at least a factor of 2 lower than in 2011, meaning stops are yielding far less evidence of criminal activity.

Table 4 reports results of a basic hit-rate analysis by race and Latino identity (with no control variables).   None of the stops of Whites in the sample yielded firearms or other weapons, while 0.16% of stops (a total of 2 firearms) of Blacks yielded firearms and 0.08% yielded other weapons (1 weapon total).   Table 11 is a more sophisticated approach to the firearms hit-rate analysis.   The regressions report the rate of discovery of a firearm in pedestrian stops.   None of the coefficients on Detainee Black or Detainee Hispanic are statistically significant, but this is likely due to the fact that firearms are very rarely

---

11 Whether the disparities reflect improper discretionary decisions to arrest or are reflective of stops more often justified by reasonable suspicion (or a combination of these factors) is not evident from the data.

discovered.

Drugs are discovered in 2.65% of stops of Black pedestrians, 1.91% of Whites, and in 4.43% of Latino stops.   While suspicion of drug activity may be grounds for a stop, a frisk may not be done to detect drugs.   Further, many of the "stops" for narcotics-related conduct that are recorded by police are actually arrests based on probable cause (e.g., observed drug transactions), and therefore the data is itself questionable on this issue. And, as we have shown in previous reports, drugs are not possessed or used at significantly different rates by different racial groups.   Thus, any assertion that drugs found in stop and frisk practices is a reliable indicator of violations of drug laws by race is highly questionable.

## C.   Conclusion

We have examined the relationship of race to stop and frisk practices from multiple perspectives, following standard statistical theories.   The regression and hit rate analyses are widely approved and provide the most reliable means of measuring racial bias. For the period reviewed, the data show statistically significant racial disparities that are not fully explainable by non-racial factors. If these trends continue into 2014, we will suggest appropriate remedial measures.

**Figure 1**



**Figure 2**



**Table 1**

| STOPS, FRISKS, SEARCHES AND ARRESTS BY RACE, PEDESTRIAN STOPS | | | | | |
|---|---|---|---|---|---|
| | Number of Stops | Share | Stops with Frisks | Stops with Searches | Stops with Arrests |
| Black | 1,247 | 0.684 | 17.6% | 9.9% | 8.8% |
| Latino | 158 | 0.087 | 17.1% | 12.7% | 12.7% |
| White | 418 | 0.229 | 11.0% | 5.7% | 5.3% |

**Table 2**

| REASONABLE SUSPICION FOR PEDESTRIAN STOP BY RACE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | All | | Black | | Latino | | White | |
| | # | % | # | % | # | % | # | % |
| Yes | 1,049 | 56.8 | 696 | 55.8 | 95 | 60.1 | 243 | 58.1 |
| No | 799 | 43.2 | 551 | 44.2 | 63 | 39.9 | 175 | 41.9 |

**Table 3**

| REASONABLE SUSPICION FOR PEDESTRIAN FRISK BY RACE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | All | | Black | | Latino | | White | |
| | # | % | # | % | # | % | # | % |
| Yes | 80 | 45.2 | 59 | 44.4 | 9 | 56.3 | 12 | 44.4 |
| No | 97 | 54.8 | 74 | 55.6 | 7 | 43.8 | 15 | 55.6 |

**Table 4**

| DISCOVERY OF CONTRABAND BY RACE, PEDESTRIAN STOPS | | | | |
|---|---|---|---|---|
| | **All** | **Black** | **Latino** | **White** |
| **Firearms** | 0.11% | 0.16% | 0.00% | 0.00% |
| **Other Weapons** | 0.05% | 0.08% | 0.00% | 0.00% |
| **Drugs** | 2.60% | 2.65% | 4.43% | 1.91% |
| **Any** | 4.44% | 4.65% | 6.96% | 3.11% |

