**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | **C.A. No. 10-5952** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

**PLAINTIFFS' SEVENTH REPORT TO COURT AND MONITOR**
**ON STOP AND FRISK PRACTICES: FOURTH AMENDMENT ISSUES**

## I. Introduction

This Seventh Report to the Court and Monitor provides a Fourth Amendment analysis of stop and frisk practices by the Philadelphia Police Department ("PPD") for the Third and Fourth Quarters of 2016, and sets forth plaintiffs' recommendations for correcting non-compliance by the PPD with the Consent Decree.[1]

This Report, filed five years after the entry of the Consent Decree, marks a critical juncture in this litigation. In February, 2016 the Court (Dalzell, J.) met with the parties, including from the City, the Managing Director, the Police Commissioner and Mayor Kenney's Criminal Justice Advisor (former Judge Benjamin Lerner) in response to the Sixth Report which showed continued and serious non-compliance with the Consent Decree on both the Fourth and Fourteenth Amendment issues. The City acknowledged the deficiencies in the stop and frisk practices and set forth a plan for internal accountability, including measures long advocated by plaintiffs, to ensure compliance with the Consent Decree. The parties agreed that the data from the Third and Fourth Quarters, 20116, would provide reliable grounds for assessing whether

---

[1] The Seventh Report on Fourteenth Amendment racial disparity issues will be filed separately under this Court's scheduling Order.

1

these measures were effective and what additional steps would be necessary to achieve compliance with the Consent Decree.

This Report shows improvements in the PPD stop and frisk practices, including a 35% decrease in the number of stops for 2016 as compared to 2015, and fewer stops and frisks without reasonable suspicion. Thus, in the second half of 2016, stops were supported by reasonable suspicion in 75% of the cases (as opposed to 67% in 2015) and frisks were supported by reasonable suspicion in 59% of the cases (as opposed to 43% in 2015). Nevertheless, the data shows continuing high rates of non-compliance with both Fourth and Fourteenth Amendment standards, with tens of thousands of persons being stopped and/or frisked without reasonable suspicion by the PPD on an annual basis.

In recognition of the progress in 2016 and the commitment from Mayor Kenney to continue to address the systemic issues, plaintiffs will not seek sanctions at this point. Instead, we provide specific recommendations on measures that should be implemented to bring the City into compliance with the Consent Decree.

## II. Procedural History

On June 21, 2011, the Court approved a Settlement Agreement, Class Certification, and Consent Decree ("Agreement"). On February 6, 2012, plaintiffs submitted their First Report which analyzed stop and frisk data for the first two quarters of 2011. The First Report focused on Fourth Amendment issues, and specifically whether there was sufficient cause for the stops and frisks reported by the Philadelphia Police Department ("PPD"). The audits showed that over 50% of stops and frisks were undertaken without reasonable suspicion.

Plaintiffs' Second Report was submitted in July 2012, and showed continued high rates of stops and frisks without reasonable suspicion (over 40% in both categories). On the issue of

racial disparities, plaintiffs' expert, Professor David Abrams, conducted a series of regression analyses and concluded that the racial disparities in stops and frisks were not fully explainable by non-racial factors. Further, the analysis of marijuana arrests showed even more pronounced disparities, with Blacks and Latinos constituting over 90% of all marijuana arrests.

Plaintiffs' Third Report focused on stop and frisk practices for the first two quarters of 2012. Plaintiffs again found a 40% rate of non-compliance with Fourth Amendment standards, and racial minorities constituted over 90% of arrests for small amounts of marijuana. In response, the City stated that the PPD was providing additional training, issuing revised auditing protocols, and instituting new accountability measures.

The Fourth Report, filed in December, 2013, analyzed stops and frisks in 2012 and 2013, on both Fourth and Fourteenth Amendment grounds. Pedestrian stops were made without reasonable suspicion in 43% of the cases reviewed, and frisks were conducted without reasonable suspicion in over 50% of the cases. The Report also showed very low "hit-rates," with only 3 guns recovered in over 1100 stops (0.27%).

