**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | **C.A. No. 10-5952** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

**PLAINTIFFS' REPLY REPORT ON FOURTEENTH AMENDMENT ISSUES**

**I.      Introduction**

The Report and Supplementary Report submitted by Dr. Kane on behalf of the City on Fourteenth Amendment issues confirms the central findings made by Professor David Abrams in Plaintiffs' Tenth Report on Fourteenth Amendment Issues.  We file this Response to make clear that evidence of racial bias in PPD stop and frisk practices is well-documented, and to set forth the steps that we believe are necessary to remedy the current patterns of racial discrimination.

We start, however, with an update on the issues presented by the Tenth Reports to the Court.  Following the filing of Dr. Kane's June, 2020, Report, the City informed plaintiffs' counsel that the supplementary reviews conducted by Dr. Kane had led him and the City to agree that there was racial bias in stop and frisk policing and that the City understood the need for remedial reforms in this system.  The City's July 17, 2020 filing confirms that agreement.  As a result, the parties have started discussions on the steps that should be taken, both in the short and long term, to address these issues.  The parties are ready to provide the Court with their respective positions and to set a schedule for submission of specific measures for the Court's consideration.

We think it important, however, to reply to Dr. Kane's initial assertions that called into question the validity of Professor Abrams' findings, as they are relevant to the issue of remedial measures. Dr. Kane had asserted that (1) since the largest disparities in racial distributions of stops and frisk are seen in "only" 20% of PSAs, they should be discounted as "outliers," and (2) Blacks who are subjected to impermissible frisks are at fault (as opposed to the officers involved), as Black detainees show "more wariness and/or skepticism [of police] than White and Latino detainees," and thereby cause the police to engage in racially disparate frisks. Report, 15.[1]   Neither proposition is accurate.

## II.   Professor Abrams' Findings

Professor Abrams conducted a comprehensive analysis of stops and frisks for the second half of 2019 in accord with this Court's approved Benchmarks that govern the monitoring of the Consent Decree. The Benchmarks, which reflect the best statistical measures for assessing racial bias in stop and frisk practices, are aimed at resolving the key issue of whether the substantial racial disparities in who are stopped and frisked are explainable by non-racial factors. For 2019, as for many of the prior years, Professor Abrams found that the large racial disparities are not explained by non-racial factors, such as crime rates, age, gender, or economic factors in different communities in Philadelphia. Professor Abrams made the following findings:

1.  For the 65 City PSAs, there was an average of 439 stops of Black pedestrians, 118 for White, and 42 for Latinos. The Citywide stop rate per 10,000 residents was 565 for Blacks, 415 for Whites, and 172 for Latinos. For those who were frisked after being stopped, 82% were Black, 12% White, and 6% Latino.

---

[1]      Dr. Kane's initial assertion that additional benchmarks might show the absence of racial bias has been withdrawn in the Supplementary filing.

2. A comparison of stops and census by race shows Black stops at 71%, census at 44%; White stops at 22%, census at 35%; Latino stops at 7%; census at 12%.

3. By PSAs, Blacks account for a higher share of the stops in all but one PSA; in several PSAs, Blacks are stopped at a rate of over five times their share of the population

4. A regression framework was used to determine whether factors other than race account for the racial disparities in stops, with control variables of crime rates, demographics, and economic factors. In the final analysis, including additional specification checks suggested by Dr. Kane, Professor Abrams found that the racial disparities are not explained by the non-racial control variables, and these findings were statistically significant.

5. Regressions were run as well on the issue of the salience of race in pedestrian frisks, and once again there were statistically significant results: the frisk rate for Black detainees is 7.7% higher than for Whites which means that Black detainees are over 60% more likely to be frisked than white detainees.

6. Racial bias was also documented on the benchmark of the rate of *unreasonable* stops and frisks by race, as measured by Fourth Amendment standards. With respect to stops, 18% of Black stops were without reasonable suspicion, as opposed to 11% of stops of Whites, and 13% of stops of Latinos. A regression analysis showed that at a statistically significant 1% confidence level, that Blacks *are over 50% more likely to be stopped without reasonable suspicion than Whites*, a marked increase over previous years. With respect to frisks, Blacks were 40% more likely to be frisked without reasonable suspicion than Whites. These findings mean that police employ a higher factual threshold for what constitutes "reasonable suspicion" for White suspects as opposed to Blacks.

7. Stop hit-rates for contraband were lower for Blacks than for Whites, and although the results were not statistically significant at the 5% confidence level (due to the very low hit rates), they point to possible evidence of racial bias.

