# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Mahari Bailey, et al., | : | |
|     Plaintiffs | : | C.A. No. 10-5952 |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia, et al., | : | |
|     Defendants | : | |

## DEFENDANT CITY OF PHILADELPHIA'S RESPONSE TO PLAINTIFFS' PROPOSALS REGARDING 14th AMENDMENT ISSUES

Defendant City of Philadelphia (the "City") hereby submits its initial Response to the proposals recently raised by Plaintiffs regarding pedestrian stops and frisks conducted by the Philadelphia Police Department ("PPD"). As set forth below, the City and PPD are taking a number of immediate steps to analyze and eliminate racial bias in policing – both generally and with respect to this litigation specifically. At the same time, the City and PPD are rolling out plans and protocols regarding additional, long-term steps that will be implemented to address these same issues, and the issues generally giving rise to this litigation. The City and PPD look forward to working together with Plaintiffs to achieve the goals contemplated by these measures.

I.     BACKGROUND

As the Court is well aware, this litigation is centered on PPD protocols, procedures, and accountability with respect to pedestrian stops and frisks by Philadelphia police officers. Since the litigation began, Plaintiffs have submitted many comments, suggestions, and proposals regarding these programs, most of which PPD and the City have agreed with and adopted. As set forth in the City's recent reports in this matter

(Doc. Nos. 62, 74, 83, 105), the results of this collaboration have been, by and large, successful, and have resulted in massive reductions in (a) the total number of pedestrians being "stopped" by Philadelphia police; (b) the total number of pedestrians being "frisked" by Philadelphia police; and (c) the percentage of pedestrian stops that are conducted without reasonable suspicion. As these improvements have occurred, PPD has continued to train its police officers and supervisors on what constitutes reasonable suspicion and how to properly document it on 75-48A forms. Most recently, PPD enacted its most aggressive reform yet, the creation and implementation of a "progressive discipline system" through which PPD can discipline officers for 75-48A non-compliance, track "repeat offenders," and impose progressively increasing penalties on officers who continue to make errors. The culmination of these measures places PPD on the forefront of a growing national and local movement to remedy racial and social disparities in policing in general, and in the area of "stop-and-frisk" specifically.

All that said, PPD and the City recognize the need to go further and the opportunity to use this moment to achieve meaningful, lasting, change. As further described below, a host of reform efforts are currently underway, some specific to this litigation and others which arose separately but are very much related to the same issues. The City is also formulating a series of longer-term plans and programs – both in response to Plaintiffs' specific proposals and otherwise – which should lead to a better understanding of, and ability to respond to, the challenging issues that all parties now seek to remedy. While some of these measures will undoubtedly require further discussion with Plaintiffs' counsel and/or third-parties regarding implementation, the City is committed to advancing them.

## II. PPD REFORMS, REVIEWS, REVISIONS, AND UPDATES

### A. GENERALLY APPLICABLE REFORM MEASURES

In the summer of 2020, the national conversation regarding racial and social disparities in policing rose to a new level of prominence. The City, recognizing the passionate feelings of its citizens and the need to ensure justice and equality for all, has committed to a host of meaningful police reforms that PPD will apply as a matter of course. Many of these reforms involve the very same issues as those that comprise the Fourteenth Amendment component of this litigation (i.e. eliminating racial disparities in policing). Without limitation, these include:

### 1. Culture & Accountability Reforms

PPD is implementing new measures regarding officer accountability. PPD has chosen to be a pilot site for the newly established Active Bystandership for Law Enforcement Program/ABLE Center at Innovative Policing Center at Georgetown University. Modeled after the New Orleans Police Department's EPIC program, PPD will train all PPD personnel—both officers and non- sworn—in active bystandership. It is anticipated that implementation of the ABLE program will lead to increased internal accountability, decreased misconduct, and improved officer safety and wellness. To assess the success of this program, PPD will track the number of complaints against officers as well as officer injuries. The national ABLE "train the trainer" session will commence this month.

Additionally, Dr. Marks and the National Training Institute on Race and Equity (NTIRE) team will deliver a comprehensive Implicit Bias and mitigation training to all PPD personnel (sworn and non-sworn), which will entail a two-day training session. As

a diversity and implicit bias expert, Dr. Marks has provided implicit bias training to over 2,000 Police Chiefs and executives, and several thousand patrol officers in local police departments (including the entire Los Angeles Police Department). This team was chosen after careful consideration with City leadership and Police Advisory Commission (PAC), with the goal of delivering the best evidence-informed training to support the goal of reducing biases and disparities in policing. The original in-person training was delayed due to COVID-19, and PPD is currently working with Dr. Marks to adapt virtual training with a goal of starting in late September 2020.

