IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | **C.A. No. 10-5952** |
| **v.** | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

**PLAINTIFFS' REPLY TO CITY'S PROPOSED RACIAL BIAS REMEDIAL MEASURES**

## I. Introduction

We submit this Reply to the City's Response to Plaintiffs' Proposed Remedial Reforms on racial bias in the stop-and-frisk practices of the Philadelphia Police Department ("PPD"). Plaintiffs' proposals were submitted in the Reply Report on Fourteenth Amendment Issues filed on July 20, 202. We will focus on these proposals again, but we first address the City's remedial measures and the question of the state of compliance of the PPD with the *Bailey* consent decree.

## II. Status of Compliance

The City asserts that there has been significant progress over the past several years with respect to the compliance of the PPD with the Fourth Amendment provisions of the Consent Decree. We agree, in part. Over the past five years, stops have gone from nearly 200,000 per year to approximately 80,000 in 2019. Further, the rates of stops and frisks without reasonable suspicion have improved, with stops without reasonable suspicion in the 15-20% range. However, this improper stop rate has not improved over the past 18 months, and the rate of improper frisks remains stubbornly high, in the 25-35% range. Accordingly, ten years into this litigation there is still not substantial compliance on Fourth Amendment

issues.[1] In any event, the reduction in stops and increased compliance with the reasonable suspicion standard have not reduced the large racial disparities that have long-plagued stop and frisk practices in Philadelphia. Our data shows that the reduction of stops for the period 2017-2019 was lower for Blacks, at 27.2%, than for Whites, at 34%.

III. **The City's Proposals**

The City has stated that in recognition of the "national conversation regarding racial and social disparities in policing" and its commitment to "justice and equality" and to "meaningful police reforms," it is moving to end racial bias in policing. Response, at 2. We appreciate this commitment and the willingness of the City and PPD to include counsel for plaintiffs and community organizations in a collaborative process. We further recognize that some initiatives as outlined in Section II of the City's Response are being implemented and considered but, as we discuss below, these measures do not directly address the core issue of racial bias in stop-and-frisk practices. Most important, therefore, is the

[1] We are hopeful that the disciplinary measures adopted by the PPD and approved by this Court in 2019 will have an impact on the quality of stops. The audits conducted by the PPD and plaintiffs' counsel have shown that stops and frisks without reasonable suspicion are primarily concentrated in stops for suspected firearms and narcotics violations, and those made on "flash information" of criminal conduct. The PPD's training and re-training has had some impact, but there is still significant room for improvement. We also caution on mixed messages to officers. In testimony on September 3, 2020, before City Council on policing and gun violence, Deputy Police Commissioner Melvin Singleton stated that notwithstanding the limits on stops for firearms imposed by the Pennsylvania Supreme Court in *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019)(prohibiting stops for observed firearms unless officer has reason to believe that the individual does not have a license to carry or is otherwise engaged in criminal conduct), the Department approves of officers who engage in such prohibited stops in areas of gun violence, and that the PPD is willing to see such stops found illegal in court with the trade-off of getting a gun off the streets. No other official from the PPD, including Commissioner Outlaw, who was at the hearing, countered this position. *See* https://www.youtube.com/watch?v=zLL-FJxfz0g. We further note that frisks for firearms have been highly ineffective, with an average seizure rate of approximately one firearm for every 100 frisks.

status of negotiations between the City and Plaintiffs with respect to remedial measures that directly impact the problem of racial disparities.

