**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | **C.A. No. 10-5952** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

**[PROPOSED] ORDER**

And now, this _____ day of _____, 2021, upon consideration of

Plaintiffs' Motion to Mandate Racial Bias Remedial Measures and the Defendants' response, it is

hereby ORDERED:[1]

1.      No later than May 1, 2021, the PPD shall issue new or amended directives

regarding stop and frisk practices by Philadelphia police officers and supervisors for stops

involving quality of life offenses ("QOL"), including carrying open liquor containers,

obstructing sidewalks, public urination, minor disturbances, panhandling, littering, spitting,

gambling, "trespass" in parks or other areas after hours, and suspected smoking of marijuana.

Absent exigent circumstances that present an immediate risk to public safety, officers who

observe or respond to reports of QOL offenses shall first conduct "mere encounters," advising

the individual(s) involved to refrain from the prohibited conduct and/or to move from the area

in which the alleged offense has occurred.  These encounters shall not involve a "stop" of the

individual(s) as currently defined by PPD directives on stops, frisks, and investigative

detentions, or the completion of a PPD 75-48A form; rather, the encounter shall be recorded

on a PPD document designed to record these types of encounters.  If the individual(s) do not

---

[1]      Both parties are in agreement with the provisions in bold, paragraphs 4 through 8.

comply with the directive to cease the offending conduct or to move from the area, the officer may then conduct a "stop" consistent with current PPD Directives that require reasonable suspicion of criminal conduct.

2.      No later than May 1, 2021, the PPD shall submit to the Court and the Plaintiffs a plan and protocols for (a) internal discipline of officers and supervisors for violations of the *Bailey* Consent Decree provisions prohibiting racial bias in stop and frisk practices and (b) incentivization of policing practices consistent with the *Bailey* Consent Decree provisions.

3.      The discipline plan and protocols referenced in para. 2, *supra*, shall include metrics and benchmarks for assessing racially biased stops by individual officers and for the failure of supervisors and Commanders to correct and prevent racially biased stops or frisks, as follows:

a.      For patrol and tactical unit officers, the plan and protocols shall require evaluation of stops or frisks made without reasonable suspicion (including by race of suspect), the hit rate for frisks for weapons (including by race of the suspect), QOL stops (including by race of the suspect), the number of stops of Black and White suspects, and civilian or internal complaints relating to stops and frisks.  Additional information and metrics will be designated and submitted to the Court based on the current audits, research, and analysis being conducted by the Police Advisory Commission. *See Plaintiffs' Memorandum of Law*.

b.      For supervisors and Commanders, the plan and protocols shall include (1) real time assessment of data pertaining to the legal sufficiency of and racial disparities in stops and frisks in their areas of command by district patrol officers and by officers assigned to tactical units, (2) periodic reporting by Commanders and/or assigned Accountability Officers of the reasons for racial disparities in their areas of command, (3) details as to

supervision and oversight of officers to ensure compliance with the Consent Decree, and specifically that stop and frisk practices are free from racial bias, and (4) standards for performance evaluations and for assessing Commanders' success in ensuring compliance with the Consent Decree.

4.      No later than July 1, 2021, the PPD shall assign specially trained **Accountability Officers to five Police districts to be designated by the parties. The Accountability Officers shall be assigned to the District Captains and shall be charged with the responsibility of using real time data in evaluating and addressing patterns of stops and frisks without reasonable suspicion and evaluating and addressing racial disparities and racial bias in stops and frisks within their areas of command.  The Accountability Officer's review shall include (a) the racial breakdown of stops by officer in comparison to other officers in the district or division (including officers in tactical squads or units); (b) the racial breakdown by stops and frisks with and without reasonable suspicion by all officers in the district or division, including tactical squads and units; (c) officers with very high numbers of stops (and their racial breakdown); and (d) stops for QOL offenses.  The metrics and scope of reviews shall be stipulated by the parties no later than June 1, 2021.  Absent an agreement on the metrics and scope of the reviews and evaluations by the Accountability Officers, the Court, on motion of the parties, shall Order appropriate guidelines for the Accountability Officers.**

No later than September 15, 2021, the parties shall evaluate the work of the **Accountability Officers and either agree on an expansion of Accountability Officer assignments and/or alternative measures in furtherance of ensuring PPD compliance with the Consent Decree.**

5.      The PPD shall provide *Bailey* specific training in the annual department-wide training that will include detailed instructions on the Consent Decree and the Fourth and Fourteenth Amendment standards that govern stop and frisk practices.  These sessions shall include specific examples of legal and illegal stops and frisks and shall include the findings in *Bailey* of patterns of racially biased stops.  All members of the PPD shall be advised that they will be held accountable by the PPD and the *Bailey* Court for stops or frisks that violate the Consent Decree.  All members of the PPD shall also be informed, consistent with the provisions of para. 6, *infra*, that the PPD will be engaged in random reviews of body worn camera videos and other PPD data to ensure compliance with the Consent Decree.

Separately, the PPD will continue with a program of implicit bias training and continue to implement the ABLE program.

6.      No later than June 1, 2021, the PPD shall implement a Command level review of randomly selected 75-48A stops forms and corresponding Body Worn Camera video ("BWC") in five Police Districts where high levels of racial disparities have been documented in *Bailey* audits.  At a minimum, the review process shall include a monthly review of ten randomly selected videos of pedestrian stops that have been documented by 75-48A forms.  Each set of Command level reviews shall be made in writing by the PPD Official responsible for the Command level review and the results of the first three months of BWC analyses shall be shared with Plaintiffs' counsel.  Thereafter, the parties shall evaluate the BWC process and either agree upon an expansion of the BWC reviews to other Police Districts and/or the implementation of alternative BWC reviews that ensure PPD compliance with the Consent Decree.

Further, the parties will by July 1, 2021, if feasible and operational by existing technology, implement a pilot BWC project that identifies stops where 75-48A forms were not recorded by officers.

Further, in connection with ongoing training, all members of the PPD shall be informed that the PPD will be engaged in random reviews of BWC and other data points to ensure compliance with the Consent Decree.

7.      The PPD shall continue to provide the Court and Plaintiffs' counsel with 90-day status reports on the initiatives of the PPD referenced in paragraph 7 of the Court's Order of November 12, 2020.

8.      No later than June 1, 2021, the parties shall provide to the Court any further agreements on reporting and evaluation of compliance requirements relating to this Order.


By the Court:


_____

**JOHN R. PADOVA, J.**