IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | **C.A. No. 10-5952** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO MANDATE RACIAL BIAS REMEDIAL MEASURES**

**I.     Introduction**

Over eight months ago, based on extensive data analysis by Dr. Robert Kane and

Professor David Abrams, experts for the respective parties, the Plaintiffs and the City agreed that

the long-standing patterns of racial disparities in stop and frisk practices demonstrated as well

systemic *racial bias* in violation of the Consent Decree and the Fourteenth Amendment.

Plaintiffs submitted remedial orders that would have immediately addressed these issues, but the

City suggested that more analysis was necessary to provide targeted measures in terms of the

patterns and places of racial bias.  Plaintiffs agreed to an audit process and the Court entered an

Order that the City conduct a "comprehensive internal review and investigation into racial bias

patterns in stop and frisk practices" and to prepare an "Action Plan" that would inform the

remedial measures process.  ECF No. 120 (Order of 11/12/2020).

The City's Action Plan, "*Philadelphia Police Department Stop and Frisk Internal Review

and Investigation,*" was prepared by Dr. Kane and the PPD Audit Team.[1]  Thereafter, the parties

---

[1]     The Report, attached as Exhibit A, is designated as a "Draft Action Plan," but to date it is
the only Action Plan submitted by the City pursuant to this Court's Order and Plaintiffs therefore
consider it as the PPD's final findings and analysis on the issues addressed.

discussed a range of remedial measures and, as set forth in the Motion, have agreed on several matters that are hereby submitted to the Court for its consideration and approval.  However, on several other issues, addressed below, the parties did not reach an agreement.  This Motion seeks Orders on those matters, as they are necessary to eliminate the current deep-seated patterns of racial bias in stop and frisk practices.

In this Memorandum of Law, we address the findings by the experts regarding racial bias in PPD stop and frisk practices and then provide the factual and legal grounds for the specific Orders requested.  The Court should reject the City's suggestion that more data analysis and studies are necessary before detailed and specific remedial measures can be implemented by the PPD.  In this *tenth year* of the Consent Decree, where both Fourth and Fourteenth Amendment violations are evident, there should be no further delay in the entry of remedial measures that flow directly from the data analysis provided by the experts.  Additional data analysis can inform and support this process going forward, but effective measures are needed now to protect against the daily systemic violations of the fundamental right to equal protection of the law.

## II.      The Findings of Racial Bias in PPD Stop and Frisk Practices

The November 12, 2020 Order requiring the PPD to conduct a "comprehensive internal review and investigation into racial bias patterns in stop and frisk practices" was based on the findings in Plaintiffs' Tenth Report on Fourteenth Amendment Issues (ECF No. 106).  Plaintiffs' Report included a statistical analysis by Professor Abrams that demonstrated patterns not only of racial disparities, but also of Fourteenth Amendment racial bias in stop and frisk practices.  The City's responsive Reports of June 17, 2020, and July 17, 2020, prepared by Dr. Kane, stated the City's agreement with the core findings of racial bias.  ECF Nos. 112 & 113.

Professor Abrams conducted a comprehensive analysis of stops and frisks for the second half of 2019 in accord with benchmarks approved by the Court.  These benchmarks provide reliable statistical measures for assessing racial bias in stop and frisk practices.  For 2019, as for many of the prior years, Professor Abrams found that the large racial disparities in stop and frisks are not explained by non-racial factors, as illustrated by the following:

1.      For the 65 City PSAs, there was an average of 439 stops of Black pedestrians, 118 for White, and 42 for Latinos.  ECF No. 106 (Plaintiffs' Tenth Report on Fourteenth Amendment Issues) at 3.  The Citywide stop rate per 10,000 residents was 565 for Blacks, 415 for Whites, and 172 for Latinos.  *Id.*  For those who were frisked after being stopped, 82% were Black, 12% White, and 6% Latino.  *Id.* at 4.

2.      A comparison of stops and census by race shows Black stops at 71%, census at 44%; White stops at 22%, census at 35%; Latino stops at 7%; census at 12%.  ECF No. 106 at 5.

3.      Blacks account for a higher share of the stops in all but one PSA; in several PSAs, Blacks are stopped at a rate of over five times their share of the population.  ECF No. 106 at 5.

4.      A regression framework was used to determine whether factors other than race account for the racial disparities in stops, with control variables of crime rates, demographics, and economic factors.  In the final analysis, including additional specification checks suggested by Dr. Kane, Professor Abrams found that the racial disparities were not explained by the non-racial control variables.  ECF No. 106 at 6-9.

5.      Regressions were run as well on the issue of the salience of race in pedestrian frisks, and once again there were statistically significant results: the frisk rate for Black detainees was 7.7% higher than for Whites which means that Black detainees were over 60% more likely to be frisked than White detainees.  ECF No. 106 at 9.

6.      Racial bias was also documented on the benchmark of the rate of *unreasonable*

stops and frisks by race, as measured by Fourth Amendment standards.  With respect to stops,

18% of Black stops were without reasonable suspicion, as opposed to 11% of stops of Whites,

and 13% of stops of Latinos.  A regression analysis showed that that Blacks *are over 50% more*

*likely to be stopped without reasonable suspicion than Whites*, a marked increase over previous

years.  ECF No. 106 at 10.  With respect to frisks, Blacks were 40% more likely to be frisked

without reasonable suspicion than Whites.  Id. at 11.  These findings mean that police employ a

higher factual threshold for what constitutes "reasonable suspicion" for White detainees as

opposed to Blacks.

7.      Hit rates for contraband were lower for Blacks than for Whites, and although the

results were not statistically significant at the 5% confidence level (due to the very low number

of contraband seizures), they suggested a pattern of racial bias.  ECF No. 106 at 12.

Dr. Kane accepted these findings and he also pointed to two other racial bias patterns in

stop and frisk practices:  In 2019, in seven *largely* Black populated PSAs (equal to more than

10% of all PSAs), the number of stops were "unusually high," thus evidencing racial bias in

these geographical areas, and in six PSAs with relatively *few* Black residents, there was a

significantly higher stop rate for Blacks, a pattern that Dr. Kane characterized as evidence of

stops of Blacks for being "out of place."  ECF No. 112, Exhibit A (Kane Report, June 17, 2020)

at 8-10.

Professor Abrams then conducted additional data analysis of the 2019 stops and frisks

and found that highly disparate racial policing was evident in over half of the City's PSAs.  In

Plaintiffs' Reply Report on Fourteenth Amendment Issue, filed, July 20, 2020 (ECF No. 114),

Professor Abrams ranked PSAs by (a) racial gaps in reasonable suspicion rates for stops, (b)

overall reasonable suspicion rate, (c) ratio of Black stops to population share, and (d) total stop rate, and made the following findings:

1.      For the approximately 39,000 stops for Quarters 3 and 4, 2019, of the approximately 2600 officers who made stops, 260 officers (approximately 10% of those making stops) accounted for 50% of all stops, and the top 50 officers accounted for approximately 20% of all stops.  ECF No. 114 at 6.  Of those 50 officers, 16 were in PSA 242, and no other PSA had more than 4 officers in the top 50.  *Id.*

2.      In a review of PSAs by Black-White differences in reasonable suspicion rates, there were PSAs in which White stops were *at or close to 100% for the presence of reasonable suspicion* and where Blacks have far lower numbers of stops with reasonable suspicion.  ECF 114 at 6.  Further, in 17 PSAs, at least 20% of stops were legally unfounded.  *Id.*, Table 3.  ECF 114 at 7.

3.      With respect to predominantly White PSAs, Blacks were stopped at rates up to 15 times higher than Whites.  For example, in PSA 12 with a Black population of 3%, Blacks comprised 42% of the stops.  ECF 114 at 21 (Table 4 of Plaintiffs' Reply Report).

4.      A comparison of PSAs with the highest rate of stops per residents showed several predominantly Black PSAs with very high rates of stops, but with lower violent crime rates than PSAs with lower levels of stops.  For example, PSA 122 with a largely Black population had a violent crime rate of 360 crimes for every 10,000 residents and police made 20.2 stops per 100 residents, while in a majority White PSA 62, with a higher crime rate of 502/10,000, the stop rate was only 8.8 per 100 residents.  ECF 114 at 22 (Table 5 of Plaintiffs' Reply Report).

As noted above, in response to Plaintiffs' Reply Report of July 20, 2020, the City engaged in a "'root cause' analysis" of racial disparities and racial bias pursuant to this Court's

Order of November 12, 2020.[2]  Following Dr. Kane's review of the relevant data and racial bias patterns as set forth in the Action Plan (Exhibit A), Plaintiffs provided the City with a revised set of racial bias remedial measures.  A central finding in the Action Plan was that Quality of Life ("QOL") stops are a major source of the racially disparate and biased stop and frisk practices, but notwithstanding these explicit findings, the City has refused to make any changes or reforms in QOL stops.