**Table 5**

**Pedestrian Stop Rate per 10,000 Residents**

| VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Detainee Black | 5.567 | 7.702 | 7.345 | 7.711 | 8.153 | 7.399 | 7.566 | 7.406 | 7.805 |
| | (2.081)* | (2.550)** | (2.954)* | (2.561)** | (2.666)** | (2.590)** | (2.516)** | (2.610)** | (2.481)** |
| Detainee Hispanic | | 7.665 | 8.119 | 7.192 | 9.891 | 8.000 | 8.257 | 8.030 | 10.31 |
| | | (7.866) | (11.71) | (7.922) | (10.53) | (10.16) | (9.913) | (10.23) | (9.783) |
| Detainee Age | | 0.256 | 0.138 | 0.186 | 0.284 | 0.158 | 0.193 | 0.159 | 0.170 |
| | | (0.197) | (0.220) | (0.215) | (0.203) | (0.206) | (0.195) | (0.208) | (0.194) |
| District Asian share | | | 36.53 | | 49.66 | 35.76 | 37.05 | 36.38 | 35.83 |
| | | | (32.64) | | (29.63) | (29.35) | (28.35) | (29.56) | (28.08) |
| District Black share | | | 10.76 | | 7.763 | 3.364 | 0.187 | 4.099 | -6.303 |
| | | | (7.280) | | (6.614) | (6.744) | (7.010) | (6.703) | (8.331) |
| District Hispanic share | | | 12.05 | | 0.0428 | -6.516 | -8.982 | -5.801 | -22.68 |
| | | | (14.01) | | (13.19) | (13.11) | (12.98) | (13.15) | (15.26) |
| Male population under 24 | | | -29.72 | | -108.6 | -78.62 | -84.79 | -79.02 | -55.99 |
| | | | (19.58) | | (31.48)** | (33.95)* | (31.28)* | (34.50)* | (36.04) |
| Flash Information | | | | -9.076 | | | | | |
| | | | | (11.17) | | | | | |
| Employment Rate | | | | | -109.6 | -93.88 | -81.79 | -96.60 | -40.15 |
| | | | | | (36.24)** | (35.73)* | (36.05)* | (35.74)* | (43.63) |
| Overall Crime Rate | | | | | 0.00853 | | | | |
| | | | | | (0.00439) | | | | |
| Violent Crime Rate | | | | | | 0.0567 | | | |
| | | | | | | (0.0243)* | | | |
| Property Crime Rate | | | | | | | 0.00953 | | |
| | | | | | | | (0.00523) | | |
| Drug Crime Rate | | | | | | | | | 0.0926 |
| | | | | | | | | | (0.0370)* |
| Constant | 4.511 | -5.479 | 1.124 | -2.179 | 70.23 | 56.32 | 51.56 | 57.73 | 27.31 |
| | (1.471)** | (7.052) | (9.173) | (8.165) | (24.30)** | (24.41)* | (24.18)* | (24.47)* | (28.36) |
| Observations | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 |
| R-squared | 0.152 | 0.202 | 0.272 | 0.216 | 0.430 | 0.490 | 0.512 | 0.483 | 0.523 |

Standard errors in parentheses , ** p<0.01, * p<0.05

**Table 6**

| Black Share of Stops and Population, by District | | | |
|---|---|---|---|
| District | Stops | Population | Stops/Population |
| 1 | 61.9% | 33.7% | 1.84 |
| 2 | 61.4% | 26.1% | 2.35 |
| 3 | 48.4% | 10.5% | 4.63 |
| 5 | 26.3% | 5.1% | 5.15 |
| 6 | 76.3% | 20.6% | 3.70 |
| 7 | 11.8% | 4.5% | 2.61 |
| 8 | 31.8% | 11.8% | 2.69 |
| 9 | 70.5% | 11.0% | 6.39 |
| 12 | 91.1% | 84.3% | 1.08 |
| 14 | 96.4% | 76.9% | 1.25 |
| 15 | 48.2% | 22.2% | 2.18 |
| 16 | 96.1% | 79.8% | 1.20 |
| 17 | 87.1% | 59.9% | 1.45 |
| 18 | 94.4% | 64.0% | 1.48 |
| 19 | 96.1% | 84.6% | 1.14 |
| 22 | 93.0% | 89.2% | 1.04 |
| 24 | 25.4% | 22.8% | 1.11 |
| 25 | 37.3% | 34.3% | 1.09 |
| 26 | 34.4% | 24.5% | 1.40 |
| 35 | 93.1% | 73.4% | 1.27 |
| 39 | 93.7% | 78.6% | 1.19 |