The stops and frisks continued to be racially disproportionate with statistically significant disparities that were not explained by non-racial factors (e.g., crime rates, demographics of police districts, age, and gender). The rate of stops without reasonable suspicion for Blacks was 6.5 percentage points higher than the rate for Whites, demonstrating that police were using a higher threshold of "reasonable suspicion" for stops of White suspects.

The Fifth Report covered the first two Quarters of 2014 and showed a rate of stops without reasonable suspicion of 37%. The rate of frisks without reasonable suspicion, or as fruits of an impermissible stop, was 53%. Hit rates remained very low, with 433 frisks yielding only two firearms. Indeed, where officers stated that a "bulge" justified a frisk, they seized a gun

in only 1 of 78 frisks.  On the issue of racial impact, the experts for the City and plaintiffs both found statistically significant evidence of racial bias in stops and frisks.

The Sixth Report covered two Quarters in 2015, and showed continuing high rates of stops and frisk without reasonable suspicion, very low "hit-rates" for weapons, and racially biased patterns of stops and frisk practices.  As discussed, the Sixth Report was the subject of Judge Dalzell's intervention in early 2016.

### III.   Review of 75-48a Forms, Third and Fourth Quarters, 2016:  Fourth Amendment Analysis

In this section, plaintiffs set forth their findings for the Third and Fourth Quarters, 2016 on the Fourth Amendment provisions of the Consent Decree.  As in previous audits, in assessing whether reasonable suspicion existed for the stop or frisk, we fully credit the narrative information provided by the officer and, in "close" cases, find reasonable suspicion.

For the Third and Fourth Quarters, 2016, we randomly sampled 4597 pedestrian stops.[2] Of these 4597 pedestrian stops, 75% were supported by reasonable suspicion and 25% were made without reasonable suspicion.  Frisks were reported in 722 stops. Of these, 59% were made with reasonable suspicion, 27% were made without reasonable suspicion, and 14% were preceded by a stop without reasonable suspicion ("fruit of the poisonous tree" category).[3] These data show modest, but important improvements in the legality of stops and frisks.  However, there are still high rates of unconstitutional stops and frisks, with over 35,000 persons being stopped in 2016 without reasonable suspicion.

---

2 Some of the 75-48a stop forms involve arrests and searches based on full probable cause and some reflect police activity that is not properly viewed as a stop, as there was no "seizure" of the person (e.g., a "stop" to provide medical assistance or one who turns herself in on an outstanding warrant).  Plaintiffs' analysis excludes those "non-stops," with the resulting total of 4597 stops.  The City also excludes those cases.

3 There is good reason to believe that this data understates the problem with frisk practices.  In a significant number of cases, stops for suspicion of weapons or for violent crimes report *no frisk conducted* which is simply not plausible given police training and actual police practices.  *Infra*, at 19.

1. **Stop Data**

| Actual Stops | 4597 | |
|---|---|---|
| Reasonable Suspicion | 3460 | 75% |
| No Reasonable Suspicion | 1137 | 25% |



2. **Frisk Data**

| Frisks | 722 | |
|---|---|---|
| Reasonable Suspicion | 426 | 59% |
| No Reasonable Suspicion | 196 | 27% |
| Fruit of the Poisonous Tree | 100 | 14% |



### 3. Stop/Frisk Ratio

While officers documented frisks in 849 cases, in 127 of these cases, the officers conducted a search, and not a frisk.  The 722 frisks are 16% of the 4597 stops.



### 4. Contraband Recovered by Stops

| | | |
|---|---|---|
| USC | 10 | 0.22% |
| Guns (no drugs) | 19 | 0.41% |
| Drugs (no guns) | 71 | 1.54% |
| Guns & Drugs (both) | 1 | 0.02% |
| Evidence / Other | 132 | 2.87% |

Note: 218 entries noted recovery of contraband, but multiple types of contraband were recovered in one of these stops, thus resulting in 233 contraband seizures.