## III.   Dr. Kane's Report

Dr. Kane does not directly dispute any of Professor Abrams' findings, and to the extent he questions the reliability of Professor Abrams' process and findings, his theories are unsupported.[2]

First, Dr. Kane cites the reduction in the *number* of stops over the past several years, but that data point has little to do with racial bias. Whether 200,000 or 75,000 stops are being made on a yearly basis, the Fourteenth Amendment issue remains the same: are racial disparities explained by non-racial factors?  Moreover, for the period 2017-2019, the reduction in the number of stops was lower for Blacks, at 27.2% than for Whites, at 34%.

Second, Dr. Kane initially discounted City-wide data showing that Blacks are stopped and frisked at much higher rates than Whites, even accounting for possible non-racial reasons (Blacks, at 44% of the population, make up 71 % of the stops).  Report, 4.  According to Dr. Kane, policing must be examined at the "workgroup level" (in Philadelphia the PSAs). Putting aside the fact that Professor Abrams did a separate analysis at the PSA level (*see, infra*), Dr. Kane's assertion runs counter to the Benchmarks Memorandum and to common sense.  The *Bailey* Consent Decree addresses both City-wide and PSA level practices that impact racial minorities and, as the Supplementary Report acknowledges, "there exists a significant

---

[2]     Dr. Kane erroneously asserts that Professor Abrams' analysis was for the "most part" focused on data from the agreed-upon PPD randomly selected sample of stops for 2019, as opposed to an analysis based on the full data set for all stops and frisks in this reporting period. Report, 1.   To the contrary, Professor Abrams adhered to the Benchmarks, analyzed *both* sets of data, and rested most of his findings on the full data set.

4

association between detainee race (African-American) and the likelihood of being stopped . . . in the City as a whole," even if the effect is greatest in certain PSAs.  We agree that the geographic distributions are relevant to the implementation of *remedial measures,* but that is a separate issue that we address below.

Third, Dr. Kane recognizes two disturbing racial patterns in stop and frisk practices that Professor Abrams has documented for many years.  Specifically, in 2019: (1) In seven *largely* Black populated PSAs (or over 10% of all PSAs), the number of stops are "unusually high," thus evidencing racial bias in these geographical areas, and (2) in six PSAs with relatively *few* Black residents, there is a significantly higher stop rate for Blacks, a result that Dr. Kane properly characterizes as evidence of stops of Blacks for being "out of place."  Report, 8.  We agree that these findings demonstrate the immediate need for remedial measures for these PSAs, and we set forth our recommendations in Section IV.  We take issue, however, with Dr. Kane's initial suggestion (apparently withdrawn in the Supplementary Report) that these PSAs, are simply "outliers."

The Fourteenth Amendment Equal Protection Clause protects *every resident* of Philadelphia from racially biased policing, and it is wrong to discount discrimination against tens, if not hundreds, of thousands, of Black residents who happen to be stopped in these PSAs. Whether the issue is racial bias in policing, poverty levels, high rates of homicide, or any other social or economic issue, City-wide rates are relevant, even if driven by unequal distribution in discrete communities.

To test Dr. Kane's thesis regarding "outlier" PSAs, Professor Abrams has conducted additional data analysis of the 2019 stops and frisks.  Depending on the method used to identify the "outliers," Professor Abrams estimates that over half of the PSAs would be included.

Professor Abrams ranked PSAs by: (a) racial gap in reasonable suspicion rates for stops; (b) overall reasonable suspicion rate; (c) ratio of black stop to population share; and (d) total stop rate on the assumption that PSAs at the high end of any of these measures may not be complying with Fourth and Fourteenth standards.  More specifically:[3]

1.  Professor Abrams reviewed the approximately 39,000 stops for Quarters 3 and 4, 2019 and made a preliminary finding that of the approximately 2600 officers who made stops in that time period, 260 officers (approximately 10% of those making stops) account for 50% of all stops, and that the top 50 officers account for approximately 20% of all stops.  See Table 1.  Of those 50, 16 are in PSA 242, and no other PSA has more than 4 officers in the top 50. This suggests that the PPD should be looking carefully at both the Fourth and Fourteenth Amendment metrics with respect to these officers.

2.  In a review of PSAs by Black-White differences in reasonable suspicion rates, there are PSAs different from the "outliers" identified by Dr. Kane in which White stops are at or close to 100% for the presence of reasonable suspicion and where Blacks have far lower numbers of stops with reasonable suspicion. See Table 2 (note that within Table 2, those PSAs with comparatively few stops are far less likely to present differences that are statistically significant.)