PPD has further requested no-cost technical assistance from the Bureau of Justice Assistance National Training and Technical Assistance Center (NTTAC) to conduct a comprehensive review of current PPD officer safety and wellness efforts. This request is currently under consideration with BJA NTTAC.

### 2. **Efforts to Increase Transparency with Respect to Civilian Complaint Reporting & Internal Investigations**

PPD is implementing additional reforms to increase transparency concerning complaints against police officers and the investigatory and disciplinary system triggered by these complaints. To achieve this, PPD will: (1) expand reporting of civilian complaints and internal investigations to include the posting of quarterly complaints against police, including districts, type of complaint, full text of complaint, complaint disposition, and demographic information of the complainant; (2) establish specific criteria for the designation of an investigation as internal or external; and (3) establish systemic tracking and public reporting of incidents in which officers witness inappropriate or excessive force by another officer.

PPD will work with multiple stakeholders on these revised processes and expects these reforms to be implemented by the end of the calendar year.

### 3. Police Board of Inquiry ("PBI") Review

On the same subject of PPD officer accountability and discipline, PPD, in partnership with PAC, has initiated a review of the PBI process.[1] PPD will be working with PAC to evaluate the PBI, including the PPD disciplinary process from start to finish. PAC and PPD are in the process of finalizing a Joint Action Plan and work will begin early this fall with an anticipated completion date of late fall. At the same time, Commissioner Outlaw is personally reviewing all protocols related to the disciplinary process and the PBI. The City will continue working with advocates and government leaders to examine other ways to increase transparency in this area.

This review, too, will include a community-engagement element. Community members will be surveyed regarding the PBI process and their feedback reviewed in an effort to improve transparency, complainant cooperation, and overall satisfaction.

### 4. Creation of Police Oversight Commission

There is currently a proposed amendment to the Philadelphia Home Rule Charter to create an independent, civilian Police Oversight Commission and PPD is working collaboratively with City Council on the structure, duties and powers of this Commission. The issue will be put to voters for approval in November 2020.

### 5. Introduction of a Low-Level Complaint Mediation Process

PPD and the PAC have also agreed to implement a mediation process for low level complaints so that community members and officers can engage in a positive and

---

[1] Put simply, the PBI process is the process that is triggered after an internal affairs investigation results in a finding against the officer. This process entails a presentation of facts and a determination of whether the officer should in fact be disciplined. PBI also determines the specific discipline imposed.

productive way regarding the root cause of the complaint. The City is hopeful that this process will build trust between PPD and the community. PPD and the City are currently working together to implement this process.

### 6. Hiring and Hiring Diversity

Commissioner Outlaw will appoint a Diversity and Inclusion Manager, who will be charged to review all PPD policies and practices through an equity lens. The Diversity and Inclusion Manager will assist with increasing diversity of new hires and will report directly to the Commissioner. The hiring process for this position is expected to be completed by October 2020.

In the meantime, PPD is reviewing its recruitment and retention efforts to enhance racial and geographic recruitment diversity. PPD has requested no-cost technical assistance from the International Association of Chiefs of Police (IACP) Collaborative Reform Technical Assistance Center (CRI-TAC) to conduct a comprehensive review of recruitment and retention efforts. This request was approved in August 2020 and an assessment project – focused on better attracting diverse individuals to PPD's rank and file – is expected to begin this month. The Police Commissioner, the Diversity and Inclusion Manager, and members of the executive team will then use this assessment to develop a plan for enhancing PPD's racial and geographic recruitment diversity. The next cadet class will begin in December 2021 at the earliest.

Finally, funding has been approved to create a Deputy Inspector General focused on deterring, detecting, preventing, and eradicating waste, fraud, and abuse within law enforcement agencies. The Deputy Inspector General will also review policies and

practices of those agencies. This position is being filled through the Office of the Mayor's Managing Director.

### 7. Operations – Early Intervention System

PPD is currently assessing a new Early Intervention System ("EIS"), which will assist in the management and retention of PPD officers. The system is expected to both highlight good work being done by officers, and, through monitoring, identify officers who may be at-risk employees. PPD has reviewed several technology options regarding the development of this system and members of the Executive team are in communication with vendors.