The City's proposed reforms include initiatives that would increase the "Transparency of Civilian Complaint and IAD investigation procedures and Police Board of Inquiry Hearings," create a "Mediation Policy for Resolution of Low-level Civilian Complaints," establish a "Police Oversight Commission" and an "Early Intervention System," reform "Search Warrant Practices" by requiring inclusion of exculpatory information in affidavits and a prohibition of no-knock entries, promote "Technology Review," "Collective Bargaining Changes," "Use of Force Review and Reforms," "Independent Review of Use of Force at Political Protests," and a "Violence Reduction Strategy" and "Civilianization" of certain PPD positions. These programs, while necessary and welcome, mainly address issues other than racial bias.[2]

A few of the proposals are connected to the issue of racial bias. Thus, the "Culture and Accountability Reforms" includes plans for Department-wide implicit bias training, a measure we have also proposed, but with the caveat that a number of studies have shown that these trainings have little impact unless they are well-planned, comprehensive in delivery, and tailored to address an audience that is highly skeptical of the necessity of such training.[3]

The proposal on hiring is aimed at increasing the racial and geographic diversity of the PPD through reforms in recruitment and hiring. Again, this is a necessary and welcome project, but unless the PPD makes extensive changes in this program, and in particular with respect to "disqualification" standards

---

[2] We also point out that these proposed reforms are at different stages of consideration by the PPD, and most have yet to be fully defined or implemented. Further, the Police Oversight Commission is on the ballot for this November. We look forward to receiving additional time frames and substantive details on each set of these reform measures.

[3] Accountability reforms also include the adoption of the ABLE program, which we endorse.

for recruits (e.g., poor credit history, physical fitness requirement, past low level criminal charges), we doubt that these efforts will lead to significant changes in the racial make-up of the PPD.[4]

Finally, the proposal on "Alternative Responders" mirrors to some degree our broader proposal for limiting police-civilian stops and other interactions by having other professionals respond to and address calls for service or contacts with populations in need of social services, as opposed to police interventions (e.g., homeless, persons with mental illness). However, since the City's partnership with Accenture to plan and implement a "Capacity Planning Tool" is just beginning, this important issue will need some time for resolution.

IV. **City's Response to Plaintiffs' Proposed Remedial Measures**

In this section, we address the City's response to our racial bias remedial measures and identify what we believe are necessary steps towards implementation. For ease of reference, we first re-state our each of our proposals and then address the City's response.

1. Training [Plaintiffs' proposal]

"All members of the PPD, regardless of PSA assignment, including officers, supervisors, and commanders, should be re-trained regarding the *Bailey* Consent Decree's prohibition on racially biased stops and frisks. Further, all members of the PPD should be advised that they will be held accountable (a) for stops or frisks that violate the Consent Decree as racially biased, (b) for a supervisor's failure to correct and/or sanction such stops or frisks (with disciplinary measures similar to those adopted to address Fourth Amendment violations), and (c) with respect to

[4] The proposed reforms regarding hiring are an example of the point made above about the tentative status of a number of the City's proposals which are still in a planning and formulation stage, and do not yet incorporate substantive policies and practices. Accordingly, we have discussed with City a reporting timetable for updating the Court and Plaintiffs on these initiatives. *See Section V.*

Commanders, their failure to address patterns of racially biased stops in their districts or PSAs, based on the *Bailey* Benchmarks. In the same way that the PPD has undertaken to discipline individual officers and supervisors for Fourth Amendment violations through audits of stops and frisks, the PPD should proceed with disciplinary action where the data regarding racial distribution of stops and frisks demonstrates individual responsibility of officers and immediate supervisors, and for Commanders and others who function at high levels, where their districts continue to show racially biased policing patterns. The need for supervisory and commander accountability on the issue of racially biased policing is critical, and the PPD should consider use of "Compstat" reviews of racially disparate policing in the same manner that such reviews are done for crime patterns."

*City's Response:*

The City states its full agreement with this proposal, but states concerns regarding the scope and focus of the re-training that we requested. The re-training outlined by the City focuses primarily on *Fourth Amendment* issues, e.g., the rules regarding mere encounters and stops, the *Hicks* standard with respect to stops for firearm violations, and the holdings in leading U.S. and Pennsylvania Supreme Court stop and frisk cases. These re-trainings are necessary given the number of stops and frisks without reasonable suspicion, especially in firearm, narcotics, and "flash information" investigations. But even if successful in reducing the number of stops and improving quality, these measures will not necessarily reduce racial disparities. Because stops that are in full compliance with Fourth Amendment standards can be the result of racial bias if made of Blacks, but not Whites, for the same or similar conduct, they would be evidence of racial bias and would be in violation of the Consent Decree and the Fourteenth Amendment.