Further, the City resists Plaintiffs' requests for Orders on the key issues of disciplinary and incentive programs that are critical to an effective remedial process on racial bias patterns. The City suggests, as it did in its initial request for a "root cause analysis," that more data analysis and studies are necessary before the proposed remedial measures can be implemented. In that approach, the City has engaged the Police Advisory Commission ("PAC") to develop proposals for additional data collection and analysis.  While Plaintiffs respect the work of the PAC, and will work with PAC in this study, given the ten years of highly racially disparate and biased stop and frisk practices in violation of the Consent Decree, there should be no further delays in the ordering of remedial measures.

Additional data analysis can inform and support this process going forward, but effective measures are needed now to protect against the daily violations of the fundamental right to equal protection of the law.  The proposed Orders will reform QOL stop and frisk practices that drive a

---

[2]     The Order required the PPD to (1) develop an Action Plan with the direct assistance of the City's expert, Dr. Robert Kane, to assess patterns of racial disparities and racial bias in stops and frisks (ECF No. 120 ¶ 2); (2) to retrain all members of the PPD "on the Fourth and Fourteenth requirements and prohibitions" of the Consent Decree (*Id.* ¶ 3); and (3) to file a report that "addresses in detail any plans and policies regarding changes in quality of life stop and frisk practices" and thereafter develop with the Plaintiffs an "implementation" schedule for any agreed upon changes in stop and frisk quality of life protocols (*Id.* ¶ 4).  The Order also imposed certain reporting requirements on other initiatives the PPD had implemented to address racial bias and related issues within the PPD.  ECF No. 120 ¶¶ 5-7.

good deal of the racial disparities.  They will further provide a system of accountability that both incentivizes constitutional practices and sanctions officers, supervisors, and commanders who fail to adhere to Fourteenth Amendment standards.

## III.   The Merits of the Proposed Remedial Measures

### A.   Quality of Life Stops

Each year, police make tens of thousands QOL stops that include carrying open liquor containers, obstructing sidewalks, public urination, minor disturbances, panhandling, littering, spitting, gambling, "trespass" in parks or other areas after hours, and suspected smoking of marijuana.[3]  Data regarding police stops produced over the ten years of monitoring the Consent Decree has shown that QOL offenses comprise 40-45% of all stops of pedestrians and that the racial disparities in these stops are consistently greater than stops for more serious offenses.[4]  Accordingly, Dr. Kane's audit and Action Plan focused on the racial disparities in QOL stops and his central finding, detailed below, was that QOL stops are a major source of the racially disparate and biased stop and frisk practices.  Exhibit A (Action Plan) at 9. Notwithstanding these explicit findings by the City's own expert, the PPD has refused to make any changes or reforms in QOL stops.

---

[3]    Offenses as minor as dropping the wrapper from a single straw can result in a forcible stop (and potential frisk) for littering. *See* 75-48A Stop Sequence number 6707043.  This and other stop narratives are part of the *Bailey* database and copies of the reports can be provided to the Court.

[4]    For the first quarter of 2020, just before the COVID shutdown, out of 1798 randomly selected stops, 815 were for QOL offenses, or 45% of all stops. The PPD has reported somewhat lower percentages, due in part to differences in what offenses should be labeled QOL.

To be clear, plaintiffs do not propose that the PPD abandon the policing of QOL offenses. Rather, Plaintiffs' proposal incorporates a basic reform by requiring, absent exigent circumstances, that the person engaged in the alleged quality of life offense first be asked to refrain from the objectionable conduct, and only if they refuse would officers be permitted to proceed with a formal stop. Officer intervention would be permissible if the incident cannot safely be handled by the civilian responder.[5]

The PPD has not presented any data that calls into question the robust findings of the experts that the QOL stops are even more racially biased than stops for serious crimes. Moreover, there is no evidence that QOL stops lead to seizures of weapons or have any impact on the overall rate of serious crime. To the contrary, Dr. Kane found

---

[5]     The PPD is engaged in a study and assessment of an Alternative Responder Process Program to determine whether 911 calls that involve medical, mental health, or other personal crisis issues, would be better addressed by other professionals. The parties have agreed to periodic reporting on this study, and plaintiffs will request submission of the final report to the Court and Plaintiffs.

        Other police departments have implemented alternative responder policies.  In Eugene, Oregon, 20% of 911 calls are diverted through the CAHOOTS program to two-person teams of crisis workers and medics who are trained to respond to people in behavioral health crisis. *See* https://www.vera.org/behavioral-health-crisis-alternatives/cahoots.  Portland Street Response in Oregon dispatches unarmed three-person teams consisting of an emergency medical technician, a community health worker, and a mental health worker to assist people experiencing houselessness or a mental health crisis. *See* https://www.portland.gov/streetresponse.  Similar programs have been initiated in Oakland, California (Mental Health First Oakland); Tucson, Arizona (through unarmed Community Service Officers who respond to minor, non-injury traffic accidents, criminal damage, and requests for community assistance); and San Francisco, California (Street Crisis Response Team).  In Ithaca, New York, the city administration is exploring the possibility of dividing responses to calls for service into those that can be handled by unarmed responders rather than armed officers.  *See* https://www2.tompkinscountyny.gov/ctyadmin/reimaginepublicsafety. *See also* Amos Irwin, Betsy Pearl, *The Community Responder Model*, Center for American Progress (October 2020) *available at* https://www.americanprogress.org/issues/criminal-justice/reports/2020/10/28/492492/community-responder-model/.

that these stops are both infused with racial bias and are "ineffective" in terms of

overall law enforcement.

      Dr. Kane made the following relevant findings:

- Of the 17 PSAs that were audited to determine the reasons for racial disparities and racial bias, 5 PSAs accounted for 51% of all stops and *96% of all stops were of Blacks, compared to 87% for all PSAs (with comparative Black populations of 93% and 87%).* Exhibit A (Action Plan) at 8.

- Of the stops in these five PSAs, 47.5% were for QOL (compared to an overall average of 35.8% QOL stops for all 17 PSAs). Exhibit A at 8. Further, 88% of the stops were based on officer *sight* observations (compared to 75.4% of all stops). *Id.*

- QOL and sight stops are more racially disparate than stops for serious crimes and for stops made in response to 911 or other community calls for intervention. *In other words, the more discretionary the stop, the higher the disparity.* Coupled with a low arrest rate, the Action Plan concluded that this policing is *"an inefficient law enforcement activity."* Exhibit A at 8.

- The Action Plan shows that Black detainees represent 92.3% of all persons stopped for QOL offenses, but only 83.5% of those stopped for non-QOL offenses, a differentiation found to be statistically significant. Exhibit A at 9.

- Sight stops (as opposed to 911 or other reports of crime) "were significantly and positively predictive" of stops of Blacks (with sight stops 72% more likely to produce a Black person stop). Exhibit A at 17.

- 35.8% of all sight stops were for QOL, 18% for narcotics, and 6% for bike violations, or 60% of pedestrian stops in the data base.  Exhibit A at 17.  Radio calls in the 793 stops account for only 5 instances of QOL stops.

The Action Plan concludes with the significant assertion that these findings "show the difference between police activities that are officer-driven and those that are community driven." Exhibit A at 18.  Racial bias results from "discretionary police decision-making" in stop and frisk practices as it does in "decisions about deadly force," and other policing interventions.  *Id.*

In direct contrast to the City's stated concern about responding to residents' requests for police interventions, Dr. Kane found that the great majority of QOL stops are the result of "sight" observations by police officers, who then have broad discretion as to how to respond (or not respond) to the activity or conduct.  Exhibit A at 17.  Plaintiffs' review of thousands of 75-48A reports also show that well over 95% of stops are made by officers in response to their observations and not from 911 calls.

Residents are concerned about a range of issues, including economic development and public safety, but there is no survey or other data that shows that they believe that forcible stops are the only way to handle QOL offenses.  Moreover, even if such sentiments were expressed, where, as here, the result is racially biased stops, there can be no justification for continuation of that practice.  Plaintiffs sets forth a process for addressing low level offenses in a less intrusive and non-racially biased manner.   QOL incidents should be addressed, but if they can be resolved by having the offender "move on" with an end to the objectionable conduct, that is sufficient.[6]  At the same time, the elimination of thousands of forcible stops for low-level

---

[6]     In one notable example, in response to a call from a City Council member regarding a homeless woman on a sidewalk in the district, police engaged in a "mere encounter," informed

infractions means fewer negative police/civilian encounters, less resentment of the police and, ultimately, improved police-community relations.

The PPD has provided data for 2020 that show a significant decrease in both car and pedestrian stops (pedestrian stops in 2020 were 29,339; in 2019 they were at approximately 79,000) and a large increase in shootings (from 1465 in 2019 to 2246 in 2020). To the extent that the PPD suggests that there is a causal relationship between the decrease in stops and the increase in shootings since 2013, and especially in 2020, the data are to the contrary. The large decrease in stops in 2020 was caused by COVID-19 and the increase in shootings is likely the result of a host of COVID-related and other factors. Indeed, aside from shootings, all other felonies dropped in 2020, notwithstanding the reduction in pedestrian and car stops.[7]

Moreover, QOL stops have no association, much less causal connection with violent crime trends. In our review of tens of thousands of QOL stops over the past 10 years, there have been a miniscule number of weapons recovered. In most of these stops, only a warning is issued, and arrests are made only in the rare cases where an outstanding warrant is identified. Where an intervention short of a stop can effectively respond to the low-level offense, there are no other

---

the woman how she could obtain an ID card and enroll in a welfare program and she then agreed "to walk off on her own accord." S*ee* 75-48A Stop Sequence No. 5966287.