## Table 7

### Reasonable Suspicion for Pedestrian Stop

| VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Detainee Black | -0.0287 | -0.0174 | -0.0599 | -0.0215 | -0.0641 | -0.0654 | -0.0661 | -0.0652 | -0.0654 |
| | (0.0250) | (0.0272) | (0.0313) | (0.0272) | (0.0314)* | (0.0315)* | (0.0315)* | (0.0315)* | (0.0315)* |
| Detainee Hispanic | | 0.0441 | 0.0587 | 0.0386 | 0.0574 | 0.0566 | 0.0562 | 0.0567 | 0.0567 |
| | | (0.0424) | (0.0457) | (0.0423) | (0.0457) | (0.0458) | (0.0458) | (0.0458) | (0.0457) |
| Detainee Age | | 0.00159 | 0.00150 | 0.00178 | 0.00145 | 0.00140 | 0.00137 | 0.00141 | 0.00137 |
| | | (0.000902) | (0.000906) | (0.000904)* | (0.000906) | (0.000913) | (0.000912) | (0.000913) | (0.000911) |
| District Asian share | | | 0.394 | | 0.168 | 0.146 | 0.121 | 0.150 | 0.0490 |
| | | | (0.439) | | (0.458) | (0.461) | (0.462) | (0.460) | (0.478) |
| District Black share | | | 0.194 | | 0.187 | 0.177 | 0.161 | 0.179 | 0.121 |
| | | | (0.102) | | (0.102) | (0.104) | (0.107) | (0.104) | (0.127) |
| District Hispanic share | | | 0.0479 | | 0.0832 | 0.0638 | 0.0520 | 0.0664 | -0.0173 |
| | | | (0.142) | | (0.143) | (0.148) | (0.148) | (0.148) | (0.183) |
| Male pop. under 24 | | | -0.203 | | 0.399 | 0.483 | 0.510 | 0.474 | 0.669 |
| | | | (0.232) | | (0.423) | (0.456) | (0.446) | (0.457) | (0.523) |
| Flash Information | | | | 0.0966 | | | | | |
| | | | | (0.0379)* | | | | | |
| Employment Rate | | | | | 0.768 | 0.807 | 0.918 | 0.793 | 1.144 |
| | | | | | (0.452) | (0.458) | (0.490) | (0.455) | (0.623) |
| Overall Crime Rate | | | | | | 2.64e-05 | | | |
| | | | | | | (5.35e-05) | | | |
| Violent Crime Rate | | | | | | | 0.000249 | | |
| | | | | | | | (0.000317) | | |
| Property Crime Rate | | | | | | | | 2.74e-05 | |
| | | | | | | | | (6.30e-05) | |
| Drug Crime Rate | | | | | | | | | 0.000425 |
| | | | | | | | | | (0.000485) |
| Constant | 0.587 | 0.525 | 0.510 | 0.512 | 0.00690 | -0.0441 | -0.106 | -0.0341 | -0.235 |
| | (0.0206)** | (0.0375)** | (0.0796)** | (0.0378)** | (0.306) | (0.323) | (0.338) | (0.321) | (0.413) |
| Observations | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 |
| R-squared | 0.001 | 0.003 | 0.007 | 0.006 | 0.009 | 0.009 | 0.009 | 0.009 | 0.009 |