5.   **Contraband Recovered by Frisks**

| | |
|---|---|
| Non-Gun Contraband | 70 |
| Guns | 14 |
| No contraband | 638 |
| Total Frisks | 722 |



6.   **Contraband Recovered By Frisks, With and Without Reasonable Suspicion**

| | |
|---|---|
| Reasonable Suspicion | 66 |
| No Reasonable Suspicion | 11 |
| Fruit of the Poisonous Tree | 7 |

7.  **Arrests and Contraband Recovered**



| | |
|---|---:|
| Arrest, No Contraband Recovered | 424 |
| Arrest, Non-Gun Contraband Recovered | 162 |
| Arrest, Gun Recovered | 21 |
| No Arrest | 3990 |
| **Total Stops** | **4597** |

**8.  Racial Composition of Philadelphia**

(2010 Census)                                1517550    (total)

| | | |
|---|---|---|
| White | 644395 | 42.46% |
| Black & African American | 655824 | 43.22% |
| Hispanic | 128928 | 8.50% |
| Asian | 67654 | 4.46% |
| American Indian / Pacific Islander / Other | 20749 | 1.37% |



**9. Stops by Race**

| | | | | |
|---|---|---|---|---|
| Black | 3150 | 68.52% | **77.44%** | minorities |
| Non-Latino White | 1037 | 22.56% | | |
| Latino | 410 | 8.92% | | |
| Total | 4597 | | | |



**10. Stops by Race and Reasonable Suspicion**

|  | Reasonable | Unreasonable | Reasonable % |
|---|---|---|---|
| Black | 2367 | 783 | 75.14% |
| Non-Latino White | 798 | 239 | 76.95% |
| Latino & Other | 295 | 115 | 71.95% |
| Total | 3460 | 1137 | 4597 |
|  | 75.27% | 24.73% |  |



**11. Frisks by Race**

| | | | | |
|---|---|---|---|---|
| Black | 548 | 75.90% | **85.87%** | minorities |
| Non-Latino White | 102 | 14.13% | | |
| Latino | 72 | 9.97% | | |
| Total | 722 | | | |



**12. Frisks by Race and Reasonable Suspicion**

|  | Reasonable | Unreasonable | FTPT | Reasonable % |
|---|---|---|---|---|
| Black | 324 | 154 | 70 | 59.12% |
| Non-Latino White | 64 | 20 | 18 | 62.75% |
| Latino | 38 | 22 | 12 | 52.78% |
| Total | 426 | 196 | 100 | 722 |
|  | 59.00% | 27.15% | 13.85% |  |



**13. Stops by Race and Contraband Recovery**

|  | Contraband | No Contraband | Total | Contraband % |
|---|---|---|---|---|
| Black | 159 | 2991 | 3150 | 5.05% |
| Non-Latino White | 40 | 997 | 1037 | 3.86% |
| Latino & Other | 21 | 389 | 410 | 5.12% |
|  | 220 | 4377 | 4597 |  |
|  | 4.79% | 95.21% |  |  |



**14. Frisks by Race and Contraband Recovery**

|  | Contraband | No Contraband | Total | Contraband % |
|---|---|---|---|---|
| Black | 58 | 490 | 548 | 10.58% |
| Non-Latino White | 15 | 87 | 102 | 14.71% |
| Latino | 11 | 61 | 72 | 15.28 |
|  | 84 | 638 | 722 |  |
|  | 11.63% | 88.37% |  |  |



IV.   **Commentary on Fourth Amendment Issues**

There are a number of significant findings from the data for the Third and Fourth Quarters, 2016:

1.      25% of all stops were made without the requisite reasonable suspicion. The PPD audits for these periods show slightly lower rates of stops without reasonable suspicion (approximately 19%), but in light of the approximately 140,000 pedestrian stops for 2016, over 35,000 persons in Philadelphia continue to be stopped each year without reasonable suspicion.

2.      27% of all frisks were made without reasonable suspicion, and an additional 14% were made in cases where the stop itself was not supported by reasonable suspicion ("fruit of the poisonous tree"). The PPD audits for these Quarters show frisks without reasonable suspicion at a rate of 28% (virtually the same finding as the plaintiffs), but the City did not provide a separate analysis of frisks, otherwise permissible, that followed an illegal stop.