---

[3]     Given the short time frame for these additional statistical reviews, the findings reported in this section are provisional.  And there are two specific caveats:  First, while the results relying on reasonable suspicion rates are reliable in current form, the results based on overall stop rates should be refined using a regression framework to control for stop rates.  Second, due to the small number of observations for some PSAs in the sample analyzed for legal sufficiency, the top PSAs are likely to vary somewhat from year to year.

3.  A review of PSAs on the factors of shares of stops (and frisks) that were made
    without reasonable suspicion shows significant differences across PSAs on the
    Fourth Amendment issues of stops with or without reasonable suspicion.  In 17
    PSAs, at least 20% of stops are legally unfounded.   See Table 3.

4.  Professor Abrams' reviewed his Table 4A from his Tenth Report to determine
    which PSAs had the highest ratio of Black stops to population share and to set
    forth the top 20 PSAs by stops per 100 residents.  See Tables 4 and 5.  A
    comparison of these two Tables lists of problematic PSAs show an overlap in
    only two PSAs, showing from another different angle that racial bias issues are
    not limited discrete PSAs.

As noted above, this additional data analysis shows that there are several ways
of assessing racial disparities, both on a Citywide and PSA level, to determine whether
they reflect racial bias or are explained by non-racial factors.  Accordingly, whether the
City decides to start with the Kane identified "outlier" PSAs or with the PSAs that have
significant disparities in stops without reasonable suspicion based on race (with a
regression for crime rates), or any other of the Benchmarks for racial bias, it must
consider both PSA and Citywide patterns in a comprehensive remedial plan.

The data regarding these PSAs has been consistently reported for the past 10 years,
showing highly disparate racial patterns of stops of Blacks in largely Black and largely White
PSAs.  Yet, the City chose not to address these issues.  We are hopeful, however, that the City's
most recent statements reflect a change in policy and practice.[4]

---

[4]   Dr. Kane initially suggested that Professor Abrams' regression for "employment rates"
was not a sufficient control in examining "ecological processes" or "structural disadvantages" in
Black communities, Report, 12-13, notwithstanding the fact that employment rates are the

Dr. Kane also asserted that because "relations between police officers and some predominantly Black communities in Philadelphia have become increasingly strained in recent years [and because] Black detainees [view] the police with more wariness and/or skepticism than white and Latino detainees," the racially disproportionate *frisks* of Blacks are justified.

Central to this thesis is a "blame the victim" rationale: Black residents of Philadelphia who respond to racially biased policing by being wary or skeptical of police who stop them (with or without justification) only have themselves to blame when the officer *frisks* them due to their "wariness" or "skepticism."   But any assertion that police are justified in viewing "wariness" or "skepticism" in determining whether a frisk is justified because a detainee is armed and dangerous, is wrong as a matter of Constitutional law, the restrictions on frisks imposed by the Consent Decree, and PPD Directives and training on frisk procedures, none of which allow for this false inferential leap.   Moreover, these traits do not explain racial disparities in *stops,* since one's personal views of police (good or critical) has nothing to do with the question of whether one's *conduct* established reasonable suspicion of criminality sufficient to justify a stop.

The data on frisks provides strong empirical proof that "wariness" and "skepticism" provide no support for a reasonable suspicion that one is armed and dangerous.  As we have documented for many years, the hit rate for weapons in frisks in Philadelphia is vanishingly small, with seizures made in fewer than 1% of frisks.  If Dr. Kane were correct, the rate would be much higher.  Simply put, "wariness" and "skepticism" are irrelevant and insufficient under the

---

Benchmarks control and that in previous reports where different measures of poverty were used, none of them produced any significant difference in the regression results.  Dr. Kane also asserted that without "controls for spatial autocorrelation" the regression models used by Professor Abrams may not be reliable.  The Supplementary Report withdraws these critiques.

Fourth Amendment as a matter both of constitutional doctrine and empirical evidence as they have *no* predictive value of whether one is armed and dangerous.

Further, on the issue of racial bias in frisk practices, police continue to frisk Black detainees at a higher rate than whites (one in five Black detainees frisked; 1 in 8.4 white detainees frisked), even though the hit rate for contraband of white detainees is *higher* than it is for Black detainees.  And, in predominantly Black and predominantly White PSAs with similar low crime rates, the stop and frisk rates are far higher in some predominantly Black PSAs.  *See also* Lance Hannon & Aaron Siegel, "Racially Profiling People and Places," 18 *Contexts, American Sociological Association*, 66 (2019) (analyzing stop rates of vehicles in low crime PSAs by race).