A preliminary budget has been developed for this project and discussions with potential funding sources have begun. The anticipated implementation date for the new early intervention system platform is December 2020.

### 8. Search Warrant Review

PPD has drafted amendments to its search and arrest warrant policies to align them with existing procedure. These policies now require reasonable exculpatory information (information that would contradict a person's involvement in a crime) to be included in all affidavits of probable cause. The amendments were adopted as of September 1, 2020.

PPD has also implemented changes with respect to the service of warrants. While Fourth Amendment case law permits an exception to the "knock" requirement when exigent circumstances exists, *PPD has made the decision to completely prohibit no-knock warrant service.* The Police Commissioner has already approved this change.

### 9. Technology Review

PPD is in the process of reviewing and revising technology policies. In July 2020, the NYU Policing Project began a review of 17 PPD surveillance and information gathering technology policies from a civil rights/civil liberties perspective. This review complements the numerous other policy review efforts being conducted both internally and externally. PPD has also sought outside input, including from Plaintiffs' counsel in this case, regarding PPD's current facial recognition programs. Upon completion of these reviews, the agreed upon recommendations will be presented to Commissioner Outlaw for consideration and approval, and incorporated into PPD policy.

### 10. Collective Bargaining Changes

The City and PPD are working with state legislators and the FOP to enact reforms to the collective bargaining process and resulting contracts. Negotiations with the FOP are expected to begin in January and arbitration will begin in the spring of 2021. As part of the next Act 111 arbitration, the City intends to seek several changes, including but not limited to:

- Re-establish residency requirements for officers going forward;

- Remove any limitations on the Commissioner's authority to transfer officers at her discretion, including removal of any required input by the FOP;

- Revise aspects of the grievance arbitration process for police discipline, including but not limited to the process for selection of arbitrators;

- Eliminate disciplinary record expungements and make all prior records available for consideration during Police Board of Inquiry investigations; and

- Inclusion of community members and outside experts on the Police Board of Inquiry.

Additionally, prior to negotiations, PPD will commission an outside review of the PPD Code of Conduct to inform the collective bargaining process.

### 11. Use of Force Policy Review and Reforms

Mayor Kenney and Commissioner Outlaw have accepted President Obama's challenge to review police use of force standards and policies in Philadelphia. As part of this, PPD initiated a review of its Use of Force policies against the Police Executive Research Forum's Report, "*Use of Force: Taking Policing to a Higher Level – 30 Guiding Principles*." Following completion of the review, the reform committee responsible for the review will engage the community by seeking a diverse range of input, experiences and stories. Findings of the review and engagement efforts will be submitted to the public, and feedback will be sought prior to implementation.

Complementing this review process, several reforms already adopted include: (1) all use of force incidents are to be reported via Police Radio; (2) intentionally pointing a firearm is now considered a use of force and must be recorded on a PPD Use of Force form; and (3) a Directive update to more clearly articulate the already-existing prohibition against kneeling on a person's head or neck.

### 12. After-Action Review

PPD is in the process of conducting an after-action review of May – June demonstration activity. PPD has engaged CNA, a non-profit consulting firm, and the law firm Montgomery McCracken Walker and Rhoads, LLP to conduct an independent after-action review of the City's preparation and response to recent protests, demonstrations, police use of force, and other activities during the time period. In addition to their review of PPD policy, personnel and internal documents, CNA and Montgomery McCracken intend to seek community engagement through interviewing active participants and community members to gain a holistic perspective of the events. The review is ongoing.

### 13. Violence Reduction Strategy

In an effort to support and enhance its comprehensive gun violence reduction plan, the Philadelphia Roadmap to Safer Communities, the City has implemented the Group Violence Intervention ("GVI") - an evidence-based approach that elevates the role of community support and social services in reducing gun violence. GVI partners law enforcement with the community to focus on the small and active number of people driving the violence which plague many of the City's neighborhoods. As part of the ongoing reforms, PAC has completed a review of the GVI and made several recommendations. A working group, again including Plaintiffs' counsel in this matter, has been convened to review these recommendations. Implementation is forthcoming.

### 14. Civilianization

The City will review uniformed positions and determine whether they could be converted to civilian positions. Though PPD has had a meeting with a potential vendor to oversee this review, no decisions have been made yet, given costs associated with the study.

### 15. Alternative Responder Process Assessment

PPD is mindful of the critique that, over time, too many functions have been placed on police officers. PPD is over one year into a large-scale review of police calls for service, the manner in which those calls are answered, and whether certain of the calls would be better served by other departments. PPD intends to use the results of this review to seek partnerships and develop coordinated responses with other City agencies.