Our proposal on training is more “race” specific in calling for explicit mandates for officers, supervisors, and commanders that racially biased stops patterns are prohibited by the Consent Decree and will be subject to sanctions and discipline. This training element is necessary as some officers may believe that if stops (and frisks) are made with reasonable suspicion, the officer has acted properly. In follow up discussions with the City after receipt of the City’s Response, we were informed that the PPD is in agreement with our central points on training, including the need for advising officer, supervisors and commanders of the sanctions that could be imposed for stops and frisks that reflect racial bias. The City also informed plaintiffs that the PPD will be updating its Commissioner’s Memorandum on Bias in Policing (we suggest that it should become a Directive), and that racial bias issues will be part of all re-training on stop and frisk practices. Finally, we are informed that Dr. Marks will be starting the implicit racial bias training on October 28, 2020 and will be using stop and frisk data and analysis in this program.

We recognize the difficulty in assessing whether any individual stop or frisk was improperly motivated by race and, therefore, our proposed measures focus on “patterns” of racial bias, and the responsibilities of supervisors and commanders to detect and affirmatively address these patterns in their districts and PSAs. This approach necessitates an understanding of the reasons why racial bias patterns develop, as well as a clear message that the failure to address these patterns will be subject to discipline. We address this issue in more detail in connection with plaintiffs’ following related proposal.

2. <u>Commander Responsibilities and Data Analysis [Plaintiffs' proposal]</u>

"The PSAs identified in the Tenth Reports that comprise majority Black populations that have experienced disproportionately high stop rates and the minority Black PSAs in which Blacks are disproportionately stopped should be the subject of immediate remedial measures. Within 60 days, the City should provide a report to the Court and Plaintiffs' counsel from the Commissioner and the Commanding Officers in these PSAs setting forth (a) their explanations for these racially disparate practices, and (b) a detailed plan to remedy these practices. This plan should include details as to the standards for reviews in each PSA, reporting of racial distribution of stops and frisks, the re-training and disciplinary measures to be implemented, and the reporting of disciplinary actions taken with respect to officers and supervisors. The City could start the remedial process in PSAs where it thinks there are the most serious problems and then extend those remedies on a Citywide basis."

*City's Response*

The City agrees with the proposal that commanders at the district level be required to review data regarding the racial breakdown of stops and frisks and has requested a subcommittee of the MacArthur Foundation Project to assist in the analysis of this data with input from plaintiffs' counsel. The City also states that it will be conducting an audit and review of the Districts and PSAs that have particularly high racial disparities and is "formulating an action plan to gather data regarding pedestrian stops in these areas and conduct a 'root-cause' analysis" that will be provided by December 15, 2020.

We are advised that the action plan will include the requested reports of Commanders as to their understandings of the reasons for racially disparate practices

in their Divisions as well as detailed remedial measures that will be implemented to address racial disparities in the stop and frisk program. There is also agreement between the parties that the "action plan" (and the City's additional audits) will address the findings made by Professors Abrams and Kane on specific patterns of racial bias. As set forth in Plaintiffs' Reply Report on Fourteenth Amendment Issues, the relevant data includes:

(a) Of the approximately 39,000 stops for Quarters 3 and 4, 2019, of the 2600 officers who made these stops, 260 officers (approximately 10% of those making stops) account for 50% of all stops, and the top 50 officers account for approximately 20% of all stops. Report, Table 1. Of those 50, 16 are in PSA 242, and no other PSA had more than 4 officers in the top 50.