[7]     The reported decrease in stops in 2020 was largely a product of COVID, but it may be partly explained as well by officers' failure to report stops (perhaps due in part to officer knowledge of the new disciplinary system for stops without reasonable suspicion). The City has made the point that the reported 95% reduction in stops in New York City is highly questionable. We do not know if same is true in Philadelphia, but to ensure compliance with reporting requirements, we will further explore checks on the failure to document a stop by tracing responses to 911 calls for service that would likely result in a stop and by periodic random reviews of videos captured by body worn cameras.

public safety concerns, and in any event, where *racial bias is manifest as it is here*, stops are prohibited by the Fourteenth Amendment and the Consent Decree.

Because the City has referenced the issue of racial disparities in car stops with respect to PPD's project with the Police Advisory Commission, we address some of those issues.[8] Significantly, The Defender Association analyzed over one million vehicle stops from 2014 through Q3 2019, and it found that car stop data mirrored pedestrian stop data on several racial disparity benchmarks.

- The vast majority (97%) of vehicle stops by the PPD are made for alleged motor vehicle code (MVC) violations.  MVC stops are almost always conducted as a matter of officer observation and discretion.

- While 43% of Philadelphians are Black, Black drivers comprised 72% of the 309,533 MVC stops conducted between October 2018 and September 2019.  The share of Black residents in a police district remains a significant predictor of stops even after controlling for violent crime, poverty, and other factors.  *See* Exhibit B, Figure 1.

- Black drivers are twice as likely to be searched as White Non-Latino drivers, but they are 34% less likely to be found with contraband.  Police require less evidence to justify the search of Black drivers.

---

[8]     The Complaint and Consent Decree in *Bailey* cover vehicular stops, but due to several factors, including monitoring resources and what appeared to be more problematic patterns of Fourth and Fourteenth Amendment violation for pedestrian stops, Plaintiffs monitored car stops for only a short period of time following the entry of the Consent Decree.  In the past several years, the Defender Association of Philadelphia has engaged in a comprehensive analysis of car stops using the same metrics and benchmarks that have been employed by the experts in analyzing pedestrian stops.  Accordingly, we present a summary of the Defender Association findings, which have been shared with the PPD and with City Council in connection with legislation pending in Council to substitute mailed summonses for car stops for minor MVC infractions.  The Defender Report can be made available to the Court.

- There are low rates of ticketing (10%), contraband recovery (0.67%), weapons recovery (0.17%), and arrests (1.32%).  *See* Exhibit B, Figure 3.

- 88% of MVC stops are in response to five violations: lights issues, disregarding a stop sign, illegal window tint, failure to signal/prohibited to turn, and expired tags (registration or inspection).  While a subset of stop sign and turning violations may amount to reckless driving, most of these violations are tantamount to QOL pedestrian stops as they do not have a direct bearing on traffic safety and do not support suspicion of criminal activity. Racial disparities in these stops are particularly pronounced, especially with respect to light issues and tinted windows.  *See* Exhibit B, Figure 2.

The relevance of car stop data is highlighted by a recent Memorandum sent by Captain Brian Hartzell of the Third Police District to all officers under his supervision stating that officer vacation requests would be conditioned on increased Code Violation Notices ("CVNs"), issued for violations of City Ordinances, and car stops.  *See* Exhibit C.  Captain Hartzell instructed the officers that motor vehicle stops were especially useful as they help to "*avoid the issues we have with the Bailey Agreement*." (Emphasis added).  In other words, pretextual car stops could substitute for pedestrian stops as a way of getting around *Bailey*, and a quota for stops was imposed for those seeking vacation time.

Finally, police are already trained to exercise their broad discretion to refrain from making forcible stops and rather to engage in "mere encounters" as a means of intervention.  For example, following the ruling in *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019), which prohibited stops of persons based only on observation of possession of a firearm (given the broad rights to licensed and Second Amendment legal possession of firearms), the PPD issued a training memorandum to officers suggesting that officers engage in "mere encounters" when a

13

firearm is observed as a way of gaining some additional information about legal or illegal conduct relating to that firearm.  Further, we have reviewed numerous 75-48A reports that reflect police discretion not to make a forcible stop for QOL (and other) offenses, and to use mere encounters to resolve the incident, for example by directing the individual to move on or end the proscribed conduct.[9]

The City provides no persuasive grounds for maintaining the racially biased status quo. The PPD ignores the detailed findings of Dr. Kane regarding the high levels of racial bias in QOL stops in the very audit the City insisted was necessary to frame proper remedial measures. The City provides *no* grounds or reasons for rejecting these well supported findings of its own expert, and it seeks to avoid any changes under the mantra of "additional data analysis."  As stated, we have no objection to continued analyses, but not at the expense of immediate measures necessary to counter racial bias.

Moreover, while the PPD has referenced increased shootings in Philadelphia, it provides no evidence that shows a causal relationship between decreases in QOL stops and violent crime. And regardless of any association or causative effects on crime that could be drawn from stop and frisk practices, if those stops are the result of racial bias, they are barred by the Fourteenth Amendment and the Consent Decree.

> **B.      Real Time Data Analysis, Discipline for Violations of the Consent Decree, and Incentivizing Conduct Consistent with the Consent Decree**

---

[9]      *See* 75-48A Stop Sequence No. 6077453 (in dispute at a Target store, police engaged in a mere encounter to "encourage male to leave" the store); 6077302 (police engage in a mere encounter to investigate a report of vandalism); 6078816 (assisting disoriented person who was homeless to seek help from Salvation Army); 6081091 (mere encounter with person who needed transportation to bus terminal).

Plaintiffs have proposed a dual system of incentivizing conduct consistent with the Consent Decree and discipline for those who violate the Decree.  *See* Motion to Mandate Racial Bias Remedial Measures ("Motion") ¶¶ 2-3.  Further, Plaintiffs have proposed a process for Commander real-time review of data regarding racial bias in stops and frisks.  In short, we have recommended a "Compstat" approach for policing practices that would mirror Compstat for crime control: the use of current relevant data in evaluating officer and supervisor conduct, here for the purpose of monitoring stop and frisk practices for patterns of racial bias.  Motion ¶ 4.

These proposals are mutually supportive: data on racial disparities are essential for Commanders and will enable them to craft policies and procedures to eliminate racial bias in pedestrian stops.  By the same token, once that data is available, there are sound metrics and benchmarks for supervision and discipline of officers, for holding Commanders responsible for continued patterns or racial bias, and for incentivizing constitutional policing.

The City has stated an agreement in principle on these measures, but it has suggested that more data is necessary before final remedial measures can be drafted and implemented.  The City has also raised operational and labor issues as possible barriers to disciplinary and incentivization measures.  But the City has failed to provide any alternative disciplinary procedures or even suggested standards and metrics for a disciplinary process. This Court has ordered disciplinary measures for officers and supervisors who violate the Fourth Amendment provisions of the Consent Decree, and without a similar system of accountability for racially biased stops, there can be no assurance of compliance with the Consent Decree.

Plaintiffs' request to establish disciplinary measures for racially biased stops rests on objective factors that can be used to determine whether officers and Commanders are engaged in

or fail to correct racially biased stops.  Motion ¶¶ 2-3.  More specifically, the Motion seeks the following:

a.        For patrol and tactical unit officers, the plan and protocols shall require evaluation of stops or frisks made without reasonable suspicion (including by race of suspect), the hit rate for frisks for weapons (including by race of the suspect), QOL stops (including by race of the suspect), the number of stops of Black and White suspects, and civilian or internal complaints relating to stops and frisks.  Additional information and metrics will be designated and submitted to the Court based on the current audits, research, and analysis being conducted by the Police Advisory Commission.

b.        For supervisors and Commanders, the plan and protocols shall include (1) real time assessment of data pertaining to the legal sufficiency of and racial disparities in stops and frisks in their areas of command by district patrol officers and by officers assigned to tactical units), (2) periodic reporting by Commanders and/or assigned Accountability Officers of the reasons for racial disparities in their areas of command, (3) details as to supervision and oversight of officers to ensure compliance with the Consent Decree, and specifically that stop and frisk practices are free from racial bias, and (4) standards for performance evaluations and for assessing Commanders' success in ensuring compliance with the Consent Decree.

Given the extensive analyses already conducted by the experts, the continued collection of real-time data, and the patterns of racial bias that have been specifically identified, there is a solid empirical basis for developing and implementing a system of discipline and supervisory responsibilities for the Fourteenth Amendment violations. To be sure, if additional data analysis relevant to discipline and supervision is developed by the PAC or by the experts for the parties, they can be incorporated as supplemental metrics in the

disciplinary system.  At this point, however, there is no justification for further delay in the entry of remedial measures that are essential to protect against the daily systemic violations of the fundamental right to equal protection of the law.