Standard errors in parentheses , ** p<0.01, * p<0.05

**Table 8**

**Pedestrian Frisks**

| VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Detainee Black | 0.0497 | 0.0610 | 0.0585 | 0.0489 | 0.0579 | 0.0550 | 0.0543 | 0.0552 | 0.0587 |
| | (0.0185)** | (0.0201)** | (0.0231)* | (0.0195)* | (0.0232)* | (0.0233)* | (0.0233)* | (0.0233)* | (0.0232)* |
| Detainee Hispanic | | 0.0443 | 0.0146 | 0.0279 | 0.0144 | 0.0126 | 0.0122 | 0.0127 | 0.0149 |
| | | (0.0313) | (0.0338) | (0.0304) | (0.0338) | (0.0338) | (0.0338) | (0.0338) | (0.0338) |
| Detainee Age | | -0.00218 | -0.00208 | -0.00160 | -0.00209 | -0.00222 | -0.00224 | -0.00221 | -0.00204 |
| | | (0.000666)** | (0.000668)** | (0.000649)* | (0.000669)** | (0.000674)** | (0.000673)** | (0.000674)** | (0.000673)** |
| District Asian share | | | -0.204 | | -0.235 | -0.285 | -0.320 | -0.277 | -0.161 |
| | | | (0.324) | | (0.339) | (0.340) | (0.341) | (0.340) | (0.353) |
| District Black share | | | 0.0230 | | 0.0219 | -0.000956 | -0.0245 | 0.00336 | 0.0630 |
| | | | (0.0754) | | (0.0755) | (0.0770) | (0.0792) | (0.0766) | (0.0937) |
| District Hispanic share | | | 0.0961 | | 0.101 | 0.0574 | 0.0445 | 0.0609 | 0.164 |
| | | | (0.105) | | (0.106) | (0.110) | (0.110) | (0.109) | (0.135) |
| Male pop. under 24 | | | 0.0961 | | 0.179 | 0.368 | 0.381 | 0.359 | 0.0111 |
| | | | (0.171) | | (0.312) | (0.336) | (0.329) | (0.337) | (0.386) |
| Flash Information | | | | 0.285 | | | | | |
| | | | | (0.0272)** | | | | | |
| Employment Rate | | | | | 0.106 | 0.193 | 0.378 | 0.164 | -0.128 |
| | | | | | (0.333) | (0.338) | (0.362) | (0.336) | (0.460) |
| Overall Crime Rate | | | | | | 5.96e-05 | | | |
| | | | | | | (3.94e-05) | | | |
| Violent Crime Rate | | | | | | | 0.000452 | | |
| | | | | | | | (0.000234) | | |
| Property Crime Rate | | | | | | | | 6.56e-05 | |
| | | | | | | | | (4.65e-05) | |
| Drug Crime Rate | | | | | | | | | -0.000265 |
| | | | | | | | | | (0.000358) |
| Constant | 0.127 | 0.183 | 0.137 | 0.145 | 0.0676 | -0.0475 | -0.137 | -0.0304 | 0.218 |
| | (0.0153)** | (0.0277)** | (0.0587)* | (0.0272)** | (0.226) | (0.239) | (0.250) | (0.237) | (0.305) |
| Observations | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 |
| R-squared | 0.004 | 0.011 | 0.016 | 0.068 | 0.016 | 0.017 | 0.018 | 0.017 | 0.016 |

Standard errors in parentheses, ** $p<0.01$, *

**Table 9**

**Reasonable Suspicion for Pedestrian Frisk**

| VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Detainee Black | -0.0448 | -0.0491 | -0.0894 | -0.0590 | -0.114 | -0.111 | -0.110 | -0.111 | -0.122 |
| | (0.0878) | (0.101) | (0.109) | (0.101) | (0.111) | (0.111) | (0.110) | (0.111) | (0.111) |
| Detainee Hispanic | | -0.0112 | -0.0744 | 0.000555 | -0.0849 | -0.0860 | -0.0885 | -0.0856 | -0.0914 |
| | | (0.140) | (0.146) | (0.139) | (0.146) | (0.146) | (0.145) | (0.146) | (0.146) |
| Detainee Age | | 0.000162 | -6.68e-05 | 0.000761 | 0.000230 | 0.00121 | 0.00176 | 0.00108 | 0.000863 |
| | | (0.00328) | (0.00331) | (0.00328) | (0.00332) | (0.00339) | (0.00337) | (0.00339) | (0.00335) |
| District Asian share | | | -0.0599 | | -0.478 | -0.397 | -0.524 | -0.393 | 0.0754 |
| | | | (1.407) | | (1.456) | (1.454) | (1.443) | (1.456) | (1.523) |
| District Black share | | | 0.448 | | 0.462 | 0.487 | 0.520 | 0.481 | 0.746 |
| | | | (0.309) | | (0.309) | (0.309) | (0.308) | (0.309) | (0.387) |
| District Hispanic share | | | 0.637 | | 0.713 | 0.753 | 0.699 | 0.756 | 1.097 |
| | | | (0.407) | | (0.413) | (0.413) | (0.409) | (0.414) | (0.519)* |
| Male population under 24 | | | -0.664 | | 0.589 | -0.137 | -0.200 | -0.0795 | -0.738 |
| | | | (0.753) | | (1.362) | (1.468) | (1.404) | (1.479) | (1.744) |
| Flash Information | | | | 0.138 | | | | | |
| | | | | (0.0815) | | | | | |
| Employment Rate | | | | | 1.599 | 1.060 | -0.00398 | 1.216 | -0.419 |
| | | | | | (1.450) | (1.504) | (1.639) | (1.486) | (2.202) |
| Overall Crime Rate | | | | | | -0.000243 | | | |
| | | | | | | (0.000186) | | | |
| Violent Crime Rate | | | | | | | -0.00222 | | |
| | | | | | | | (0.00109)* | | |
| Property Crime Rate | | | | | | | | -0.000253 | |
| | | | | | | | | (0.000220) | |
| Drug Crime Rate | | | | | | | | | -0.00200 |
| | | | | | | | | | (0.00164) |
| Constant | 0.488 | 0.488 | 0.474 | 0.432 | -0.590 | -0.00954 | 0.585 | -0.116 | 0.694 |
| | (0.0763)** | (0.129)** | (0.273) | (0.132)** | (1.003) | (1.094) | (1.149) | (1.083) | (1.455) |
| Observations | 176 | 176 | 176 | 176 | 176 | 176 | 176 | 176 | 176 |
| R-squared | 0.001 | 0.002 | 0.028 | 0.018 | 0.035 | 0.045 | 0.059 | 0.043 | 0.044 |