3.      As with previous data analysis, the number of reported frisks (722) is quite low, with only 16% of stops recording a frisk. There is also good reason to believe that officers have not been reporting many frisks.  For example, in stops based on suspicion of gun possession or a violent crime, the police frequently report no frisk of the suspect.  In our review, the rate of "no-frisks" in this category ranges from 3-4% of all stops.  *See, e.g.,* D.C. Numbers: 2016 19-075308; 2106 16-030885; 2106 12-050983; 2016 18-060108; 2016 02-048761; 2016 15-088422; 2016 15-090458; 2016 39-060019; 2016 39-101075; 2106 22-102341; 2016 18-091824; 2106 22-092551; 21096 39-094676.

4.      The very low "hit-rate" of stops and frisks is further cause for concern. Contraband was recovered in only 101 stops, other "evidence" was seized in an additional 132 stops for a total of 233 seizures, a 5 % seizure rate for all stops.  Moreover, only 20 guns were

seized (0.43 % of all stops), but 5 of these seizures were the result of searches not frisks (incident

to a probable cause arrest), thus reducing the rate to 0.33% of all actual stops.  We recognize that

a significant number of legitimate stops are not likely to disclose contraband or lead to an arrest,

but such low hit rates are troubling and are likely the product of the high rate of stops without

reasonable suspicion.

By contrast, hit-rates for frisks are a highly reliable metric as officers must have

*reasonable suspicion that the suspect is armed and dangerous* before a frisk can be conducted.

Thus, it is fair to expect that seizure of weapons or other contraband would be made in a

significant number of these cases if the officers are accurately reporting facts that establish

reasonable suspicion. Yet, the rate of recovery is vanishingly small.  Of 722 frisks, only 15

firearms were seized (98% of all frisks yielded no weapons) and contraband other than weapons

was seized in only 70 other frisks (a 90% rate of no contraband or weapon seizure). And, it is

highly likely that the hit-rates are even lower, given the fact that police reported no frisks in a

significant number of stops involving violent crimes or reports of weapons.

This data raises serious questions whether the justifications that were provided for the

frisks are fair predictors of weapon possession.  For example, in 104 stops where the officer cited

a "bulge" in a pocket as grounds for a frisk, no guns or other weapons were seized.  "Bulges"

inevitably turn out to be cell phones or wallets and the other triggering factors are very weak

indicators of criminal activity.  Similar very low hit rates (indeed, zero for some categories of

frisks) are reported for frisks based on anonymous information (17 reports, 0 guns); "body

blading" or other "furtive" movements (26 reports, 1 gun); suspicion of drug related activity (49

reports, 0 guns); hands in pocket (68 reports, 0 guns); high crime/high drug area (24 reports, 0

guns).  Indeed, the only fair predictor of weapon possession is where there is evidence of actual

sighting of a weapon, or report from a credible source.

The fact that so few frisks lead to the recovery of a weapon raises serious questions as to whether the police are accurately reporting what they observe and whether the reasons generally provided for frisks are appropriate indicators of weapon possession.

5.      Analyzing improper stops by category, there continue to be significant numbers of stops for conduct which the Agreement and federal and state case law make clear are not justifiable grounds for stops or frisks. These include:

- person involved in a "disturbance"

- single person "obstructing" the sidewalk

- anonymous information (e.g., man with gun; man with drugs)

- person on steps of or near "abandoned" property

- person involved in "verbal dispute" (non-domestic)[4]

- high crime area/roll call complaints

- panhandling

- suspicion of narcotics activity

6.      Although the continued high rates of impermissible stops and frisks are the result of several factors, we believe that the primary cause at this point is the lack of accountability of officers and their supervisors for violations of the Consent Decree.  The Police Department delayed implementation of the accountability process until 2016 (following establishment of the electronic data base, re-training of officers with respect to stop and frisk practices, and the institution of an internal auditing process).  These accountability measures are set forth in the Department's Directive on stop and frisk practices (currently Directive 12.11, Appendix B), and

---

[4] We credit all reports of "domestic" disputes.

include:

1. Under Section 7, patrol supervisors must review each 75-48a, send incomplete forms back to the officer, and note what actions were taken where the officer did not provide sufficient reasons for the stop or frisk.