 Finally, the racial bias Benchmark analysis that compares stops and frisks *without reasonable suspicion* by race shows, as it has for many years, far higher rates of stops and frisks without legal cause of Blacks, thus making clear that the factual threshold for stops of Blacks is lower than it is for comparably placed White subjects.

In recent weeks, City policymakers have recognized the reality of racial bias in many aspects of local policing.  Given the mandates of the *Bailey* Consent Decree, and the evidence of racial bias found by Professor Abrams and Dr. Kane, the City must address the problem of racial bias in stop and frisk practices.  The recent testimony of City Solicitor Marcel Pratt at City Council hearings on stop and frisk practices included a refreshingly candid statement on this problem:

> I support the elimination of unconstitutional stop and frisk, including the targeting of Black men and other members of protected classes.  We know that the truth is that some police do target people of color, particularly Black men for stop and frisk.  And I think if you deny that, you are intellectually dishonest or something else.  It's easy to corroborate.  You know, the supporting empirical data,

anecdotal data and as we saw earlier, some of us who can do it through personal
experience.

Hearing, June 12, 2020, at 80.

Mr. Pratt's vision of racial equality in policing will not become a reality without
significant reforms.  According, we set forth the measures we believe are essential to remedying
this problem.  As noted, we have started discussions with the City and will be able to report to
the Court what actions will be taken.  In the event that significant reforms are not adopted, we
will seek Court intervention through *Bailey* contempt remedies.

## IV.   Remedial Measures

The City has taken some steps to address Fourth Amendment violations, including
enhanced training, specific limits on factors that are valid grounds for a stop or frisk, and
remedial measures for some officers and supervisors who had violated the Consent Decree.
Some of these measures are appropriate as well for remedying racial disparities and racially
biased stops and frisks.  But more is needed, and we urge consideration and adoption of the
following remedial measures, starting with an overall approach, designating certain PSAs for
immediate attention, and suggesting changes to stop and frisk practices that can contribute to
enhanced compliance with the Consent Decree.  As noted above, discussions on these issues
have started.

1.  All members of the PPD, regardless of PSA assignment, including officers, supervisors,
and commanders, should be re-trained regarding the *Bailey* Consent Decree prohibition
on racially biased stops and frisks.  Further, all members of the PPD should be advised
that they will be held accountable (a) for stops or frisks that violate the Consent Decree as
racially biased, (b) for a supervisor's failure to correct and/or sanction such stops or frisks
(with disciplinary measures similar to those adopted to address Fourth Amendment

10

violations), and (c) with respect to Commanders, their failure to address patterns of racially biased stops in their districts or PSAs, based on the *Bailey* Benchmarks. In the same way that the PPD has undertaken to discipline individual officers and supervisors for Fourth Amendment violations through audits of stops and frisks, the PPD should proceed with disciplinary action where the data regarding racial distribution of stops and frisks demonstrates individual responsibility of officers and immediate supervisors, and for Commanders and others who function at high levels, where their districts continue to show racially biased policing patterns. The need for supervisory and commander accountability on the issue of racially biased policing is critical, and the PPD should consider use of "Compstat" reviews of racially disparate policing in the same manner that such reviews are done for crime patterns.

2. The PSAs identified in the Tenth Reports that comprise majority Black populations that have experienced disproportionately high stop rates and the minority Black PSAs in which Blacks are disproportionately stopped should be the subject of immediate remedial measures. Within 60 days, the City should provide a report to the Court and Plaintiffs' counsel from the Commissioner and the Commanding Officers in these PSAs setting forth (a) their explanations for these racially disparate practices, and (b) a detailed plan to remedy these practices. This plan should include details as to the standards for reviews in each PSA, reporting of racial distribution of stops and frisks, the re-training and disciplinary measures to be implemented, and the reporting of disciplinary actions taken with respect to officers and supervisors. To the extent that the City wants to start the remedial process in PSAs where it thinks there are the most serious problems and then extend those remedies on a Citywide basis, that could be a basis for agreement.

3.  Except in exigent circumstances presenting an imminent threat to public or personal safety, officers should not engage in stops or frisks of persons suspected of committing "quality of life" offenses, including  public possession of an open liquor container, curfew violation for persons under 18, small amounts of marijuana where the offense is suspected by smell and/or by the mere appearance that an a smoking object is marijuana, littering, "obstructing" a sidewalk or passageway, public urination, truancy, trespass (where offense is after-hours presence in a public park or other area), panhandling, prostitution, and minor "disturbances."  Rather, where intervention other than an informal request to refrain from the conduct is necessary, the officer should have PPD dispatch to refer the issue to the appropriate governmental or private agency or through the 311 program referenced below.