PPD is also partnering with Accenture for this project and will receive the benefit of their Capacity Planning Tool. This pro bono engagement will entail an evaluation of

the dedicated time PPD frontline officers currently spend dealing with crisis calls and the resulting impacts. PPD looks forward to partnering with other city agencies to ensure that Philadelphia citizens are receiving the proper services in a proper manner. Accenture is scheduled to begin work on this project in September 2020.

**B. THE CITY'S RESPONSE TO, AND IMPLEMENTATIONS REGARDING, PLAINTIFFS' PROPOSED MEASURES AND REFORMS**

Plaintiffs have sent the City a series of proposed reforms and revisions to existing PPD protocols and procedures. As set forth below, Plaintiffs' suggestions are appreciated and the City and PPD are already taking meaningful steps to adopt some of them, with still more contemplated in the coming months. The City's response to Plaintiffs' proposals is as follows:

**1. <u>Additional Error-Specific Training</u>**

Plaintiffs propose that PPD's training regarding pedestrian stops be updated in order to address recurrent issues – both with respect to the quality of stops themselves and racial disparities – in the area of pedestrian stops. Specifically, Plaintiffs propose that "*retraining* . . . should include information as to the types of stops and frisks that continue to be made without reasonable suspicion, the hit-rates for weapons and contraband based on the reasons for the frisks, and the racial disparities reflected in the reports of the experts." Pl. Proposals, at 2.

PPD and the City wholeheartedly agree and have already taken steps to update and implement the type of *retraining* on *Bailey*-specific issues that Plaintiffs suggest. The Training Bureau is actively putting out additional training, and has already disseminated a message to all PPD members on the holding of *Commonwealth v. Hicks*,

and the distinction between a mere encounter and investigatory "stop" in situations where a person is carrying a firearm without particular suspicion of wrongdoing. Also in the immediate term, PPD is drafting an updated roll call message to address repeated errors in 75-48A completion, specifically including the four most common types of errors found in the most recent audit report (i.e. person with a gun, other investigation, narcotics violation, matched flash info). The roll call message will include specific examples of these errors, and is expected to be disseminated to all PPD officers no later than September 24, 2020.

Following this year's mandatory MPO training, the PPD Training Bureau will also be creating a pocket checklist, to be updated annually with pertinent case law, to aid supervisors in reviewing 75-48A forms. This checklist will include the key rules established in seminal cases such as *Terry v. Ohio*, *Illinois v. Wardlaw, Commonwealth v. Hicks*, and *Commonwealth v. Graham*. PPD will present a draft of the checklist to the Law Department for approval and targets an early February 2020 dissemination date. Supervisors will be encouraged to refer to these checklists when they are unsure about the propriety of a "stop" or "frisk."

PPD will further emphasize these issues in a *Bailey*-specific, detailed training module conducted by Inspector Robin Hill, in which Inspector Hill specifically addresses the same recurrent errors and the appropriate ways to cure them. One of Inspector Hill's upcoming training sessions will be video-recorded and incorporated into the 2021 annual training for all Philadelphia police officers.

Finally, PPD notes – as mentioned above – the expectation that in late September 2020, the National Training Institute on Race and Equity (NTIRE) will begin delivering a

comprehensive Implicit Bias and mitigation training to all PPD personnel (sworn and non-sworn), which will entail a two-day training session.

### 2. Data Analysis and Monitoring of Officers

Plaintiffs propose that commanders at the district-level be required to review data to determine (a) racial breakdown of stops by officer; (b) racial breakdown of stops and frisks without reasonable suspicion; (c) racial breakdown of stops by officers with very high numbers of stops; and (d) officer stops for minor offenses where racial disparities are very high.

PPD agrees that these categories of data should be recorded, evaluated, and communicated to commanders at both the district level and executive level, and is taking multiple steps to gather this data for analysis. In the near term, the City and PPD have enlisted the assistance of the Racial, Ethnic, and Diversity subcommittee of the MacArthur Foundation to examine and analyze the Relative Rate Index and existing disparity in pedestrian stops. PPD is establishing an internal team to work with the Foundation on this project. PPD's proposal for Plaintiffs' counsel to also participate in the subcommittee was recently granted, and counsel for Plaintiffs has indicated his intent to participate. The City expects the subcommittee to conduct a thorough, data-based analysis on which potential curative measures can be based. All findings will be communicated to PPD commanders.