(b) Black-White differences in stops without reasonable suspicion were far greater in certain PSAs, including some PSAs where white stops were at or close to 100% with reasonable suspicion, but where Black stops were made with high rates of no reasonable suspicion. Report, Table 2. Further, on the same metric of stops without reasonable suspicion, there are significant differences across PSAs. In 17 PSAs, over 20% of stops were without reasonable suspicion. Report, Table 3.

(c) Primarily Black PSAs had higher rates of stops than primarily white PSAs (where race neutral reasons for these stops did not explain the different rates), while primarily White PSAs had far higher

numbers of Black stops when compared to their population share, than in less White populated PSAs. See Tables 4 and 5.

Commanders should be provided with this data analysis and it should be their direct responsibility to engage both mid-ranking supervisors and patrol officers to bring their Districts into compliance with the Consent Decree and the Fourteenth Amendment. We strongly believe that once officers and supervisory officials know that their Commanders are being held responsible (or, being credited) for their actions on racial bias, there will be enhanced compliance with the Consent Decree and the Fourteenth Amendment.

3-4. Quality of Life and Social Service Stops [Plaintiffs' proposal]

"Except in exigent circumstances presenting an present threat to public or personal safety, officers should not engage in stops or frisks of persons suspected of committing "quality of life" offenses, including public possession of an open liquor container, curfew violation for persons under 18, small amounts of marijuana where the offense is suspected by smell and/or by the mere appearance that an a smoking object is marijuana, littering, "obstructing" a sidewalk or passageway, public urination, truancy, trespass (where offense is after-hours presence in a public park or other area), panhandling, prostitution, and minor "disturbances." Rather, where intervention other than an informal request to refrain from the conduct is necessary, the officer should have PPD dispatch to refer the issue to the appropriate governmental or private agency or through the 311-program referenced below."

"To reduce the unnecessary use of police stops and to improve the delivery of effective services, the existing 311 system should be expanded. Currently, uniformed and armed PPD officers are being asked to intervene and provide services that are unrelated to crime

prevention, investigation, and public safety, a practice that has led to encounters that do not advance public safety, adversely impact police-community relations, and hamper the ability of officers to devote the necessary resources to appropriate policing services. An expanded 311 system for interventions involving the homeless, calls for assistance based on physical or mental health needs, and other related service calls, would assign those responsibilities to other professionals. Police would serve as back-up upon request of the 311 responders."

*City's Response*

The City responds to these proposals by first referencing its retention of Accenture to evaluate current practices to determine if certain types of police stops can be better handled by other departments (the "311" issue). On the related question of whether the quality of life stops should in the first instance be handled by an informal direction to the person involved to move on or to otherwise desist in the triggering conduct, the City stated that it is "committed to providing service to those who request it while still reducing negative interactions and formal pedestrian stops." There have been further discussions, and while the parties are not in full agreement on the merits, there has been some clarification of the City's position. Accordingly, we set forth our position and the reasons for the proposal, and then provide an update on the current state of negotiations.

First, as noted above, the partnership with Accenture has just started and, therefore, any policy changes that might result from its study are far down the road. We think that the urgency of this issue requires more immediate reforms that can be implemented while the City's study on the 311 issues proceeds.

Second, approximately 40% of stops are for quality of life conduct, and many of them are unnecessary from a public safety point of view. [5] The person with an open liquor container can be told to put it away without a formal stop, detention, record check (and frisk if the officer thinks for some reason that he is armed and dangerous). Indeed, in a number of these stops, the officer reports that the person engaged in the conduct was first told to desist or leave the area, and they were formally stopped and investigated only upon a refusal to do so.

Third, with respect to the City's stated concern that 911 callers expect a police response, our review of tens of thousands of stops over the years of monitoring show that the vast majority of these stops are based on an officer's observations, and not in response to a civilian call to 911 or a request for service to an officer. And even where a civilian has initiated the investigation, she is no doubt far more interested in seeing that the conduct ends, than in how that result is achieved.[6] Moreover, what we suspect is the real driver of formal stops—to check for an outstanding warrant—is neither productive (very few warrants are discovered) and in any event cannot justify the thousands of stops of low level offenses which create community distrust of police.