The City's agreement in principle on the issue of incentivizing constitutional conduct by officers and supervisors is similarly highly qualified.  The City suggests that Civil Service Regulations and Union-Management "concerns" may bar any meaningful incentives.  We disagree.  Where constitutional rights are at stake, this Court has the power to require measures that protect those rights and the protections in the Consent Decree. There are management prerogatives that enable consideration of individual officer and Command level adherence to constitutional principles in departmental performance evaluations, promotions and assignments.

IV.    **Conclusion**

The *Bailey* Consent Decree and monitoring process is at a critical juncture.  Patterns of racial bias plague stop and frisk practices and deny large numbers of residents of this City the equal protection of the laws and undermine public confidence in policing in Philadelphia.  We request that the Court enter the Proposed Order as a first, but essential, step in ensuring compliance with the Consent Decree and the Constitution.

Respectfully submitted,

*/s/ David Rudovsky*
David Rudovsky
Paul Messing
Susan Lin
Kairys, Rudovsky, Messing, Feinberg & Lin, LLP

Mary Catherine Roper
ACLU of Pennsylvania

Counsel for Plaintiffs

17

# EXHIBIT A

*Philadelphia Police Department Stop and Frisk Internal Review and Investigation*

Prepared and Submitted by

Robert J. Kane, PhD

on behalf of the PPD Audit Team


**Action Plan**

Introduction

During the last Bailey reporting period – Q1 and Q2 of 2019 – the monitoring teams discovered significant racial disparities in pedestrian stops within Police Service Areas (PSA) that could not be adequately explained by benchmark factors (e.g., local crime rates, and levels of structural disadvantage). These findings, showing that percent Black residential population within PSAs predicted pedestrian stops of Black individuals, represented a reversal in the longer-term historical trend indicating a reduction in both racial disparities and the overall numbers of pedestrian stops within PSAs. In particular, the Bailey reports for Q1 & Q2 2019 identified certain PSAs characterized by particularly high racial disparities in pedestrian stops, a pattern that prompted the command staff of the Philadelphia Police Department (PPD) to further investigate the issue. The PPD, working in conjunction with the Department of Law, and Dr. Robert J. Kane, conducted an audit of select PSAs designed to identify the sources of racial disparities in pedestrian stops with the hope of creating policy interventions as needed to implement within the police department.

To complete the audit several members of the PPD command staff collected relevant data from a variety of sources to examine and try to identify the primary factors that might explain the observed racial biases in the patterns of PPD pedestrian stops.

The goals of the audit and analyses were as follows:

1. Identify factors to help explain the observed racial disparities in patterns of pedestrian investigations among a sample of police service areas.
2. Learn whether the observed stop patterns had been driven by factors that might indicate racial profiling, bias, etc.
3. Use the findings of the analyses of select PSAs to inform remedial efforts to address and hopefully eliminate the observed and/or potential racial bias in patterns of pedestrian stops across the entire department.

The City retained Dr. Robert J. Kane to work with a team of PPD Inspectors from the Audits and Inspections Unit, who have been specially assigned to work on this project. Kane provided methodological and analytical guidance in the collection and examination of data, as well as in the writing of this report.

Audit Methodology

*Selection of Police Service Areas.* The first step in completing the audit involved identifying a select group of police service areas that would become the objects of analysis. The

idea was to pick a subset of all PSAs based on their racial compositions and patterns of racial disparities in their pedestrian stops, and then to compile (often by hand) detailed information on the types of police units that made the stops (i.e., whether they were regular patrol units or special units from outside the PSA), the extent to which stops were the result of community tips, the numbers of high-priority calls for service, and the racial composition of officers making the stops. The audit team used the *Plaintiff's 10th Report* to select a group of PSAs that contained either high or low percentages of Black residential population in combination with high rates of stops of Black detainees. This was not a random sampling process, it was purposive sampling in an effort to ensure that the PSAs under audit contained both the racial disparities and variations in Black residential populations necessary to conduct meaningful analyses. In addition, the audit team tried to ensure reasonable geographic coverage of PSAs across the city. Fig. 1 shows the PSAs selected for the audit, as well as their resident police districts.

Figure 1. Summary of PSAs within Districts Included in Audit



As Fig. 1 shows, the audit team selected 17 (i.e., 26%) of the 66 police service areas for analysis, spread across 11(i.e., 50%) of the 22 police districts. None of the PSAs reside in Northeast Philadelphia, as they did not contain enough Black population and racial disparity in stops to justify their inclusion. For the most past, the PSAs under analysis were in the north, the southeast, south, and center city/society hill. These are not only the most densely populated parts of the city, they also contain the most variations in racial composition and numbers of pedestrian stops.

*Sources of Data.* Inspectors assigned to the Audit collected a randomized sample of 75-48A forms from Quarters 1 and 2 of 2019 (the timeframe covered by the 10th Bailey Reports),

which were part of the previously audited samples in this litigation. Inspectors reviewed 5 percent of the forms from each included PSA, subject to a minimum of 25 forms reviewed per PSA. For every pedestrian stop included in the sample (n=793), inspectors collected the race and sex of the detainees, the reason for the stop (i.e., narcotics/theft/warrant), how the officer determined that the person should be stopped (i.e., sight/call for service), the officer payroll number, the district or unit to which that officer was assigned, the race of the officer(s) making the stop, and whether the stops were conducted by a team of two officers.

In addition to the individual-level variables (i.e., described above), the audit team also collected PSA-level data presumed relevant to helping explain the stop patterns. These data included all calls for service, priority 0/1 calls for service, violent crime rates, racial composition, and the number of crime victims.

The inspectors also conducted interviews with District-level supervisors to provide context as to the crime-fighting and community enhancement strategies in place. The mix of quantitative and qualitative data should allow for more contextual analyses than would be the case with just one type of data were collected.

Analysis Plan

The audit conducts its analysis in three stages. The first stage examines the police service areas under audit in an attempt identify common features of those PSAs that may have been associated with the distribution of pedestrian stops within them. To that end the first stage examines block-level percent Black populations, violent crime rates, and numbers of Priority 0 and 1 calls for service, overlaying pedestrian stops to allow for visual interpretations that may contextualize the distribution of the stops. This Stage 1 analysis serves to demonstrate how the within-PSA variations in racial composition, violence, priority calls for service, and pedestrian stops may be obscured when conducting cross-PSA analyses.

The second stage of the analysis moves from the PSAs down to the individual pedestrian stops, examining multiple attributes of the sampled stops in an effort to identify factors at the street level that may be driving the observed racial disparities in those stop patterns. Findings from this stop-level descriptive summary (i.e., Stage 2) will help inform the development of a mixed-model multiple regression analysis in Stage 3 designed to predict "Black detainees" in pedestrian stops. Findings from all three stages of the analysis plan will be discussed at the end of the report with interpretations and recommendations being offered by the audit team.

**Data Analysis**

Stage 1: Within-PSA Examinations

As noted, the audit team identified 17 police service areas as the analysis units, partly because some of them had large Black residential populations along with large numbers of pedestrian stops, while others had low Black residential populations along with large numbers of pedestrian stops. In general, the PSAs containing large Black residential populations showed very similar patterns to one another in terms of the contextual variables and distributions of pedestrian stops, as did the PSAs containing relatively few Black residents. As such, this part of the analysis shows mapping visualizations and descriptive summaries of just two PSAs – 193 and 033 – because they are representative of their fellow PSAs.

Figure 2. Pedestrian Stops and Local Contexts of PSA 193



As Fig. 2 indicates, PSA 193 (i.e., the third sector of District 19) contains 77% Black residential population, a relatively high poverty rate (30%), and a relatively low median household income ($37,401). As the visualizations show, despite the PSA averages, there are substantial variations in block-level percent Black residential populations (ranging from <20% Black up to nearly 100% Black), violent crimes, and priority 0/1 calls for service. Close inspection shows that the pedestrian stops are primarily concentrated on street blocks characterized by high violent crime numbers and high numbers of priority 0/1 calls for service. These are the very blocks that would garner police attention, partly because of the violent crime complaints, and partly because someone (presumably, community members) called the police for help, given the priority CAD calls. These high violence, high priority 0/1 CAD call areas also contain *most* of the Black residential population of PSA 193, as well as most of the Black pedestrian stops. From a structural standpoint, the dilemma seems to be how to reduce racial disparities in pedestrian stops on street blocks that contain much violence and community-requested interventions (as indicated by the CAD calls), but that also house majority-Black residential populations.

As the narrative summary in Fig. 2 indicates, 63% of pedestrian stops of Black individuals were made by White officers, while the racial composition of the officers of the 19th District are 45% White, 43% Black, and 8% Hispanic. Unfortunately, there is no way to determine how those White (or other) officers were distributed across PSAs, particularly as PSA boundaries are permeable. Importantly, for the sampled pedestrian stops included in the audit,

the audit team was able to note the race of the officer, which will be further investigated in the Stage 3 analysis phase.