Standard errors in parentheses, ** $p<0.01$, * $p<0.05$

**Table 10**

**Pedestrian Arrests**

| VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Detainee Black | 0.0149 | 0.0336 | 0.0269 | 0.0303 | 0.0256 | 0.0226 | 0.0230 | 0.0226 | 0.0239 |
| | (0.0146) | (0.0158)* | (0.0182) | (0.0158) | (0.0183) | (0.0183) | (0.0183) | (0.0183) | (0.0183) |
| Detainee Hispanic | | 0.0735 | 0.0460 | 0.0687 | 0.0456 | 0.0438 | 0.0441 | 0.0438 | 0.0447 |
| | | (0.0249)** | (0.0270) | (0.0248)** | (0.0271) | (0.0271) | (0.0271) | (0.0271) | (0.0270) |
| Detainee Age | | 0.000466 | 0.000586 | 0.000631 | 0.000577 | 0.000466 | 0.000486 | 0.000465 | 0.000480 |
| | | (0.000524) | (0.000525) | (0.000524) | (0.000525) | (0.000528) | (0.000528) | (0.000528) | (0.000528) |
| District Asian share | | | -0.0982 | | -0.159 | -0.206 | -0.210 | -0.202 | -0.293 |
| | | | (0.250) | | (0.260) | (0.261) | (0.261) | (0.261) | (0.271) |
| District Black share | | | 0.0220 | | 0.0202 | -0.00276 | -0.0111 | -2.19e-05 | -0.0601 |
| | | | (0.0582) | | (0.0582) | (0.0594) | (0.0611) | (0.0591) | (0.0733) |
| District Hispanic share | | | 0.0642 | | 0.0743 | 0.0320 | 0.0370 | 0.0323 | -0.0462 |
| | | | (0.0815) | | (0.0824) | (0.0854) | (0.0854) | (0.0853) | (0.106) |
| Male pop. under 24 | | | 0.181 | | 0.349 | 0.539 | 0.489 | 0.543 | 0.688 |
| | | | (0.134) | | (0.243) | (0.263)* | (0.257) | (0.263)* | (0.307)* |
| Flash Information | | | | 0.0757 | | | | | |
| | | | | (0.0216)** | | | | | |
| Employment Rate | | | | | 0.215 | 0.307 | 0.403 | 0.283 | 0.678 |
| | | | | | (0.259) | (0.263) | (0.282) | (0.261) | (0.364) |
| Overall Crime Rate | | | | | | 5.82e-05 | | | |
| | | | | | | (3.09e-05) | | | |
| Violent Crime Rate | | | | | | | 0.000303 | | |
| | | | | | | | (0.000182) | | |
| Property Crime Rate | | | | | | | | 6.92e-05 | |
| | | | | | | | | (3.64e-05) | |
| Drug Crime Rate | | | | | | | | | 0.000508 |
| | | | | | | | | | (0.000282) |
| Constant | 0.0728 | 0.0381 | -0.0394 | 0.0273 | -0.181 | -0.298 | -0.322 | -0.288 | -0.482 |
| | (0.0121)** | (0.0218) | (0.0461) | (0.0219) | (0.176) | (0.187) | (0.195) | (0.185) | (0.242)* |
| Observations | 1,674 | 1,674 | 1,674 | 1,674 | 1,674 | 1,674 | 1,674 | 1,674 | 1,674 |
| R-squared | 0.001 | 0.006 | 0.016 | 0.013 | 0.016 | 0.018 | 0.018 | 0.018 | 0.018 |