2. Under Section 8, Commanding Officers must take necessary actions to correct errors in stop and frisk practices including the identification of officers who fail to state reasonable suspicion, and they are accountable for officers and their supervisors who repeatedly engage in impermissible stops or frisks. The Commanding Officers must submit memorandum on a periodic basis detailing corrective actions taken.

3. Under Section 9, Special Unit Inspectors must complete audits of randomly selected stop and frisk reports, provide Commanding Officers under their supervision and command with memorandum detailing errors and deficiencies in these reports, review responses by the Commanding Officers as to remedial actions taken by the Commanding Officers, and forward all findings and actions taken to the Chief Inspector, Office of Standards and Accountability.

4. Under Section 9, the Office of Standards and Accountability must ensure departmental compliance with stop and frisk procedures under the Directive (including reports on any racially biased or other discriminatory patterns), and provide quarterly audits of stop and frisk reports to various officials and offices within the Police Department, including the Police Commissioner, Deputy Police Commissioner, and all Inspectors.

At the 2016 conference with Judge Dalzell, the City agreed to full implementation of these policies. We believe that the improvements noted for the Third and Fourth Quarters, 2016, are the result of these accountability measures, but quite clearly, more must be done. We have reviewed the reports generated pursuant to this accountability process for 2016 and they fail to show sufficient reviews at the supervisory levels.

First, we have not been provided with data as to the number and types of cases in which Sergeants have required changes in the 75-48A form as result of their daily reviews. Second, for this process to be successful, *the City Audit Division should, in every case in which it finds a stop or frisk without reasonable suspicion, determine from the assigned Sergeant what review was conducted and the results of that review.* For example, in our review, we determined that the following stops were made on a clear lack of reasonable suspicion, but it is not apparent that the

21

PPD engaged in any supervisory review with the Sergeant or officer involved, or if and review

was conducted, that any retraining or discipline resulted.

| D.C. Number | Impermissible Ground for Stop or Frisk |
|---|---|
| 2016 15-083896 | men on corner |
| 2016 19-115230 | man with gun (anonymous) |
| 2016 25-057252 | frisk for drugs |
| 2016 39-105272 | man with gun (anonymous) |
| 2016 24-120159 | men on corner |
| 2016 16-051358 | miscreants |
| 2016 16-051621 | vagabonds |
| 2016 22-100665 | man with gun (anonymous) |
| 2016 24-116841 | man with gun (anonymous) |
| 2016 15-117428 | man with gun (anonymous) |
| 2016 22-084112 | man/robbery (anonymous) |
| 2016 25-095554 | known drug corner |
| 2016 19-097844 | open air drug location |
| 2016 25-098948 | running in alley |

The accountability measures must go beyond the Sergeant level and include Captains

and Commanders.  There must be a comprehensive and effective process for identifying officers

(or their supervisors) who repeatedly engage in stops or frisks without reasonable suspicion and,

critically, there is a need for specific retraining, increased supervision, or other remedial,

disciplinary action for these practices.

**V. Conclusion**

Plaintiffs recognize the improvements in the Fourth Amendment aspects of PPD stop and frisk practices, but all parties must understand that while the comparative analysis with prior years is encouraging, there are still far too many stops and frisks without reasonable suspicion and the PPD must reduce that number to come into compliance with the Consent Decree.  Our recommendations as to accountability measures are made to help facilitate that process.  We will provide a racial analysis in a later filing.


Respectfully submitted,

s/David Rudovsky, Esquire

s/Paul Messing, Esquire

s/Susan Lin, Esquire

Kairys, Rudovsky, Messing & Feinberg, LLP


s/Mary Catherine Roper, Esquire
ACLU of Pennsylvania

Counsel for Plaintiffs