4.  To reduce the unnecessary use of police stops and to improve the delivery of effective services, the existing 311 system should be expanded.  Currently, uniformed and armed PPD officers are being asked to intervene and provide services that are unrelated to crime prevention, investigation, and public safety, a practice that has led to encounters that do not advance public safety, adversely impact police-community relations, and hamper the ability of officers to devote the necessary resources to appropriate policing services.  An expanded 311 system for interventions involving the homeless, calls for assistance based on physical or mental health needs, and other related service calls, would assign those responsibilities to other professionals.  Police would serve as back-up upon request of the 311 responders.

5. To ensure compliance with proper stop and frisk practices, and to deter and prevent other incidents of police misconduct, the PPD should enact a Directive on the duty to Intervene and report misconduct with requirements that officers:

   a. intervene when another officer engages in conduct that is unlawful or violates departmental Directives or regulations;

   b. promptly report that misconduct incident in writing to the offending officer's supervisor; and

   c. fully cooperate in any investigation or proceeding related to that incident.

6. There are other longer-term reforms that could address the objectives of the Consent Decree:

   a. Enhancement of the PPD's effort to recruit women and people of color.

   b. The adoption and implementation of incentives for policing that respect the rights of civilians as mandated by PPD Directives and the Constitution.  In the same way that the PPD is required to discipline officers and supervisors for repeated instances of stop and frisk violations, it could affirmatively reward officers, supervisors and commanders for practices that exceed the norms.  For example, given that the current rate of stops without reasonable suspicion is approximately 15%, PSAs or other units that perform at a 10% or lesser rate could be recognized in some concrete manner.

   c. The expanded deployment of body worn cameras, under terms and conditions that the devices be used for the entirety of a civilian or other encounter, are properly preserved for review, and are subject to regular audits to ensure proper use of the cameras.

13

**V.**  **Conclusion**

The parties have started discussions about the above suggested remedial measures, and

other possible reforms.  We look forward to discussing these matters with the Court.

Respectfully submitted,

*/s/ David Rudovsky*
David Rudovsky
Paul Messing
Susan Lin
Kairys, Rudovsky, Messing, Feinberg & Lin, LLP

Mary Catherine Roper
ACLU of Pennsylvania

Counsel for Plaintiffs

## Table 1 – Officers with Most Stops

| | Stops | PSA |
|---|---|---|
| 1. | 368 | 392 |
| 2. | 306 | 393 |
| 3. | 290 | 192 |
| 4. | 255 | 123 |
| 5. | 240 | 124 |
| 6. | 235 | 242 |
| 7. | 227 | 151 |
| 8. | 226 | 93 |
| 9. | 217 | 242 |
| 10. | 203 | 242 |
| 11. | 191 | 242 |
| 12. | 187 | 191 |
| 13. | 185 | 242 |
| 14. | 185 | 242 |
| 15. | 181 | 242 |
| 16. | 179 | 121 |
| 17. | 167 | 173 |
| 18. | 166 | 242 |
| 19. | 163 | 182 |
| 20. | 154 | 242 |
| 21. | 139 | 181 |
| 22. | 135 | 151 |
| 23. | 135 | 253 |
| 24. | 135 | 192 |
| 25. | 129 | 242 |
| 26. | 125 | 172 |
| 27. | 125 | 262 |
| 28. | 124 | 242 |
| 29. | 123 | 242 |
| 30. | 123 | 392 |
| 31. | 122 | 33 |
| 32. | 119 | 241 |
| 33. | 117 | 181 |
| 34. | 117 | 242 |
| 35. | 115 | 393 |
| 36. | 115 | 242 |
| 37. | 112 | 242 |
| 38. | 111 | 122 |
| 39. | 111 | 182 |
| 40. | 108 | 123 |
| 41. | 104 | 393 |
| 42. | 101 | 242 |

| | | |
|---|---|---|
| 43. | 101 | 392 |
| 44. | 100 | 123 |
| 45. | 99 | 122 |
| 46. | 97 | 253 |
| 47. | 97 | 181 |
| 48. | 97 | 222 |
| 49. | 95 | 191 |
| 50. | 95 | 393 |