Also in the coming months, PPD will be conducting a comprehensive internal review and investigation into the police Districts and specific Police Service Areas (PSAs) with particularly high (and comparatively low) racial disparities in pedestrian stops. PPD is formulating an action plan to gather data regarding pedestrian stops in

these areas and conduct a "root-cause" analysis based on the data gathered. The City and PPD intend to develop an investigative plan in the coming months, to be shared with counsel for Plaintiffs by December 15, 2020 for input and feedback. This District / PSA review is expected to supplement the work of the MacArthur Foundation and the department-wide culture and accountability reforms referenced above. As there is little or no precedent for a review of this nature, this is expected to be a significant, but highly meaningful undertaking.

### 3. Camera Footage Review

Plaintiffs' propose that PPD conduct random audits of stops and frisks recorded by body worn cameras and install dashboard cameras in police vehicles. Currently, 2,150 body-worn cameras have been deployed to PPD personnel, with a **future rollout planned for *all patrol and special operations.*** This will require OIT to update and rewire all police districts with appropriate broadband capabilities to handle uploading of the footage.

PPD notes that randomly auditing officers' stops and frisks would likely run afoul of the CBA and would require – at minimum – PPD to meet and confer with the Fraternal Order of Police. In the alternative, the Standards and Accountability Unit intends to forward to supervisors the names of those officers who have committed past errors and whose 75-48A forms are thus subject to continued review in accordance with the recently implemented discipline system. The supervisors of these officers will then conduct random reviews of body camera footage of their pedestrian stops in accordance with standards established by the Commissioner.[2]

---

[2] This body camera review will be for training and educational purposes only in order to comport with the currently-in-effect Collective Bargaining Agreement.

PPD anticipates ironing out the particulars of this notification and review process over the next several months, with supervisory footage review to begin in February 2021.

### 4. **Incentivizing Conduct Consistent with *Bailey***

Plaintiffs suggest that PPD should – in addition to disciplining officers for 75-48A noncompliance – incentivize and reward conduct that is appropriate and comports with the standards established in this litigation. While Plaintiffs' suggestion is well-taken, PPD has a number of concerns about the implementation of a "reward" system for the performance of job functions. Beginning in November of this year, however, PPD commanders will address roll call once a month to reiterate examples of "good" and "bad" stops from within their command. PPD shares Plaintiffs' sentiments about the importance of positive reinforcement and will continue to emphasize an appreciation for good police work throughout the ranks.

### 5. **"Quality of Life" Stops**

Plaintiffs suggest that PPD reduce the number of formal stops of persons engaged in low-level (i.e. "quality of life") offenses, and instead direct the individual(s) to cease the conduct and move on. Plaintiffs also suggest that even these stops that are generated by 911 calls could be handled by a "mere encounter" and that in the long term, certain of these calls could be addressed through the 311 system instead.

At present, PPD remains committed to providing service to those who request it while still reducing negative interactions and formal pedestrian stops. And as noted above, the City has retained Accenture to assist in evaluating whether other departments might be better suited to handle certain calls or situations. The City and PPD remain open to discussions with Plaintiffs on all of these issues.

### C. COMMANDER'S MEETING

On August 17, 2020, PPD held a remote meeting with its command staff, the Law Department, and Plaintiffs' counsel, to discuss both the Fourth and Fourteenth Amendment issues that remain at the center of this litigation. In addition to emphasizing the importance of these issues, the purpose of the meeting was to solicit recommendations and suggestions from the commanders themselves, whether pertaining to a particular area of the City or the City as a whole. To date, Commissioner Outlaw has received a large number of responses, which will be reviewed starting next week. PPD intends for the most promising recommendations to be formulated into pilot programs with benchmarks, goals, objectives, and performance measures, both – where practicable – at the District and PSA level. PPD anticipates beginning to implement these programs in February or March of 2021, which are expected to supplement and work in conjunction with the various measures referenced herein.

### III. CONCLUSION

The City and PPD look forward to continuing to work with Plaintiffs' counsel to further the goals of this litigation and best serve Philadelphia citizens alike. The wide-ranging series of reforms set forth above – both individually and collectively – demonstrate the commitment of all interested parties in finding solutions to these very important issues.

Date: September 15, 2020

Respectfully Submitted,

*/s/ Craig M. Straw*
Craig M. Straw, Esquire
First Deputy City Solicitor

*/s/ Jonathan Cooper*

Jonathan Cooper
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5448
jonathan.cooper@phila.gov