In discussions that followed the City's Response, we were informed that the PPD is still evaluating the proposal and has not rejected the proposal in whole or in part. The parties have therefore agreed that the City shall file a report with the Court by November 15, 2020 that states its position on plaintiffs' proposal for ending large numbers of quality of life stops,

---

[5] We have regularly found that racial disparities are higher for quality of life stops than for all other categories of stops and strongly suspect that many more White quality of life offenders are being told to "move on" without being subject to a formal stop.

[6] We share a concern with the City that the "mere encounters" we are suggesting for quality of life offenses may go unrecorded and therefore not subject to supervision or oversight. Of course, that is true for current practices where officers have the discretion to not make a formal stop. Further, the Department could require recording by way of the officer's daily activity sheet or by other forms of record-keeping.

with details as to how and when any changes in policy will be implemented. At that point, the parties will further discuss the issues and if an agreement is not reached, plaintiffs will make a formal request for a Court order on this matter.

5. Duty to Intervene [Plaintiffs' proposal]

"To ensure compliance with proper stop and frisk practices, and to deter and prevent other incidents of police misconduct, the PPD should enact a Directive on the duty to Intervene and report misconduct with requirements that officers:

a. intervene when another officer engages in conduct that is unlawful or violates departmental Directives or other regulations;

b. promptly report that misconduct incident in writing to the offending officer's supervisor; and

c. fully cooperate in any investigation or proceeding related to that incident."

*City's Response*

The City has indicated its agreement with this principle and is engaged in implementation of the closely related ABLE initiative. The City also maintains that there is an existing Directive on the duty to intervene (which it will provide to the Court and plaintiffs before the next conference). We believe that existing policies have proven to be ineffective and to overcome a long-standing pattern of failing to report misconduct of fellow officers, a formal directive on interventions, with corresponding disciplinary measures, is essential.

6. Other Related Reforms [Plaintiffs' proposals]

a. "Enhancement of the PPD's effort to recruit women and people of color.

b. The adoption and implementation of incentives for policing that respect the rights of civilians as mandated by PPD Directives and the Constitution. In the same way that the PPD is required to discipline officers and supervisors for repeated instances of stop and frisk violations, it could affirmatively reward officers, supervisors and commanders for practices that exceed the norms. For example, given that the current rate of stops without reasonable suspicion is approximately 15%, PSAs or other units that perform at a 10% or lesser rate could be recognized in some concrete manner.

*c.* The expanded deployment of body worn cameras, under terms and conditions that the devices be used for the entirety of a civilian or other encounter, are properly preserved for review, and are subject to regular audits to ensure proper use of the cameras."

*City's Response*

As to (a), the City has otherwise set forth its plans on recruitment and hiring. *See* Response, at 3.

As to (b), the City agrees with the "incentivization" concept, but not with specific "rewards" for performance of job functions in a manner expected of officers. Commanders will address this issue by providing examples of "good" and "bad" stops at roll call.

As to (c), the City reports that it plans to have body worn cameras for all patrol and special operations' officers, but it provides no date for the full

implementation of this program. The City states, however, that the current collective bargaining agreement with the FOP bars random auditing of stop and frisk actions by officers. We do not think that is accurate and the current policy on body worn cameras, while cautioning against review of recordings for the "sole purpose" of random discovery of violations, allows reviews to address performance deficiencies and to facilitate early interventions. In any event, a court order in *Bailey* as a remedy for violations of the Consent Decree and the Fourth Amendment would not be subject to FOP agreement.