Figure 3. Pedestrian Stops and Local Contexts of PSA 033



As Fig. 3 indicates, PSA 033 (i.e., the third sector of District 3) contains 7% Black residential population, only 16% poverty, and a relatively high median household income ($59,412). As with the visualizations in Fig. 2 for PSA 193, the maps for PSA 033 show considerable variations in block-level percent Black residential populations (ranging from <20% Black up to over 100% Black), violent crimes, and priority 0/1 calls for service. Map inspections indicate that the pedestrian stops are primarily concentrated in the western part of the PSA in a relatively constrained north-south bounded grid, the same blocks characterized by high violent crime numbers and high numbers of priority 0/1 calls for service. These high violence, high priority 0/1 CAD call areas also contain most of the PSA's Black residential population and the Black pedestrian stops. By contrast – and as distinct from PSA 193 – the blocks within PSA 033 containing mostly White residents also contain most of the White pedestrian stops. Again, this spatial patterning of pedestrian stops demonstrates the difficulty of separating the racial composition of street blocks from the racial composition of pedestrian stop detainees.

As previously noted, 14 of the audited PSAs contain majority-Black residential populations, while 3 PSAs contain majority-White residential populations. Both groups show almost identical patterns at the block-level within the PSAs, that pedestrian stops in general tend to be concentrated in areas characterized by high violence and large numbers of priority 0/1 calls for service. Black pedestrian stops tend to concentrate on street blocks containing mostly Black residents, while White pedestrian stops tend to concentrate on street blocks containing mostly

White residents. It is within this overall ecological context that the analyses in Stages 2 and 3 are conducted and interpreted.

Stage 2: The Attributes of Individual Pedestrian Stops

The next set of analyses moves from the PSA down to the individual pedestrian stops (n=793) to examine the extent which certain attributes or characteristics of those stops might help explain the observed racial disparities in pedestrian stops. Findings from this stage of the analysis may on their own suggest some remediation strategies; and they will also inform the regression analysis to be conducted in Stage 3.

Table 1 is a cross-tabulation summarizing the variables under consideration.



Table 1. Summary of Ped Stop and PSA Characteristics

| | | Detainee Details | | | | | Stop Reasons and Details | | | | | | PSA Characteristics | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSA | N (%) | % Black | % Male | Mean Age | % QOL | % Narcotics | % Sight | % Radio Calls | % >1 Officer | % Special Unit | % White Officer | Violent Crime Rate | % Black Pop | % White Pop | # Priority Calls |
| 33 | 43 (5.4) | 39.5 | 86.1 | 32.3 | 25.6 | 18.6 | 74.4 | 00.0 | 70.0 | 79.1 | 48.8 | 170 | 7.0 | 69.0 | 1,590 |
| 63 | 6 (.76) | 66.7 | 83.3 | 29.2 | 00.0 | 00.0 | 16.7 | 00.0 | 50.0 | 83.3 | 33.3 | 310 | 10.0 | 81.0 | 1.302 |
| 122 | 49 (6.18) | 91.9 | 87.8 | 32.2 | 38.8 | 20.4 | 83.7 | 16.3 | 82.0 | 67.4 | 67.4 | 360 | 89.0 | 5.0 | 1,001 |
| **123\*** | **69 (8.7)** | **95.7** | **87.0** | **33.3** | **39.1** | **26.1** | **82.7** | **00.0** | **88.0** | **75.4** | **71.0** | **356** | **89.0** | **6.0** | **1,732** |
| 141 | 39 (4.9) | 94.9 | 84.7 | 33.3 | 28.2 | 12.9 | 53.9 | 46.2 | 82.0 | 51.3 | 66.7 | 223 | 95.0 | 2.0 | 2,010 |
| 142 | 59 (7.4) | 89.8 | 79.7 | 31.0 | 36.6 | 34.0 | 83.1 | 17.0 | 80.0 | 78.0 | 50.8 | 401 | 90.0 | 5.0 | 1,474 |
| 172 | 30 (3.8) | 77.0 | 86.7 | 33.1 | 20.0 | 20.0 | 83.3 | 16.7 | 80.0 | 80.0 | 56.7 | 306 | 75.0 | 20.0 | 597 |
| **181\*** | **109 (13.0)** | **96.3** | **88.1** | **34.4** | **44.0** | **19.3** | **92.7** | **2.0** | **86.0** | **92.7** | **72.5** | **349** | **96.0** | **1.0** | **1,334** |
| **182\*** | **72 (9.1)** | **94.4** | **89.0** | **35.6** | **44.4** | **15.3** | **83.3** | **00.0** | **89.0** | **87.6** | **58.3** | **356** | **90.0** | **6.0** | **1,480** |
| 191 | 24 (3.0) | 100 | 87.6 | 29.3 | 16.7 | 8.3 | 58.3 | 00.0 | 63.0 | 66.7 | 66.7 | 193 | 83.0 | 12.0 | 1,196 |
| 193 | 14 (1.8) | 100 | 100 | 31.7 | 28.6 | 21.4 | 42.9 | 00.0 | 100.0 | 50.0 | 51.4 | 261 | 77.0 | 18.0 | 1,347 |
| 222 | 49 (6.2) | 55.1 | 42.9 | 36.5 | 6.1 | 8.2 | 24.5 | 00.0 | 78.0 | 69.4 | 55.1 | 490 | 96.0 | 1.0 | 2,009 |
| 224 | 15 (1.9) | 73.3 | 66.7 | 34.3 | 26.7 | 00.0 | 53.3 | 00.0 | 80.0 | 60.0 | 46.7 | 385 | 87.0 | 8.0 | 1,100 |
| 263 | 20 (2.5) | 35.0 | 85.0 | 33.4 | 5.0 | 15.0 | 30.0 | 5.0 | 60.0 | 50.0 | 70.0 | 190 | 6.0 | 72.0 | 1,453 |
| 353 | 35 (4.4) | 94.3 | 85.8 | 31.0 | 11.4 | 20.0 | 62.9 | 8.6 | 69.0 | 62.9 | 62.9 | 291 | 89.0 | 4.0 | 1,640 |
| **392\*** | **99 (12.5)** | **92.9** | **92.9** | **35.0** | **57.6** | **15.2** | **86.9** | **12.1** | **82.0** | **71.8** | **67.7** | **798** | **93.0** | **2.0** | **2,004** |
| **393\*** | **61 (7.7)** | **100** | **86.9** | **35.3** | **52.5** | **8.2** | **93.4** | **6.6** | **82.0** | **73.8** | **67.2** | **585** | **95.0** | **1.0** | **1,559** |

The data in Table 1 are sorted by police service area and show that five (i.e., 123, 181, 182, 392, and 393) of the 17 PSAs accounted for 51% of all pedestrian stops included in the audit. Those PSAs are highlighted in Table 1. On average in those five PSAs, 96% of all pedestrian stop detainees were Black (compared to 87% for all PSAs in the audit); and the PSAs themselves were, on average, 93% Black (compared to 86.6% for all PSAs). It is important to note, however, that the audit team selected many of these PSAs precisely because they contained high percentages of Black residential population *and also* accounted for large numbers of pedestrian stops of Black detainees. A primary purpose was to identify any potential drivers of these large numbers of stops in these primarily African American police service areas. And the data in Table indicate a few interesting patterns.

First, in the 5 PSAs accounting for 51% of all pedestrian stops in the audit, "Quality of Life" served as the justification for an average of 47.5% of their stops. This contrasts to an overall average of 35.8% across all audited PSAs. Next, in those five PSAs highlighted in Table 1, 87.8% of their pedestrian stops were based on "sight," as opposed to radio calls, while "sight" accounted for 75.4% of all pedestrian stop types across the audited PSAs. The problem is, many "quality of life" and "sight" pedestrian stops are highly discretionary (i.e., officer-initiated), and they rarely end in arrest. Indeed, across all PSAs included in the audit, quality of life stops yielded a 14% arrest rate – even when including those generated by radio calls, which are less discretionary than those generated by sight – while "sight" pedestrian stops yielded a 16.6% arrest rate. Thus, not only might these stops be considered intrusive to the community (particularly those *not* generated by radio calls) and largely left to officers' discretion, they represent – based on their arrest yields – an inefficient law enforcement activity.

A follow-up analysis examined the extent to which quality of life stops were associated with Black detainees, the results of which are summarized in Table 2.

Table 2. Quality of Life Pedestrian Stops by Black Detainee

| | | | Black Detainee | | Total |
| | | | No | Yes | |
|---|---|---|---|---|---|
| Quality of Life Stop | No | Count | 84 | 425 | 509 |
| | | % within Quality of Life Stop | 16.5% | 83.5% | 100.0% |
| | | % of Total | 10.6% | 53.6% | 64.2% |
| | Yes | Count | 22 | 262 | 284 |
| | | % within Quality of Life Stop | 7.7% | 92.3% | 100.0% |
| | | % of Total | 2.8% | 33.0% | 35.8% |
| Total | | Count | 106 | 687 | 793 |
| | | % within Quality of Life Stop | 13.4% | 86.6% | 100.0% |
| | | % of Total | 13.4% | 86.6% | 100.0% |

As the data in Table 2 show, Black detainees represented 83.5% of the non-quality of life stops (3.1% less than their overall representation in the data), while they represented 92.3% of the quality of life stops. That is, in a dataset that is already dominated by pedestrian stops of Black detainees, quality of life stops further exacerbated the differences between Black and non-Black detainees.

Another set of analyses showed that multiple pedestrian stops were made by "repeat" officers (based on the Payroll ID indicator in the dataset), which may influence the racial disparities observed in ped stops. Table 3 shows a summary of officer appearances in the dataset.