Standard errors in parentheses, ** $p<0.01$, *

## Table 11

### Firearm Recovered

| VARIABLES | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| Detainee Black | 0.00160 | 0.00151 | 0.00159 | 0.00108 | 0.00200 | 0.00193 | 0.00193 | 0.00193 | 0.00198 |
|  | (0.00167) | (0.00182) | (0.00210) | (0.00182) | (0.00210) | (0.00211) | (0.00211) | (0.00211) | (0.00211) |
| Detainee Hispanic |  | -0.000354 | 0.000436 | -0.000944 | 0.000558 | 0.000513 | 0.000514 | 0.000514 | 0.000546 |
|  |  | (0.00283) | (0.00306) | (0.00282) | (0.00306) | (0.00306) | (0.00306) | (0.00306) | (0.00306) |
| Detainee Age |  | -3.03e-05 | -2.35e-05 | -9.41e-06 | -1.86e-05 | -2.17e-05 | -2.16e-05 | -2.17e-05 | -2.00e-05 |
|  |  | (6.03e-05) | (6.07e-05) | (6.03e-05) | (6.06e-05) | (6.11e-05) | (6.10e-05) | (6.11e-05) | (6.10e-05) |
| District Asian share |  |  | 0.00338 |  | 0.0253 | 0.0241 | 0.0236 | 0.0242 | 0.0233 |
|  |  |  | (0.0294) |  | (0.0307) | (0.0308) | (0.0309) | (0.0308) | (0.0320) |
| District Black share |  |  | -0.00522 |  | -0.00448 | -0.00506 | -0.00541 | -0.00497 | -0.00558 |
|  |  |  | (0.00685) |  | (0.00685) | (0.00698) | (0.00718) | (0.00695) | (0.00850) |
| District Hispanic share |  |  | -0.00990 |  | -0.0133 | -0.0144 | -0.0144 | -0.0144 | -0.0150 |
|  |  |  | (0.00949) |  | (0.00958) | (0.00993) | (0.00994) | (0.00992) | (0.0123) |
| Male pop. under 24 |  |  | 0.0197 |  | -0.0386 | -0.0338 | -0.0345 | -0.0339 | -0.0341 |
|  |  |  | (0.0155) |  | (0.0283) | (0.0305) | (0.0299) | (0.0306) | (0.0350) |
| Flash Information |  |  |  | 0.0103 |  |  |  |  |  |
|  |  |  |  | (0.00253)** |  |  |  |  |  |
| Employment Rate |  |  |  |  | -0.0744 | -0.0722 | -0.0690 | -0.0729 | -0.0681 |
|  |  |  |  |  | (0.0302)* | (0.0307)* | (0.0328)* | (0.0305)* | (0.0417) |
| Overall Crime Rate |  |  |  |  |  | 1.49e-06 |  |  |  |
|  |  |  |  |  |  | (3.58e-06) |  |  |  |
| Violent Crime Rate |  |  |  |  |  |  | 9.00e-06 |  |  |
|  |  |  |  |  |  |  | (2.12e-05) |  |  |
| Property Crime Rate |  |  |  |  |  |  |  | 1.72e-06 |  |
|  |  |  |  |  |  |  |  | (4.21e-06) |  |
| Drug Crime Rate |  |  |  |  |  |  |  |  | 7.10e-06 |
|  |  |  |  |  |  |  |  |  | (3.25e-05) |
| Constant | 0 | 0.00105 | -0.00314 | -0.000338 | 0.0456 | 0.0427 | 0.0415 | 0.0430 | 0.0416 |
|  | (0.00138) | (0.00251) | (0.00533) | (0.00252) | (0.0205)* | (0.0216)* | (0.0226) | (0.0215)* | (0.0276) |
| Observations | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 | 1,823 |
| R-squared | 0.001 | 0.001 | 0.002 | 0.010 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 |

Standard errors in parentheses , ** p<0.01, * p<0.05

Respectfully submitted,


/s/ David Rudovsky, Esquire                    /s/ Mary Catherine Roper, Esquire
                                               ACLU of Pennsylvania
/s/ Paul Messing, Esquire                      PO Box 40008
                                               Philadelphia, PA 19106
Kairys Rudovsky Messing & Feinberg, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106                         /s/ Seth Kreimer, Esquire
(215) 925-4400                                 University of Pennsylvania Law School
                                               3900 Chestnut Street
                                               Philadelphia, PA 19104

                                               Counsel for Plaintiffs[12]

---

[12] Counsel express their appreciation to a number of volunteer lawyers and law students who have donated hundreds of hours of time in this project.   Special thanks to Jon Dunsmoor who organized and structured the data collection and student reviews.