**Table 2 – PSA's by Racial Gap in Reasonable Suspicion for Stops**

| PSA | Stop RS Racial Gap | Black Stop Reasonable Suspicion | White Stop Reasonable Suspicion | Number of Stops |
|-----|--------------------|----------------------------------|----------------------------------|-----------------|
| 143 | 0.50 | 0.50 | 1.00 | 7 |
| 22 | 0.35 | 0.65 | 1.00 | 28 |
| 82 | 0.34 | 0.60 | 0.94 | 23 |
| 73 | 0.33 | 0.67 | 1.00 | 11 |
| 142 | 0.32 | 0.68 | 1.00 | 56 |
| 352 | 0.30 | 0.70 | 1.00 | 75 |
| 11 | 0.27 | 0.73 | 1.00 | 86 |
| 241 | 0.27 | 0.60 | 0.87 | 148 |
| 62 | 0.25 | 0.75 | 1.00 | 46 |
| 141 | 0.24 | 0.76 | 1.00 | 53 |
| 351 | 0.24 | 0.76 | 1.00 | 53 |
| 161 | 0.24 | 0.76 | 1.00 | 26 |
| 252 | 0.22 | 0.78 | 1.00 | 33 |
| 192 | 0.21 | 0.79 | 1.00 | 96 |
| 243 | 0.21 | 0.63 | 0.83 | 26 |
| 261 | 0.20 | 0.80 | 1.00 | 16 |
| 353 | 0.19 | 0.81 | 1.00 | 55 |
| 21 | 0.18 | 0.82 | 1.00 | 38 |
| 223 | 0.18 | 0.82 | 1.00 | 29 |
| 253 | 0.17 | 0.76 | 0.93 | 62 |
| 391 | 0.17 | 0.83 | 1.00 | 68 |
| 12 | 0.14 | 0.86 | 1.00 | 16 |
| 61 | 0.14 | 0.86 | 1.00 | 56 |
| 151 | 0.13 | 0.76 | 0.89 | 317 |
| 124 | 0.13 | 0.87 | 1.00 | 63 |
| 191 | 0.13 | 0.87 | 1.00 | 32 |
| 81 | 0.13 | 0.80 | 0.93 | 19 |
| 222 | 0.13 | 0.87 | 1.00 | 88 |
| 31 | 0.13 | 0.88 | 1.00 | 36 |
| 32 | 0.11 | 0.71 | 0.83 | 37 |
| 171 | 0.11 | 0.89 | 1.00 | 33 |
| 392 | 0.10 | 0.90 | 1.00 | 114 |
| 172 | 0.10 | 0.79 | 0.89 | 71 |
| 242 | 0.09 | 0.79 | 0.89 | 400 |
| 173 | 0.08 | 0.92 | 1.00 | 105 |
| 162 | 0.08 | 0.93 | 1.00 | 42 |
| 181 | 0.07 | 0.93 | 1.00 | 82 |
| 63 | 0.07 | 0.83 | 0.90 | 28 |

| PSA | Stop RS Racial Gap | Black Stop Reasonable Suspicion | White Stop Reasonable Suspicion | Number of Stops |
|---|---|---|---|---|
| 93 | 0.06 | 0.94 | 1.00 | 79 |
| 123 | 0.05 | 0.81 | 0.86 | 108 |
| 221 | 0.04 | 0.84 | 0.88 | 144 |
| 33 | 0.03 | 0.81 | 0.85 | 84 |
| 121 | 0.03 | 0.75 | 0.78 | 49 |
| 92 | 0.02 | 0.83 | 0.85 | 86 |
| 122 | 0.02 | 0.78 | 0.80 | 82 |
| 91 | 0.02 | 0.82 | 0.83 | 67 |
| 153 | 0.00 | 0.81 | 0.81 | 43 |
| 51 | 0.00 | 1.00 | 1.00 | 7 |
| 72 | 0.00 | 1.00 | 1.00 | 10 |
| 224 | 0.00 | 1.00 | 1.00 | 29 |
| 393 | -0.02 | 0.93 | 0.91 | 152 |
| 152 | -0.02 | 0.89 | 0.86 | 90 |
| 262 | -0.04 | 0.92 | 0.88 | 20 |
| 251 | -0.07 | 0.74 | 0.67 | 36 |
| 71 | -0.08 | 0.75 | 0.67 | 7 |
| 23 | -0.11 | 0.85 | 0.73 | 28 |
| 182 | -0.15 | 0.81 | 0.67 | 78 |
| 254 | -0.17 | 0.74 | 0.57 | 34 |
| 263 | -0.18 | 0.86 | 0.68 | 29 |
| 52 | -0.20 | 1.00 | 0.80 | 11 |
| 83 | -0.20 | 1.00 | 0.80 | 27 |
| 183 | -0.27 | 0.77 | 0.50 | 24 |
| 53 | -0.50 | 1.00 | 0.50 | 6 |
| 193 | -0.78 | 0.78 | 0.00 | 10 |
| 144 | . | 0.70 | . | 20 |