## V. **Requested Court Orders**

The Court has scheduled a conference call for October 8, 2020, to discuss the status of remedial measures. Based on the discussions and negotiations between the parties, plaintiffs will be requesting specific court-ordered remedial measures, as follows:

1. Starting December 1, 2020 all members of the PPD, including officers, supervisors, and commanders, shall be re-trained regarding the *Bailey* Consent Decree's prohibition on racially biased stops and frisks. Further, all members of the PPD shall be advised that they will be held accountable (a) for stops or frisks that violate the Consent Decree, (b) for a supervisor's failure to correct and/or sanction such stops or frisks, and (c) with respect to Commanders, their failure to address patterns of racially biased stops in their districts or PSAs. The PPD is further ordered to institute disciplinary action where the data regarding racial distribution of stops and frisks demonstrates individual responsibility of officers and immediate supervisors, and for

Commanders in districts that have been identified with racially biased policing patterns.

2. By December 15, 2020, the City shall provide an "action plan" (referenced in its Response and as amplified in further negotiations, *see supra,* 7-8) to the Court and plaintiffs' counsel setting forth the scope of Commander's responsibilities in addressing patterns of racial bias in their Divisions, the Commanders' explanations for existing racially disparate stop and frisk practices, and the remedial measures that have been implemented or will be implemented by the Commanders.

3. By November 15, 2020, the PPD shall file a Report with the Court that addresses in detail its plans and policies regarding changes in quality of life stop and frisk practices. Thereafter, the parties will discuss the substance of the plan and new policies as well as an implementation schedule and will report back to the Court by December 1, 2020 on those matters.

The parties understand that if a full agreement is not reached, plaintiffs may seek a court order that the PPD institute the following measures, in line with plaintiffs' current proposal:

"Except in exigent circumstances presenting a threat to public or personal safety, officers shall not engage in stops or frisks of persons suspected of committing "quality of life" offenses, including public possession of an open liquor container, curfew violation for persons under 18, small amounts of marijuana where the offense is suspected by smell and/or by the mere appearance that an a smoking object is marijuana, littering, "obstructing" a sidewalk or passageway, public urination, truancy, trespass (where offense is after-hours presence in a public park or other area), panhandling, prostitution, and minor "disturbances." Officers may, without

making a forcible stop, instruct the subject to cease the offending conduct, and if the subject refuses to do so, following a warning, the officer may then conduct a stop to issue a citation, or other legal steps to secure compliance."

4. The PPD shall by [date] issue an updated Directive requiring all officers and supervisors to:

    a. intervene when another officer engages in conduct that is unlawful or violates departmental Directives or other regulations;

    b. promptly report that misconduct incident in writing to the offending officer's supervisor; and

    c. fully cooperate in any investigation or proceeding related to that incident.

5. In addition to the Reporting requirements previously referenced, the City shall provide reports to the Court and Plaintiffs' counsel, every 90 days, that address the following projects:

    --Deployment of body worn cameras on a city-wide basis and under terms and conditions that the devices be used for the entirety of a civilian or other encounter, are properly preserved for review, and are subject to regular audits to ensure proper use of the cameras;

    --Implementation of the Active Bystandership for Law Enforcement Program/ABLE designed to increase internal accountability, decrease misconduct, and improve officer safety and wellness.

    --Implementation of Implicit Bias Training for the PPD, under the direction of Dr. Marks and the National Training Institute on Race and Equity.

    --The proposed appointment of a Diversity and Inclusion Manager, who will develop policies to increase diversity of new recruits.

    --The PPD request for technical assistance from the International Association of Chiefs of Police (IACP) Collaborative Reform Technical Assistance Center (CRI-TAC) to conduct a comprehensive review of recruitment and retention efforts.

--The proposed Early Intervention System ("EIS"), intended to assist in the management and retention of PPD officers, by recording and evaluating officer performance, and specifically identifying at-risk officers.

--The Accenture project on possible expansion of the 311 system and other alternatives to police interventions on service-related calls and responses to medical or other non-criminal investigations.

Respectfully submitted,

s/David Rudovsky
Paul Messing
Susan Lin

Kairys, Rudovsky, Messing, Feinberg & Lin
718 Arch Street, Philadelphia, PA 19106
214-925-4400

Mary Catherine Roper
ACLU of Pennsylvania

Counsel for Plaintiffs