Table 3. Summary of Officer Appearances in the Data

| | | Frequency | Percent | Valid Percent | Percent |
|---|---|---|---|---|---|
| Number of Appearances | 1 | 304 | 38.3 | 38.3 | 38.3 |
| | 2 | 138 | 17.4 | 17.4 | 55.7 |
| | 3 | 138 | 17.4 | 17.4 | 73.1 |
| | 4 | 82 | 10.3 | 10.3 | 83.5 |
| | 5 | 53 | 6.7 | 6.7 | 90.2 |
| | 6 | 33 | 4.2 | 4.2 | 94.3 |
| | 7 | 18 | 2.3 | 2.3 | 96.6 |
| | 8 | 11 | 1.4 | 1.4 | 98.0 |
| | 9 | 6 | .8 | .8 | 98.7 |
| | 10 | 3 | .4 | .4 | 99.1 |
| | 11 | 2 | .3 | .3 | 99.4 |
| | 12 | 1 | .1 | .1 | 99.5 |
| | 13 | 1 | .1 | .1 | 99.6 |
| | 14 | 1 | .1 | .1 | 99.7 |
| | 15 | 1 | .1 | .1 | 99.9 |
| | 16 | 1 | .1 | .1 | 100.0 |
| | Total | 793 | 100.0 | 100.0 | |

   As the data in Table 3 show, 304 officers appeared once in the dataset, meaning that among the 793 randomly selected pedestrian stops included in the audit, 304 (38.3%) of them were conducted by different officers whose payroll numbers appeared just once in the audit. The summary also shows that 138 (17.4%) of the pedestrian stops were made by officers who appeared two times in the data, while an additional 138 pedestrian stops were conducted by officers who appeared three times in the data. It makes perfect sense that some officers would appear as "repeat" pedestrian stop-makers, particularly if they worked in designated PSAs over a consistent timeframe. But the summary in Table 3 also shows that some officers appeared well over three times, and actually up to 16 times in the data. For example, one of the pedestrian stops in the audit was made by an officer who appeared 16 times in the data. It is possible that officers with many appearances represent highly aggressive officers who may have been assigned to special units for "crime fighting" purposes. The next set of analyses lends support to that idea.

Table 4 summarizes the results of a cross-tabulation where the columns show the percentages of pedestrian stops conducted by sector cars or special units, and the rows indicate the number of times officers appear in the data.

Table 4. Cross Tabulation of Tactical Units by Number of Times Officers Appeared in Data

| | | | Tactical Unit | | Total |
|---|---|---|---|---|---|
| | | | No | Yes | |
| Number of times an individual officer appears in the data | 1 | Count | 116 | 188 | 304 |
| | | % within Number of times an individual officer appears in the data | 38.2% | 61.8% | 100.0% |
| | | % of Total | 14.6% | 23.7% | 38.3% |
| | 2 | Count | 33 | 105 | 138 |
| | | % within Number of times an individual officer appears in the data | 23.9% | 76.1% | 100.0% |
| | | % of Total | 4.2% | 13.2% | 17.4% |
| | 3 | Count | 24 | 114 | 138 |
| | | % within Number of times an individual officer appears in the data | 17.4% | 82.6% | 100.0% |
| | | % of Total | 3.0% | 14.4% | 17.4% |
| | 4 | Count | 16 | 66 | 82 |
| | | % within Number of times an individual officer appears in the data | 19.5% | 80.5% | 100.0% |
| | | % of Total | 2.0% | 8.3% | 10.3% |
| | 5 | Count | 7 | 46 | 53 |
| | | % within Number of times an individual officer appears in the data | 13.2% | 86.8% | 100.0% |
| | | % of Total | 0.9% | 5.8% | 6.7% |
| | 6 | Count | 4 | 29 | 33 |
| | | % within Number of times an individual officer appears in the data | 12.1% | 87.9% | 100.0% |
| | | % of Total | 0.5% | 3.7% | 4.2% |
| | 7 | Count | 4 | 14 | 18 |
| | | % within Number of times an individual officer appears in the data | 22.2% | 77.8% | 100.0% |
| | | % of Total | 0.5% | 1.8% | 2.3% |
| | 8 | Count | 3 | 8 | 11 |
| | | % within Number of times an individual officer appears in the data | 27.3% | 72.7% | 100.0% |
| | | % of Total | 0.4% | 1.0% | 1.4% |
| | 9 | Count | 0 | 6 | 6 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.8% | 0.8% |
| | 10 | Count | 0 | 3 | 3 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.4% | 0.4% |
| | 11 | Count | 0 | 2 | 2 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.3% | 0.3% |
| | 12 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 13 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 14 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 15 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 16 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| Total | | Count | 207 | 586 | 793 |
| | | % within Number of times an individual officer appears in the data | 26.1% | 73.9% | 100.0% |
| | | % of Total | 26.1% | 73.9% | 100.0% |

As the data in Table 4 show, among officers who appeared once in the data, 38.2% of them were assigned to sector patrol cars while 61.8% of them were assigned to tactical – or supplementary patrol – units. Generally, the observed differences between sector car and tactical unit assignments became greater among officers who appeared more times in the data. For example, among officers who appeared 3 times in the data, only 17.4% were assigned to sector cars, while 82.6% were assigned to special units. Among officers who appeared more than 8 times in the data, all of them were assigned to tactical units. This cross-tab relationship is also summarized, perhaps more intuitively, in Fig. 2 below.



Figure 4. Sector Car vs. Special Unit by Number of Times Officers Appeared in Data



As the bars in Fig. 2 show, most pedestrian stops in the audit were conducted by officers working tactical units, though the differences between "sector car" and "tactical unit" increased as officers appeared multiple times in the data. This is a potentially important finding because it could help explain some of the racial disparities in pedestrian stops, to the extent that officers appearing multiple times in the data tended to be assigned to tactical – rather than radio – cars for "crime fighting" purposes.

The next analysis takes up this issue by examining the extent to which officer appearances in the dataset were associated with pedestrian stops of Black detainees. Table 5 is a cross-tabulation summarizing that relationship.

Table 5. Cross Tabulation Showing Black Detainees by Number of Times Officers Appeared in Data

| | | | Black Detainee | | Total |
|---|---|---|---|---|---|
| | | | No | Yes | |
| Number of times an individual officer appears in the data | 1 | Count | 53 | 251 | 304 |
| | | % within Number of times an individual officer appears in the data | 17.4% | 82.6% | 100.0% |
| | | % of Total | 6.7% | 31.7% | 38.3% |
| | 2 | Count | 22 | 116 | 138 |
| | | % within Number of times an individual officer appears in the data | 15.9% | 84.1% | 100.0% |
| | | % of Total | 2.8% | 14.6% | 17.4% |
| | 3 | Count | 15 | 123 | 138 |
| | | % within Number of times an individual officer appears in the data | 10.9% | 89.1% | 100.0% |
| | | % of Total | 1.9% | 15.5% | 17.4% |
| | 4 | Count | 7 | 75 | 82 |
| | | % within Number of times an individual officer appears in the data | 8.5% | 91.5% | 100.0% |
| | | % of Total | 0.9% | 9.5% | 10.3% |
| | 5 | Count | 3 | 50 | 53 |
| | | % within Number of times an individual officer appears in the data | 5.7% | 94.3% | 100.0% |
| | | % of Total | 0.4% | 6.3% | 6.7% |
| | 6 | Count | 5 | 28 | 33 |
| | | % within Number of times an individual officer appears in the data | 15.2% | 84.8% | 100.0% |
| | | % of Total | 0.6% | 3.5% | 4.2% |
| | 7 | Count | 1 | 17 | 18 |
| | | % within Number of times an individual officer appears in the data | 5.6% | 94.4% | 100.0% |
| | | % of Total | 0.1% | 2.1% | 2.3% |
| | 8 | Count | 0 | 11 | 11 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 1.4% | 1.4% |
| | 9 | Count | 0 | 6 | 6 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.8% | 0.8% |
| | 10 | Count | 0 | 3 | 3 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.4% | 0.4% |
| | 11 | Count | 0 | 2 | 2 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.3% | 0.3% |
| | 12 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 13 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 14 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 15 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| | 15 | Count | 0 | 1 | 1 |
| | | % within Number of times an individual officer appears in the data | 0.0% | 100.0% | 100.0% |
| | | % of Total | 0.0% | 0.1% | 0.1% |
| Total | | Count | 106 | 687 | 793 |
| | | % within Number of times an individual officer appears in the data | 13.4% | 86.6% | 100.0% |
| | | % of Total | 13.4% | 86.6% | 100.0% |

The data in Table 5 show that among officers appearing once in the audit, 82.6% of their pedestrian stop detainees were Black, which is somewhat less than the overall percentage of Black detainees in the data (i.e., 86.6%). The percentages of Black detainees, however, increase among officers appearing multiple times in the data, reaching 91.4% among officers who appear four times. Among officers who appear 8 or more times in the data, 100% of their pedestrian stop detainees were Black. Again, these findings show that the more active officers in the data – and those assigned to tactical units – are exacerbating the differences between Black and non-Black pedestrian stop detainees.