**Table 3 – PSA by Stop Reasonable Suspicion Rate**

| PSA | Stop RS Racial Gap | Stop Reasonable Suspicion | Frisk Reasonable Suspicion | Number of Stops |
|---|---|---|---|---|
| 193 | -0.78 | 0.39 | . | 10 |
| 183 | -0.27 | 0.64 | . | 24 |
| 254 | -0.17 | 0.66 | 0.20 | 34 |
| 144 | . | 0.70 | 0.33 | 20 |
| 251 | -0.07 | 0.70 | 0.61 | 36 |
| 71 | -0.08 | 0.71 | . | 7 |
| 243 | 0.21 | 0.73 | 0.50 | 26 |
| 241 | 0.27 | 0.74 | 0.63 | 148 |
| 182 | -0.15 | 0.74 | 0.29 | 78 |
| 53 | -0.50 | 0.75 | 0.50 | 6 |
| 143 | 0.50 | 0.75 | 0.00 | 7 |
| 121 | 0.03 | 0.76 | 0.43 | 49 |
| 263 | -0.18 | 0.77 | 0.50 | 29 |
| 32 | 0.11 | 0.77 | 0.67 | 37 |
| 82 | 0.34 | 0.77 | 0.00 | 23 |
| 122 | 0.02 | 0.79 | 0.14 | 82 |
| 23 | -0.11 | 0.79 | 0.83 | 28 |
| 153 | 0.00 | 0.81 | 0.63 | 43 |
| 91 | 0.02 | 0.82 | 0.57 | 67 |
| 22 | 0.35 | 0.83 | 0.38 | 28 |
| 151 | 0.13 | 0.83 | 0.64 | 317 |
| 33 | 0.03 | 0.83 | 0.85 | 84 |
| 73 | 0.33 | 0.83 | . | 11 |
| 123 | 0.05 | 0.83 | 0.40 | 108 |
| 172 | 0.10 | 0.84 | 0.55 | 71 |
| 142 | 0.32 | 0.84 | 0.33 | 56 |
| 92 | 0.02 | 0.84 | 0.58 | 86 |
| 242 | 0.09 | 0.84 | 0.64 | 400 |
| 253 | 0.17 | 0.84 | 0.54 | 62 |
| 352 | 0.30 | 0.85 | 0.66 | 75 |
| 221 | 0.04 | 0.86 | 0.71 | 144 |
| 11 | 0.27 | 0.86 | 0.54 | 86 |
| 81 | 0.13 | 0.86 | 1.00 | 19 |
| 63 | 0.07 | 0.87 | 0.80 | 28 |
| 62 | 0.25 | 0.88 | 0.88 | 46 |
| 152 | -0.02 | 0.88 | 0.80 | 90 |
| 141 | 0.24 | 0.88 | 0.64 | 53 |
| 351 | 0.24 | 0.88 | 0.50 | 53 |

19

| PSA | Stop RS Racial Gap | Stop Reasonable Suspicion | Frisk Reasonable Suspicion | Number of Stops |
|---|---|---|---|---|
| 161 | 0.24 | 0.88 | 0.50 | 26 |
| 252 | 0.22 | 0.89 | 0.75 | 33 |
| 192 | 0.21 | 0.89 | 0.42 | 96 |
| 262 | -0.04 | 0.90 | 0.67 | 20 |
| 261 | 0.20 | 0.90 | 0.00 | 16 |
| 83 | -0.20 | 0.90 | 1.00 | 27 |
| 52 | -0.20 | 0.90 | 1.00 | 11 |
| 353 | 0.19 | 0.91 | 0.91 | 55 |
| 21 | 0.18 | 0.91 | 0.67 | 38 |
| 223 | 0.18 | 0.91 | 1.00 | 29 |
| 391 | 0.17 | 0.92 | 0.86 | 68 |
| 393 | -0.02 | 0.92 | 0.73 | 152 |
| 12 | 0.14 | 0.93 | . | 16 |
| 61 | 0.14 | 0.93 | 0.67 | 56 |
| 191 | 0.13 | 0.94 | 1.00 | 32 |
| 124 | 0.13 | 0.94 | 0.90 | 63 |
| 222 | 0.13 | 0.94 | 0.73 | 88 |
| 31 | 0.13 | 0.94 | 1.00 | 36 |
| 171 | 0.11 | 0.94 | 0.83 | 33 |
| 392 | 0.10 | 0.95 | 0.89 | 114 |
| 173 | 0.08 | 0.96 | 0.83 | 105 |
| 162 | 0.08 | 0.96 | 0.80 | 42 |
| 181 | 0.07 | 0.96 | 0.50 | 82 |
| 93 | 0.06 | 0.97 | 0.33 | 79 |
| 72 | 0.00 | 1.00 | 1.00 | 10 |
| 51 | 0.00 | 1.00 | . | 7 |
| 224 | 0.00 | 1.00 | 0.88 | 29 |