In general, findings from the analyses in Stage 2 tended to support the metaphorical "80-20" rule in criminology: That a relatively small number of PSAs (i.e., 29%) accounted for most of the pedestrian stops in the data, and that officers appearing multiple times in the data conducted a large proportion of those stops. But the findings also suggest more generally that (1) the more discretionary the ped stops (as indicated by "sight"), and (2) the more that officers were assigned to tactical units in the audited PSAs, the more the resulting pedestrian stops contributed to the observed racial biases in the data. The next step is to observe the extent to which these initial findings hold up under multivariate examination.

Stage 3: Multivariate Regression Analysis

The following set of analyses uses the findings from Stages 1 and 2 to inform the development of a regression model designed to predict Black detainees as subjects of pedestrian stops. Admittedly, this analytical task is somewhat complicated by the fact that most of the audited PSAs were majority Black in their residential populations, and the large majority of pedestrian stop detainees were Black. So, the primary question for Stage 3 is: Given that most pedestrian stops of Black individuals were conducted in Majority-black, high violence PSAs with large numbers of priority 0/1 calls for service, can we still isolate some number of ped stop-related factors that might further help us identify race effects in the ped stop patterns? That is the question we now investigate.

From an analytical standpoint, two features of the pedestrian stop data make standard OLS linear regression problematic. First is the fact that the dependent variable is binary rather than continuous. That is, we are trying to predict when a Black individual is stopped ("yes"/"no"), compared to individuals of all other racial and ethnic identities. To properly model the relationship between the predictors and the binary outcome, we must switch from linear regression to logistic regression, the standard model for dichotomous outcomes. Rather than assuming a straight-line (i.e., linear) relationship between predictors and the outcome (as OLS regression does), binary logistic regression assumes an "S" shaped relationship (or curve) between a given independent variable and the outcome in the form of a logistic function.[1] The logistic function (or Logit curve) predicts the "yes"/"no" outcome, which is why it is functionally shaped like an S, in a way that produces log odds of the "yes" occurrence.

Next, acknowledging that we are working with pedestrian stops nested within police service areas, we need to account for the potential clustering of the error terms within those pedestrian stops. That is, pedestrian stops conducted in a given police service area will likely

---

[1] Sommet and Morselli, "Keep Calm and Learn Multilevel Logistic Modeling: A Simplified Three-Step Procedure Using Stata, R, Mplus, and SPSS."

"resemble" in several key ways other pedestrian stops conducted in that PSA, given that the individual stops will be affected by the same ecological features of that PSA—e.g., local crime rate, racial composition, number of priority calls for service. To an extent, this would render the pedestrian stops within PSAs non-independent of one another, adversely influencing the standard errors produced by the model.[2] Thus, to isolate the individual pedestrian stops from the PSAs in which they were conducted, we must estimate a model designed to account for the clustering of error terms. A two-level mixed model that estimates the effects of the individual pedestrian stop factors on the dependent variable, while accounting for the clustering of error terms at the PSA level will accomplish this.[3] To this end, we estimate a hierarchical logistic regression model using the SPSS software package.[4]

Our first step was to run an intercept-only model to observe the degree to which the pedestrian stops of Black detainees varied systematically across police service areas. This initial model helps determine our need to estimate a hierarchical model (as opposed to a standard logistic regression). In analyses not shown, the intercept-only model demonstrated significant variation across PSAs, indicating that the PSAs themselves were significant covariates of pedestrian stops (random effect covariance intercept estimate=2.162; p=.01). This is not surprising, given that ped stops within PSAs tended to cluster (as the Stage 2 analyses showed) in similar locations: Majority Black street blocks characterized by high violence and priority 01/ calls for service. Using the random effect covariance estimate and the standard logistic distribution of 3.29[5], we calculated the interclass correlation coefficient as follows:

$$ICC = \frac{\sigma^2_{\mu_{0j}}}{\sigma^2_{\mu_{0j}} + 3.29} = \frac{2.162}{2.162 + 3.29} = .397$$

The ICC of .397 produced by the unconditional model was well above the .05 threshold for assuming evidence of clustering;[6] and indeed, the present ICC suggests that PSAs alone had great influence over the distribution of pedestrian stops of Black detainees (more on this below).

For the next model, we entered all independent variables to observe whether they were significantly associated with "Black Detainee" pedestrian stops. We have two caveats here: (1) For 25 (3.1%) pedestrian stops, we did not know the reason for the stop, so we replaced those missing values with the modal value of "quality of life" (i.e., the most common reason in the data for ped stops). Such a low percentage of missing value replacements should not introduce bias into the model, and it allows us to retain all ped stops in the analysis. (2) Given the strong correlations among the key structural variables (# of priority 0/1 calls, violent crime rate, and % Black residential population), we reduced these three variables to a single variable via a principal

[2] Raudenbush, Stephen and Bryk, Anthony, *Hierarchical Linear Models: Applications and Data Analysis Methods*.
[3] Singer, "Using SAS PROC MIXED to Fit Multilevel Models, Hierarchical Models, and Individual Growth Models."
[4] Sommet and Morselli, "Keep Calm and Learn Multilevel Logistic Modeling: A Simplified Three-Step Procedure Using Stata, R, Mplus, and SPSS"; Peugh and Enders, "Using the SPSS Mixed Procedure to Fit Cross-Sectional and Longitudinal Multilevel Models."
[5] Standard logistic distribution= $\pi^2/3 \approx 3.29$
[6] Heck, Thomas, and Tabata, *Multilevel Modeling of Categorical Outcomes Using IBM SPSS*.

component analysis[7]. The analysis extracted a single component with an Eigenvalue of 1.718, explaining 57.53% of the total model variance. Table 6 summarizes the component loadings:

*Table 6. Component Matrix Loadings*

|  | Component 1 |
|---|---|
| Number of Priority Calls in PSA | .707 |
| % Black Residential Population | .667 |
| Violent Crime Rate per 10k | .879 |

Extraction Method: Principal Component Analysis.

a. 1 components extracted.

Based on the high Eigenvalue, percent explained variance, and large factor loadings (i.e., approaching 1.0), we conclude that the three variables entered into the principal component were suitable for reduction into a single index measuring the "racial and risk structure" of the PSAs. We saved the composite variable as a factor component score.

Table 7 below summarizes the results of the mix model logistic regression:

---

[7] Principal Component Analysis is a common data reduction technique that allows the analyst to reduce the number of highly-correlated variables down to a single composite index that attempts to retain the dimensionality of those reduced variables. For a comprehensive – but accessible – description, the interested reader should visit: https://builtin.com/data-science/step-step-explanation-principal-component-analysis

*Table 7. Mixed Model Logistic Regression Predicting Black Detainee Pedestrian Stops*

| Variables | Coef | SE | t | sig | Exp Coeff |
|---|---|---|---|---|---|
| Intercept | 1.52* | .624 | 2.43 | .009 | 4.57 |
| White Police Officer | -.302 | .269 | -1.20 | .230 | .740 |
| Two Officers | -.344 | .339 | -1.01 | .311 | .709 |
| Officer Appearances in Dataset | .066 | .088 | .742 | .458 | 1.07 |
| Tactical Unit | -.095 | .317 | -.298 | .766 | .910 |
| Sight Stop | .964* | .362 | 2.67 | .008 | 2.62 |
| Radio Call Stop | 1.11 | .627 | 1.77 | .08 | 3.03 |
| Detainee Age | -.023* | .001 | -2.35 | .019 | .977 |
| Detainee Male | 1.76* | .303 | 5.80 | .000 | 5.79 |
| PSA Structure | .748* | .311 | 2.40 | .007 | 2.11 |

| Random Effect Covariance | | | | |
|---|---|---|---|---|
| Var | Estimate | SE | Z | Sig |
| Intercept | 1.332 | .648 | 2.06 | .020 |

*Statistically significant at or below the standard cutoff of p=.05*          *Dependent Variable: Black Detainee*

Beginning with the reasons for the pedestrian stops, Table 7 shows a few interesting results. First, "Sight" stops were significantly and positively predictive of Black detainee pedestrian stops. Sight stops are generally those that are initiated by the officers, in contrast, for example, to ped stops made as the result of Radio Calls. Based on the Exp Coeff (which represents the log odds), we see that sight stops were 2.62 times more likely than other stops to produce a ped stop of a Black individual. We can convert that log odds coefficient to a probability by dividing the Exp Coeff by the sum of 1+Exp Coeff. [i.e., 2.62 / (1+2.62). This calculation produces a coefficient of .72 and shows that **sight stops were 72% more likely than others to produce a Black ped stop**. This result is not only statistically significant, but also highly clinically substantial. Indeed, with the exception of "Detainee Male," sight stops were the strongest driver of racial disparities in pedestrian stops (among all measured factors). In the present data, 35.8% of all sight stops were for alleged quality of life violations, while just under 18% were for alleged narcotics violations. Six percent of all sight stops were for Bike MVC. Collectively, these three reasons for sight stops amounted to almost 60% of all ped stop reasons in the data. The remaining reasons for sight stops were spread across over 80 categories.