**Table 4 – Top 20 PSA's by Ratio of Black Stop Share to Population Share**

| PSA | PSA Black share | Black Share of Stops | Ratio of Black Stop Share to Population Share | Total Stops per 100 Residents | Violent Crime Rate (per 10k residents) |
|---|---|---|---|---|---|
| 12 | 3% | 42% | 15.2 | 2.9 | 103 |
| 91 | 5% | 69% | 14.05 | 4.4 | 154 |
| 63 | 6% | 76% | 11.87 | 2.0 | 310 |
| 92 | 9% | 75% | 8.73 | 8.8 | 431 |
| 33 | 6% | 38% | 6.18 | 3.8 | 170 |
| 263 | 4% | 25% | 6.02 | 2.8 | 190 |
| 31 | 12% | 64% | 5.26 | 3.0 | 148 |
| 62 | 15% | 72% | 4.72 | 8.8 | 502 |
| 52 | 5% | 23% | 4.53 | 1.9 | 130 |
| 243 | 6% | 25% | 4.12 | 2.5 | 279 |
| 183 | 22% | 90% | 4.10 | 2.5 | 140 |
| 93 | 21% | 84% | 4.08 | 5.2 | 128 |
| 73 | 7% | 26% | 3.45 | 0.5 | 63 |
| 32 | 11% | 36% | 3.37 | 2.8 | 164 |
| 83 | 7% | 24% | 3.24 | 1.0 | 105 |
| 153 | 14% | 43% | 3.03 | 1.2 | 181 |
| 51 | 9% | 26% | 2.94 | 1.2 | 114 |
| 171 | 27% | 78% | 2.90 | 3.8 | 107 |
| 23 | 16% | 46% | 2.84 | 0.9 | 114 |
| 71 | 12% | 28% | 2.33 | 0.5 | 58 |

**Table 5 – Top 20 PSA's by Total Stops per 100 Residents**

| PSA | PSA Black share | Black Share of Stops | Ratio of Black Stop Share to Population Share | Total Stops per 100 Residents | Violent Crime Rate (per 10k residents) |
|-----|-----|-----|-----|-----|-----|
| 242 | 27% | 25% | 0.93 | 46.5 | 522 |
| 393 | 92% | 94% | 1.02 | 27.1 | 585 |
| 122 | 82% | 94% | 1.14 | 20.2 | 360 |
| 392 | 93% | 95% | 1.02 | 18.7 | 798 |
| 181 | 94% | 97% | 1.04 | 17.4 | 349 |
| 123 | 84% | 94% | 1.13 | 15.6 | 356 |
| 172 | 75% | 84% | 1.12 | 14.6 | 306 |
| 182 | 83% | 97% | 1.17 | 14.3 | 356 |
| 173 | 64% | 89% | 1.39 | 11.9 | 218 |
| 124 | 89% | 96% | 1.08 | 11.6 | 304 |
| 192 | 93% | 98% | 1.05 | 10.1 | 418 |
| 241 | 25% | 29% | 1.19 | 9.1 | 308 |
| 62 | 15% | 72% | 4.72 | 8.8 | 502 |
| 92 | 9% | 75% | 8.73 | 8.8 | 431 |
| 151 | 42% | 69% | 1.64 | 8.8 | 303 |
| 121 | 79% | 88% | 1.11 | 8.7 | 188 |
| 221 | 70% | 95% | 1.37 | 8.5 | 498 |
| 253 | 16% | 34% | 2.05 | 8.2 | 378 |
| 162 | 88% | 96% | 1.09 | 7.4 | 351 |
| 142 | 90% | 95% | 1.06 | 6.7 | 401 |