In contrast to Sight, Radio Calls were not significantly associated with Black detainee pedestrian stops. This is notable since radio calls are generally initiated by members of the public, asking officers to intervene. Importantly, the vast majority of radio call-driven pedestrian stops were for reports of serious crimes, persons with guns, and warrants – the vary activities for which residents usually ask for police intervention. Radio calls only included five instances of quality of life violations, and just two narcotics stops.

Findings for "sight" vs. "radio calls" pedestrian stops largely show the difference between police activities that are officer-driven and those that are community-driven. Based on the present results, it seems that when officers were left to their own discretion or judgement, they tended to stop black individuals more systematically (and significantly) than others. When directed by radio calls, and thus having their discretion reduced, officers did not seem to stop Black individuals in any systematically biased way. These findings for Sight and Radio Call ped stops are completely consistent with the policing scholarship examining racial bias in discretionary police decision-making—from decisions about deadly force to those about arresting domestic violence offenders. Historically, the more unstructured discretion police officers have, the more likely they are to make racially biased decisions.[8] The present findings bear this out.

Table 7 also shows that police officer characteristics did not influence patterns of Black detainee pedestrian stops. Officer race, attachment to a tactical unit, and numerous appearances in the dataset were not significantly associated with Black pedestrian stops. In contrast, offender characteristics, such as age and sex, predicted Black pedestrian stops. Specifically, being male and being young predicted Black ped stops. Finally, the PSA structural variable representing percent Black residential population, violent crime rate, and number of priority 0/1 calls was also significantly associated with Black detainee pedestrian stops. This finding is important when we consider that the majority of PSAs included in the audit contained high percentages of Black residents, as well as high violence and high numbers of priority 0/1 calls for service. Thus, even in majority-Black PSAs with high violence priority calls for service, higher levels on this composite measure continued to predict Black detainee ped stops, independent of the characteristics of the individual ped stops themselves. But the converse was also true: Even in majority Black, high violence, high priority-call PSAs where most of the ped stop detainees were Black, certain characteristics of the individual pedestrian stops *still predicted* Black Detainee. Among the strongest was "sight" stops. And the most common reason for sight stops was alledged quality of life violations.

Summary of Quantitative Analyses and Some Recommendations

The analyses conducted and presented in Stages 1, 2, and 3 tell a reasonably consistent story about racial disparities in pedestrian stops. As the regression analysis shows, even when considering event-level characteristics, the overall ecology of PSAs seem to predict Black detainee ped stops: PSAs that are majority-Black and characterized by high violence and high numbers of priority 0/1 calls for service have significantly higher probabilities of Black pedestrian stops than others. This is partly about opportunity – i.e., who is primarily on the streets in these PSAs – and partly about community level violence risk and being mobilized by the community to intervene (i.e., violent crime rates and priority 0/1 calls). And indeed, the map visualizations in Stage 1 support the assertion that opportunity, risk, and calls to intervene explain a great deal of the within-PSA variations in who gets stopped: In the majority Black PSAs, it was mostly Black individuals being stopped; in majority-White PSAs, it was mostly White individuals being stopped.

---

[8] Walker, *Taming Syst. Control Discret. Crim. Justice, 1950-1990*; Kane, "Responding to Restraining Orders in Domestic Violence Incidents: Identifying the Custody- Threshold Thesis"; Fyfe, "Blind Justice: Police Shootings in Memphis."

But beyond the social ecology of the PSAs, the regression analysis showed clear event-level characteristics that were associated with Black detainee pedestrian stops. As noted, pedestrian stops initiated by officers were systematically biased toward Black detainees. And from the suspect characteristics, it is clear that being young, being male, and being Black place people at significant risk of being stopped. These findings from the regression model suggest that the department might work to reduce the number of discretionary pedestrian stops, especially for quality of life violations, and perhaps narcotics. As previously noted, only approximately 14% of all quality of life stops in the data resulted in arrest, so it is not as if these stops carry a high law enforcement value.

Despite that tactical units and the number of times officers appeared in the dataset were not significant predictors of Black ped stops in the regression analysis, their potential importance in driving some of the racial disparities should not be overlooked. In Stage 2, the cross-tabulations showed that officers who appeared multiple times in the dataset tended to be attached to tactical – or "crime fighting" – units, either from inside or outside the police district. And those high-yield officers tended to disproportionately stop Black individuals. It is true that those cross-tabulation analyses did not consider whether the Back detainee ped stops were radio-driven, or the result of another set of non-discretionary reasons. Still, the cross-tabulations in Stage 2 produced enough evidence to suggest that the department might reevaluate the premium it seems to place on tactical units and "crime fighting" supplemental patrols, at least for the purposes of potentially reducing both the overall number of pedestrian stops, and the number of Black detainee stops.

There is a long history of scholarship that has advocated for "structured" discretion in policing[9] that has, as of yet, not made its way into most police department policies and practices. In the present case, however, findings from this audit might present an opportunity for the PPD to do something other than send supplemental patrols into communities with the broad mandate to "fight crime," "be aggressive," or "produce numbers" with little other direction. The department might consider limiting the scope of officers' authority to initiate quality of life pedestrian stops so that when they make them, they do so under a strictly proscribed set of circumstances. But who defines those circumstances? It seems that when pedestrian stops are radio-driven, they evidence no systematic racial bias. This may be due the fact that community residents know when to initiate a call to the police and when not to (at least for QOL situations). The PPD might consider establishing an advisory board where police administrators and community residents identify a set of circumstances under which police officers can initiate quality of life stops outside radio-driven stops. Such a process would still allow officers to make quality of life stops but within the scope of community guidance.

Finally, the PPD should consider reevaluating the use of supplemental patrol units. Again, while these tactical units did not seem to produce racial bias in the regression model, the cross-tabulations produced in the Stage 2 analyses indicate that tactical units – and "high-yield" officers – are responsible for a large number of Black detainee pedestrian stops. Their efficacy remains an open issue.

---

[9] Davis, *Discretionary Justice: A Preliminary Inquiry*; Walker, *Taming Syst. Control Discret. Crim. Justice, 1950-1990*.

Bibliography

Davis, Kenneth Culp. *Discretionary Justice: A Preliminary Inquiry*. Baton Rouge: Louisiana State University Press, 1969.

Fyfe, James J. "Blind Justice: Police Shootings in Memphis." *The Journal of Criminal Law and Criminology*, 1973. https://doi.org/10.2307/1143112.

Heck, R.H., S.L. Thomas, and L.N. Tabata. *Multilevel Modeling of Categorical Outcomes Using IBM SPSS*. 2nd ed. New York: Routledge, 2014.

Kane, Robert J. "Responding to Restraining Orders in Domestic Violence Incidents: Identifying the Custody- Threshold Thesis." *Criminal Justice and Behavior* 27, no. 3 (2000): 561–80.

Peugh, James L., and Craig K. Enders. "Using the SPSS Mixed Procedure to Fit Cross-Sectional and Longitudinal Multilevel Models." *Educational and Psychological Measurement* 65, no. 5 (2005): 717–41. https://doi.org/10.1177/0013164405278558.

Raudenbush, Stephen, W., and S. Bryk, Anthony. *Hierarchical Linear Models: Applications and Data Analysis Methods*. 2nd ed. Beverly Hills: Sage Publishing, 2001.

Singer, J. D. "Using SAS PROC MIXED to Fit Multilevel Models, Hierarchical Models, and Individual Growth Models." *Journal of Educational and Behavioral Statistics* 23, no. 4 (1998): 323–55. https://doi.org/10.3102/10769986023004323.

Sommet, Nicolas, and Davide Morselli. "Keep Calm and Learn Multilevel Logistic Modeling: A Simplified Three-Step Procedure Using Stata, R, Mplus, and SPSS." *International Review of Social Psychology* 30, no. 1 (2017): 203–18. https://doi.org/10.5334/irsp.90.

Walker, Samuel. *Taming the System: The Control of Discretion in Criminal Justice, 1950-1990. Taming the System: The Control of Discretion in Criminal Justice, 1950-1990*, 2011. https://doi.org/10.1093/acprof:oso/9780195078206.001.0001.

# EXHIBIT B

**Figure 1**



**Figure 2**



**Figure 3**



# EXHIBIT C

**Vacations and Activity**

Good Morning.

I have been reviewing the daily activity and it has been low across the District. On 02-04-21, I requested increased CVN enforcement and there have only been 6 issued since then, all by 5/7 Platoon personnel from the District/South Street. Also, there have been very few car stops. Cars are being used in criminal activity and motor vehicle enforcement is always helpful. Also, motor vehicle codes give officers probable cause for a stop which avoids the issues we have with the Bailey Agreement.

Very simply, I am getting many more vacation requests each day than activity. I am supportive of giving personnel off, especially given the 2020 we all endured, but I'd like to see activity pick up in return for the fairness I have been giving in terms of granting vacation. I'm not asking for anything crazy. I just want officers to be doing at least 1 park and walk per tour, in addition to some car stops and CVNs where possible.

I will be meeting with the street supervisors personally to discuss further, but I wanted everyone to have the information.

Thank you.

Capt. Brian Hartzell #9
3rd District
11th and Wharton Streets
215-686-3030
brian.hartzell@phila.gov