**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | **C.A. No. 10-5952** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

**DEFENDANT CITY OF PHILADELPHIA'S RESPONSE TO PLAINTIFFS'
MOTION TO MANDATE RACIAL BIAS REMEDIAL MEASURES**

Defendant City of Philadelphia (the "City") hereby submits its Response in Opposition to certain of Plaintiff's most recent demands regarding pedestrian stops and frisks conducted by the Philadelphia Police Department ("PPD"). Although PPD and the City have – at substantial time and expense – accepted the vast majority of Plaintiffs' proposals and recommendations since this litigation began, Plaintiffs now seek to have the City held in civil contempt unless PPD ceases conducting pedestrian stops on quality-of-life issues, even when reasonable suspicion is present, without first giving each offender a verbal warning to cease their conduct. This would deprive PPD of a valuable crime-fighting tool at a time when Philadelphia's homicide rates have never been higher, and when community members have been increasingly scared for their own safety and the safety of their families. At the same time, Plaintiffs ask the Court for a mandate that PPD begin punishing police officers and supervisors for "racial bias," despite the fact that there is, to date, no workable mechanism to fairly and reliably assess whether an officer's conduct was in fact the product of any such bias. Absent such mechanism, that which Plaintiff seeks is draconian, unwarranted, and wholly unprecedented, and would harm not only individual police officers but the efficacy of the Department as a whole. Plaintiffs point to no police department

that has undertaken that which they now demand, nor do they point to a single instance in which a court has ordered a police department to take such actions, whether pursuant to a consent decree or otherwise. Moreover, Plaintiffs have not articulated how the efforts of PPD and the City evidence non-compliance with the Consent Decree in this matter. Accordingly, the Motion should be dismissed.

## I.     BACKGROUND

The Court entered the *Bailey* Consent Decree among the parties in this matter on June 21, 2011 (Doc. No. 16), providing for various data production and audits to be shared by PPD with Plaintiffs on a regular, going-forward basis. Since entering the Consent Decree, the City has – without limitation – provided Plaintiffs with a wealth of quarterly information and statistics regarding PPD pedestrian stops and frisks, conducted various internal audits measuring total stop numbers and the percentage of stops and frisks conducted without reasonable suspicion, trained and re-trained its officers numerous times on proper standards, and retained multiple expert statisticians to perform data analysis.[1] Over the past five (5) years in particular, the total number of Philadelphians stopped by PPD during any given quarter has dropped to a fraction of what it was previously, and the percentage of audited pedestrian stops conducted without reasonable suspicion has seen a similar reduction. *See* City Reports on Fourth Amendment Issues (Docket Nos. 51, 63, 74, 83, 105).

Nonetheless, on July 9, 2019 – following an agreement between Plaintiffs and the City – this Court entered an Order approving a massively overhauled discipline system designed specifically for the purpose of enforcing 75-48A non-compliance, and providing progressive discipline for officers who make repeated errors on 75-48A forms (Doc. No. 96). Given the

---

[1] Throughout this litigation, Plaintiffs and the City have agreed to limit the scope of their review and analysis to pedestrian stops. Put differently, vehicle stops are not contemplated by the arrangement among the parties.

manpower required and labor issues in developing a brand new system, this was a laborious and extensive undertaking.  As detailed in prior submissions to the Court, the implementation of the recent progressive disciplinary system required PPD to re-assign seven (7) police officers and supervisors from their positions to instead review 75-48A forms and conduct corresponding audits on a full-time basis.  Implementation of this process has also demanded significant time of high-ranking officials and placed a heavy burden on PPD's OIT team.  While the roll-out of this platform has not been without issue, the system is now fully operational, as well as the "rolling" reviews it triggers on a forward-looking basis for officers found to have committed errors.

Throughout this litigation, the parties have also submitted Fourteenth Amendment Reports on the subject of whether there exists an unexplained racial disparity in the area of stop and frisk.  Each year, Plaintiffs' expert has concluded that racial disparity exists, and each year until 2020 the City's expert disagreed.  In calendar year 2020, the City's expert – evaluating data for calendar year 2019 – concurred for the first time with Plaintiffs' assessment that there appeared to be a racial disparity that was not explained by crime rates or other factors that he was examining.  The City immediately communicated this finding to Plaintiffs and PPD took numerous action steps to better understand and address the issue, while simultaneously conducting a host of sweeping reform measures that – while not technically under the *Bailey* umbrella – took *Bailey* into account in keeping with the Department's efforts to proactively improve.

The first comprehensive step in this process was the recent PSA Audit completed by Dr. Robert Kane in February 2021.  Dr. Kane's assessment was based on a wealth of data collection by PPD, specifically geared to particular PSAs with relatively high racial disparities, to further identify the level of disparity in such areas and gain insight into their "root cause."  The City

kept Plaintiff apprised of the process and the benchmarks that were being established, while also taking Plaintiff's suggestions regarding the same.   Throughout these discussions, the parties agreed that what PPD is now attempting to do – conduct a "root-cause" analysis to identify the source of racial disparity in policing – is *wholly unprecedented*.   Indeed, Plaintiff has not provided, and the City has not found, an example of any other municipality in this country that has attempted to do that which PPD is making efforts to do; namely, identifying practices or individual conduct by officers that resulted in racial disparities in policing and assessing their source with the eventual goal of eliminating such disparities.   Nonetheless, as part of a massive City-wide effort to improve community relations and increase transparency in policing, PPD willingly agreed to undertake this project.

The data reviewed in the PSA Audit told a reasonably consistent story about racial disparities in pedestrian stops.   PSAs that are majority-Black and characterized by high violence and high numbers of priority calls for service have significantly higher probabilities of Black pedestrian stops than others. Significantly, the data showed that in the majority Black PSAs, it was mostly Black individuals being stopped; in majority White PSAs, it was mostly White individuals bring stopped.

Dr. Kane also proposed a number of measures that *could result* in fewer racially disparate stops in problematic PSAs, including a concerted effort to reduce the number of discretionary pedestrian stops, to reevaluate the use of tactical units including "crime fighting" supplemental patrols, and the creation of an advisory board which would work to identify a set of circumstances where police officers could initiate QoL stops outside of radio-driven stops. Unsurprisingly, Dr. Kane does not point to any singular practice that could be changed by PPD

to eliminate racial disparity. Ultimately, the "root cause" analysis offered a starting point for this novel task, not a final conclusion.[2]

Following completion of the PSA Audit, all parties agreed that the information obtained was helpful, but that more investigatory work should be done in order to get closer to the "root cause" of the racial disparity issue.  To that end, PPD enlisted the assistance of the Police Advisory Commission (PAC), to work with *both* PPD and Plaintiffs to further ascertain pertinent information on this topic in order to make *evidence-based* recommendations about how the City and the Philadelphia Police Department might create new policies and/or directives to reduce racial disparities in stops and frisks. This secondary analysis will build on the foundations of the PSA analysis, with the same goal of identifying practices or conduct that might result in or contribute to racial disparity. Plaintiffs' participation in this project clearly evidences their agreement that additional studies be conducted on this topic.

Nonetheless, and despite PPD's willingness to make massive, wide-ranging overhauls in the area of stop-and-frisk and otherwise, Plaintiffs are apparently no longer content to wait *for anything*, even when the relief they seek is simply unsupported by any historical precedent within the United States, or any case law whatsoever.  Plaintiff's Memorandum in Support of their Motion does not cite a single case, nor does it even acknowledge the drastically rising crime rates within the City that PPD has explained prevent it from considering certain additional measures at this time.

## II.    CITY'S RESPONSE TO PLAINTIFFS' ASSUMPTIONS

Plaintiffs' Motion is based on the premise that "Plaintiffs and the City agreed that long-standing patterns of racial disparities in stop and frisk practices demonstrated as well ***systemic***

---

[2] Notably, the City did not have the opportunity to fully engage community members regarding these issues at the time of the PSA Audit, but looks forward to doing so.  This feedback will be a valuable tool in determining what citizens are looking for.

*racial bias* in violation of the Consent Decree and the Fourteenth Amendment." Pl. Mem. of Law in Supp. of Mot., at 1 (emphasis added). This is simply not accurate. The City has readily acknowledged the presence of racial *disparity* during calendar year 2019 since Dr. Kane made that determination last Fall, but the City has never agreed with Plaintiffs that this amounts to "systemic racial bias."[3] Nonetheless, the City recognizes that racial disparity *could* be a product of racial bias, whether implicit or explicit, and reaffirms its commitment to uncovering and eliminating racial bias within PPD in any form. Indeed, this very question – whether racial disparity is attributable to racial bias and if so, how much – is one of the key findings that PPD is attempting to discover through its various data-review and data-assessment efforts in the area of stop and frisk, efforts that Plaintiffs apparently now seek to supplant with more discipline.

## III.   ARGUMENT

Plaintiffs have once again proposed wide-ranging police reforms to the City on a host of issues. As evidenced by the agreed-upon items in Plaintiffs' Proposed Order, the City and PPD have agreed to many of Plaintiffs' most recent proposals. This time, however, Plaintiffs also demand multiple reforms that are wholly unprecedented – both in the Commonwealth of Pennsylvania and within the United States at large – without bothering to cite even a single case in support of their positions. First, Plaintiffs have asked the Court to enter an Order requiring the City to revise and replace existing police strategy in the area of enforcing quality of life ("QOL") offenses; specifically requiring PPD officers to *never* make formal pedestrian stops – even if reasonable suspicion exists – without first asking the person to cease the conduct at issue (i.e. mere encounter). Second, Plaintiffs ask the Court to mandate that PPD create a new incentive

---

[3] As evidenced by the analysis and findings presented in each of the City's previous 14th Amendment Reports, calendar year 2019 is the first year in which the City and PPD concurred with Plaintiffs as to the existence of a racial *disparity* that could not be readily explained by crime rates or other factors.

and disciplinary system specifically designed to discipline police officers for exhibiting "racial bias in stop and frisk practices," and to create a new incentive system which would reward police officers for *Bailey* compliance.

In other words, Plaintiffs in their Motion ask this Court to make a finding that the City has failed to comply with the Consent Decree, and to intervene itself in PPD's strategic crime-fighting decisions, while also punishing individual police officers for what amounts to racism when there remains no viable tool or benchmark upon which to make that assessment.  Neither of these proposals is remotely warranted, and the imposition of either could have grave consequences for policing in Philadelphia, and for the safety of Philadelphia citizens.

A consent decree, although negotiated among the parties, is a "judicial act" enforceable under the court's contempt powers pursuant to 18 U.S.C. 401.  *See Goddard Systems, Inc. v. Tyson*, No. 07-5372, 2009 WL 2058729, at *2 (Jul. 8, 2009) (citing *U.S. v. Swift & Co.,* 286 U.S. 106, 115 (1932)).  Plaintiff's effort to enforce the terms of the *Bailey* Consent Decree over the City's objections thus amount to a charge that the City be held in *contempt of court* for non-compliance.  Contempt is a "drastic remedy" and the moving party carries a "heavy burden" to establish it.  *Haendel v. Clark*, 2019 WL 1372166, at *2 (W.D. Va. Mar. 26, 2019) (citing *Morgan v. Barry*, 596 F. Supp. 897, 898 (D.D.C. 1984)).  To obtain a contempt finding for non-compliance with a court order, a plaintiff must establish the following elements by clear and convincing evidence: (a) a valid court order existed; (b) the defendant had knowledge of the order; and (c) the defendant disobeyed the order.  *See Tyson,* 2009 WL 2058729 at *2 (citing *Roe v. Op. Rescue*, 919 F.2d 857, 868, 871 (3d Cir. 1990)).[4]  A litigant will not be held in contempt for violating a court order unless they had knowledge of the order, and the order is specific and

_____

[4] The City acknowledges that the first two of these elements are satisfied, but contests the satisfaction of the third.

definite. *See, e.g., Harris v. City of Philadelphia*, 47 F.3d 1342, 1350 (3d Cir. 1995) (citations omitted).  A contempt sanction should *not* be granted for alleged non-compliance with a consent decree "if there is ground to doubt the wrongfulness of the defendant's conduct." *Id.* (citing *Quinter v. Volkswagen*, 676 F.2d 969, 974 (3d Cir. 1982) (additional citations and quotations omitted)).

Turning to the Consent Decree in the instant matter, this Court set forth the standards for determining the City's compliance with its terms.  In making this determination, the Court may consider:

(1)     The number and nature of stops and frisks that do not comply with constitutional standards under the Fourth Amendment or Pennsylvania Constitution;

(2)     All information regarding the reasons provided for stops and frisks, the resultant "hit-rates," including arrest data, seizures of evidence, and information resulting from audits and surveys conducted by the parties; and

(3)     Racial disparities in stop and frisk practices under appropriate criteria and benchmarks and under professionally established statistical protocols and analysis.  *See* Consent Decree (Doc. No. 16), at 6-7 of 9.

The Court also noted that non-compliance for Fourteenth Amendment purposes may be found where "significant racial disparities" exist which are not explained by non-racial factors for such disparities, such as crime rates, suspect-descriptions, police deployment patterns, or other non-racial factors. *See id.* at 7 of 9.

Because no clear and convincing evidence exists for this Court to find that the City has failed to comply with the terms of the Consent Decree, Plaintiffs' Motion should be summarily denied.

A.     **The Unprecedented Quality-of-Life Reforms Sought by Plaintiffs
Must be Rejected.**

Plaintiffs have suggested that after years of monitoring and re-training PPD officers regarding pedestrian stops and frisks, that the City now revamp its entire stop-and-frisk model with respect to *all* Quality-of-Life offenses.[5]  Plaintiffs specifically ask this Court to preclude from conducting pedestrian stops for these types of crimes – even if there exists an abundance of reasonable suspicion under the law to justify the stop – without first issuing a verbal warning to the offending individual.   Moreover, Plaintiffs seek this remedy at a time when crime in Philadelphia, homicides in particular, is at an unprecedented level, thus seeking to strip PPD of a crime-fighting tool when Philadelphia citizens need more protection than ever.

First and foremost, Plaintiffs' proposal is unprecedented.   Plaintiffs point to no other situation, and the City is aware of none, in which a court – in the context of a consent decree or otherwise – has ordered a blanket prohibition on actions which are supported under the law.[6] Similarly, Plaintiffs provide no data at all to suggest that these actions would successfully eliminate any racial disparity in policing.   Even if precedent for this proposal existed, an order precluding PPD from engaging in *lawful* community policing and protection efforts would be unjustified.   In the absence of such precedent, it would be draconian.

---

[5] Plaintiffs reference stops which include public urination, smoking marijuana, open liquor containers, obstructing sidewalks, panhandling, littering, spitting, gambling, "trespass," and minor disturbances among the types of stops that would be subject to this Order.

[6] To the extent Plaintiffs would argue that these stops are by and large not legally justified, the data collected over the past half-decade suggests otherwise.   As the Fourth Amendment Reports in this matter have demonstrated, the vast majority of pedestrian stops by PPD officers are now supported by reasonable suspicion.

The City and PPD note that while Plaintiffs attempt to package this as a rather minor and innocuous change, it is in fact both unprecedented[7] and unjustified.  A blanket prohibition on an entire category of stops would eliminate police discretion, even in instances where someone calls and asks for their help.  Moreover, Plaintiffs do not acknowledge the potential impacts on neighborhoods when word gets out that PPD officers are prohibited from performing stops, frisks, and issuing citations without first offering perpetrators the opportunity to voluntarily leave the area.  Plaintiffs also do not address the issue of repeat offenders, and how to handle those situations when the person simply repeats unlawful conduct for which they know the most serious penalty is being asked to leave.

Moreover, Philadelphia citizens are increasingly concerned about an unprecedented crime spike affecting many parts of the City.  Homicides, in particular, have Philadelphians frightened for their families, and city councilmembers, the Mayor's Office, and PPD have been hearing these concerns at an alarming rate.  And the numbers themselves are telling.  With one minor exception, the number of murder victims in Philadelphia has steadily increased each year since 2013.  In 2020, a milestone was reached when more than twice as many people were murdered in the City than had been in 2013.  For the year 2021, the number of homicide victims to date (123) far exceeds the numbers for any comparable period in prior years.  Crime Maps & Stats | Philadelphia Police Department (phillypolice.com).  PPD and the City are now faced with the challenge of reducing these numbers while simultaneously reducing racial disparities in all areas of pedestrian stops, including QOL stops.

---

[7] Plaintiffs do reference "alternate responder policies" implemented by Portland, Oregon and the bay area, California.  These are not akin to what Plaintiff now seeks.  Moreover, neither the City nor PPD are convinced at this time that current policing models in those cities would be in the best interest of Philadelphia citizens.

The data also shows an inverse relationship between QoL enforcement and homicide rates. Notably, at times when PPD engages in more "proactive policing" – essentially defined as conducting more stops, including both quality of life and investigatory stops – there are fewer shootings and shooting victims in the City. As this Court is well-aware, since 2015, the year after Philadelphia had its lowest number of shootings in recent memory, the number of pedestrian stops has dramatically decreased. At the same time, as noted above the trend line for shootings has steadily increased, and has increased *drastically* between 2017 and present. *See* Exhibit A, at Tab 4, Proactive Policing vs. Shooting Victims Chart. More specifically, when isolating quality of life stops alone, the data evidences the same trend; fewer stops are correlated with more shootings, especially since 2016. *See id.* at Tab 5, GK Project.

Moreover, these crimes are not happening in some vacuum; residents are feeling the impact and voices from the community have grown increasingly louder over the past several months. PPD commanders have received significantly more citizen's complaints – and citizen's concerns – during these several months, and there is a general fear that as summer approaches, the situation will get worse before it gets better. *See* Exhibit B, District Captains' Summaries of Current Issues. The City and PPD are currently in the process of ascertaining more specific information on this topic – including attempts to provide input to the Court from a wider constituency than simply the City and Plaintiffs' counsel – and will supplement this Response accordingly. Based on the information received to date, however, citizens' current needs and desires would be best served by continuing to actively police their neighborhoods, not implementing experimental reforms at a time when PPD needs all tools available at its disposal.

While Plaintiffs argue, with respect to certain PSAs in the City, that QoL stops appear to be responsible for some degree of racial disparity, the remedy Plaintiff now seeks is not tailored

to that end and is thus dramatically overbroad for those purposes.  For one, Plaintiff's proposal is not limited to stops that, based on data, would likely impact racial disparity, instead it would apply to *all* pedestrian stops in the City.  Similarly, Plaintiffs do not carve out certain categories of QoL stops that they believe to be reflective of disparity.

As the national conversation surrounding these types of stops continues to grow, the City and PPD will continue to look for other jurisdictions that have demonstrated, through evidence-based strategies, that the reduction in QoL enforcement has achieved a reduction in racial disparities while maintaining public safety. If such examples exist, PPD leadership is willing to engage in discussions with those departments to determine if those models can potentially be replicated or otherwise guide PPD's efforts in this area.  But especially in light of the recent crime spike and citizens' concerns, PPD also requires input on this topic from key stakeholders including community residents and elected officials.

PPD is actively engaged in a comprehensive set of reforms that would rival any police department in the country.  Throughout this process, PPD has demonstrated its commitment to continue to provide high quality policing while reducing negative and unfair interactions, and improving community relations.  PPD wholeheartedly intends to continue these efforts, both with respect to QoL enforcement and its stop-and-frisk program more generally.  Particularly given the host of steps actively being taken in furtherance of this commitment, Plaintiff's proposal is wholly unjustified and unwarranted.  Moreover, as Plaintiff effectively concedes by not even attempting to cite supporting authority, the remedy Plaintiff now seeks it is not legally viable.  Accordingly, having failed to demonstrate by clear and convincing evidence that the City is in contempt of the *Bailey* agreement on this point, Plaintiff's Motion on QoL insofar as it pertains to QoL enforcement must be denied.

**B.** **Plaintiffs' Attempt to Impose Internal Discipline and Incentivization Measures upon PPD is Unwarranted and Must be Denied.**[8]

Plaintiffs demand that no later than May 1, 2021, PPD implement "plans and protocols for (a) internal discipline of officers and supervisors for violations of the *Bailey* Consent Decree provisions prohibiting racial bias in stop and frisk practices and (b) incentivization of policing practices consistent with the *Bailey* Consent Decree provisions."  Pl. Mot. at 2.

The City and PPD are firmly committed to addressing the racial disparity issue in the area of stop-and-frisk, along with any "racial biases" that in fact exist within PPD at large, and are currently taking numerous steps to achieve these goals.  Further, Plaintiffs have never proposed – nor is the City otherwise aware of – any workable benchmark or metric by which *racial bias* can reliably be assigned to individual police officers on the basis of quantitative data analysis. Plaintiffs point to no other police department that has developed a system for doing so, nor do they cite any authority in which a court has ordered relief even remotely similar to that which they presently seek.  Plaintiffs' proposals also constitute an over-reaching into internal PPD protocols and procedures that would not only impact PPD's internal and discretionary actions, but undoubtedly the Collective Bargaining Agreement ("CBA") between the City and Philadelphia Fraternal Order of Police ("FOP").

At the outset it is important to note that what Plaintiffs are seeking is not minor; they are asking this Court to require PPD to declare individual police officers "racially biased," and to do so even absent direct evidence of the same.  It goes without saying that a finding of "racial bias" has far greater and more lasting ramifications than nearly any Directive or policy violation.  Such

---

[8] Although Plaintiffs 2nd and 3rd proposals are technically distinct in Plaintiff's submission, Plaintiff's proposals in paragraph 3 constitute the benchmarks to be used in implementing the system Plaintiffs propose in paragraph 2.  For this reason, and because Plaintiffs themselves combine these issues for briefing purposes (*see* Pl. Mem. of Law, at [Document No. 130-2], the City will do the same.

a finding would undoubtedly preclude the police officer at issue from testifying in court (drastically limiting their career prospects), could lead to a criminal probe, and might well result in a dismissal of every conviction in which such officer ever participated, without regard to the guilt or innocence of the accused. Of course none of that is to say that police officers should *not* be disciplined when they exhibit racial bias; on the contrary, all parties to this litigation wholeheartedly agree that they should. But any process by which a brand new system is created to make these determinations – particularly one for which no historical precedent exists – must be searching and methodological, not abrupt and reactionary. The entry of Plaintiffs' Proposed Order would lead to a less effective police department and potentially devastating consequences for any officer accused of bias when no proper metric exists to make that assessment.

      1.    <u>The City and PPD Have Evidenced a Powerful Commitment to Addressing Racial Disparity and any Racial Bias within PPD, both Within and Outside of this Litigation</u>

The City and PPD have readily acknowledged that Dr. Kane's findings of racial disparity in 2019, particularly in certain Districts and PSAs, demand further attention. For this reason, the City immediately launched the PSA review, a critical first step in determining the "root cause" of the racial disparity acknowledged by Kane – i.e. is it a product of racial "bias" or something else, and how to explain it. The PSA review has now been completed, and PPD is currently working with Plaintiffs and the Police Advisory Commission ("PAC") on another audit that seeks to get closer to the heart of the same issues. As noted above, this secondary audit seeks to make *evidence-based* recommendations about how the City and the Philadelphia Police Department might create new policies and/or directives designed to reduce racial disparities in stops.

Starting last Fall, the City and PPD also enlisted the assistance of the Racial, Ethnic, and Diversity subcommittee of the MacArthur Foundation to examine and analyze the Relative Rate

Index and existing disparity in pedestrian stops. PPD established an internal team to work with the Foundation on this project, and also sought the Foundation's permission for Plaintiffs' counsel to also participate, a request which was granted. The subcommittee is currently in the process of conducting a thorough, data-based analysis on which potential curative measures can be based. All findings will be communicated to PPD and its command staff.

Simultaneously, beginning in October 2020, Dr. Marks and the National Training Institute on Race and Equity (NTIRE) began delivering a ½ day comprehensive Implicit Bias and Mitigation training to all PPD personnel. As a diversity and implicit bias expert, Dr. Marks has provided implicit bias training to thousands of police chiefs, executives, and patrol officers in local police departments (including the entire Los Angeles Police Department). This team was chosen after careful consideration with City leadership and Police Advisory Commission (PAC), with the goal of delivering the best evidence-informed training to support the goal of reducing biases and disparities in policing. A significant number of officers have received this training thus far, and it is PPD's goal for the entire Department – including both sworn and non-sworn personnel – to have received this training by October 2021.[9]

Further, PPD has long-employed an explicit prohibition on bias and discrimination – specifically including that which is racial in nature. The PPD Disciplinary Code contains two separate provisions addressing this issue, as follows:

1-022-10: "Any act . . . which objectively constitutes discriminating or harassing behavior based on race, color, gender. . ."

Starting with the 1st offense, the penalty for a violation of this sub-chapter ranges from reprimand to dismissal.

1-023-10: "Inappropriate communication(s) based on race, color, gender . . ."

---

[9] These efforts – although specifically relevant to the issues currently before the Court in this litigation – are also part of a much broader set of police reforms that PPD is currently undertaking. *See* City Response to Pl. Proposals (Doc. No. 117).

For the 1st offense, the penalty for a violation of this sub-chapter ranges from reprimand to a 15-day suspension.

Starting with the 2nd offense, the penalty for a violation ranges from reprimand to dismissal.

*See* PPD Discipline Code, Sections 1-022-10 and 1-023-10.

Although Plaintiffs' motion essentially argues that PPD is not treating the issue of racial disparity – and the need to address any underlying bias that may exist within the Department – with adequate seriousness under the terms of the Consent Decree, this is simply not the case. The City and PPD are attempting to address these issues through simultaneous, varied efforts that include officer training and education, comprehensive data collection and analysis, and the imposition of serious disciplinary sanctions for officers that are in fact found to have engaged in impermissible discriminatory acts. Plaintiffs themselves are actively involved in these processes.

Finally, and most recently, Plaintiffs' Proposed Order *for this very Motion* includes a number of *new* reform items that PPD **has proposed and agreed to undertake** in the coming months. These include the assignment of specially trained "Accountability Officers" to various police Districts to work on racial disparity issues solely with respect to this litigation, additional PPD-wide training on the Fourteenth Amendment issues at issue in this litigation, and a monthly Command-level review of body-worn camera footage in various Districts – again, for the specific purpose of assessing compliance with the instant Consent Decree. These items are not insignificant; they will require significant time and manpower but PPD has once again demonstrated its willingness to take meaningful steps in an attempt to cure some of the more challenging issues confronting police departments and cities nationwide.

In light of the foregoing, not to mention the host of reforms previously implemented during the course of this litigation, any suggestion by Plaintiffs that the City and PPD are not committed to these issues defies logic and belief.

        2.      <u>There is Currently no Workable Mechanism to Assess</u>
<u>whether an Individual Police Officer Exhibited Racial Bias in</u>
<u>Conducting a Stop or Frisk</u>.

Astoundingly, Plaintiffs ask this Court to order a new PPD disciplinary system with the aim of declaring individual police officers "racially biased."  But Plaintiffs do not suggest, and PPD and the City are currently aware of no mechanism – whether at home or being utilized by any other police department in the United States – to reliably extrapolate a "racial bias" finding from a stop, or even a series of stops, absent direct evidence of the same.  The risk of labeling police officers as essentially racist without a system in place to adequately make that evaluation would run afoul of general principles of freedom and fairness, the CBA, and the safety of Philadelphia citizens who are desperately in need of effective policing during an unprecedented crime wave.

Paragraph 2 of Plaintiff's Proposed Order – insofar as it pertains to discipline – would require the City to submit a plan to discipline officers and supervisors for "racial bias" no later than May 1, 2021.  In paragraph 3, Plaintiffs set forth "metrics and benchmarks for assessing racially biased stops" for both officers and supervisors.  As to patrol officers, Plaintiffs would require that PPD evaluate:

- stops / frisks made without reasonable suspicion;

- hit rate of frisks for weapons;

- number of stops of Black and White suspects; and

- civilian or internal complaints relating to stops and frisks.[10]

As to supervisors, Plaintiff's "metrics and benchmarks" include:

- "real time assessment" of legal sufficiency and racial disparities;

- "periodic reporting" by supervisors;

- "details" as to supervision and oversight; and

- "standards for performance evaluations" to assess commanders' success in ensuring compliance with the Consent Decree.

With respect to Plaintiffs' benchmarks for patrol officers, the City wholeheartedly agrees that those categories of information, among others, are relevant and useful in attempting to assess the "root cause" of racial disparity – particularly at a macro level – and various factors that might determine why certain PSAs exhibit meaningful disparities while others do not. Indeed, nearly all these criteria were considered and examined by PPD and Dr. Kane as part of the PSA Audit. Crucially, however, Plaintiffs never explain *how* this information could fairly be extrapolated into findings of actual *racial bias* against individual police officers and supervisors.

Turning to Plaintiffs' Memorandum of Law, the remedy Plaintiffs demand becomes no clearer. Plaintiffs' *most* specific suggestions boil down to real-time review of 75-48A data which mirrors the approach of "Compstat" – a crime-fighting tool utilized by PPD. Plaintiffs vaguely note that this Commander-level review should be for data collection that would in turn allow Commanders to craft policies and procedures "once that data is available." Pl. Mem. at 15. Plaintiffs then conclude "there are sound metrics and benchmarks for supervision and discipline of officers, for holding Commanders responsible for continued patterns or racial bias, and for incentivizing constitutional policing," but never mention any "metrics and benchmarks" beyond

---

[10] Plaintiffs note they will designate "additional information and metrics" following the ongoing PAC analysis, in which Plaintiffs themselves and PPD are also participating.

those referenced in the Proposed Order.[11]  And once again, Plaintiffs offer no explanation, and present no legal or historical precedent, as to how PPD can fairly and legally declare that individual police officers are "racially biased" without direct evidence of such bias.

Moreover, Plaintiffs' submission evidences a clear desire to punish the Police Department, rather than an actual effort to reach the heart of an issue that PPD is taking unprecedented steps to address.  Plaintiffs themselves have decided that racial disparity equates to racial bias and now demand that PPD impose discipline based on their conclusions.  Plaintiffs approved wholeheartedly of the ongoing PAC audit before noting in the discipline portion of their submission that "[a]dditional information and metrics will be designated and submitted to the Court based on the current audits, research, and analysis being conducted by the Police Advisory Commission."  Plaintiffs have clearly made up their mind as to what the PAC audit will reveal, and the fact that discipline is the solution.  And in suggesting as much, Plaintiffs are apparently asking the Court to declare the City non-compliant based, at least in part, on findings that have not yet been made.  This is neither contemplated by the letter or spirit of the Consent Decree, especially in light of PPD's ceaseless efforts to work with Plaintiffs and achieve drastic improvements in its stop and frisk program at large.

3.   Much of the Discipline Plaintiffs Seek is Duplicative of
      Disciplinary Processes Already in Effect.

Plaintiffs propose that findings of racial bias be based upon stops/frisks made without reasonable suspicion, hit rates for weapons in frisks, number of Black vs. White stops, and civilian and internal affairs complaints.  As this Court is aware, and as noted herein, less than two years ago PPD implemented a system – *at considerable time, labor, and expense* – to progressively discipline officers for stops and frisks that lack reasonable suspicion.  That system

---

[11] As noted above, Plaintiffs mention certain of the same benchmarks already utilized by the City in its PSA Audit.  Moreover, Plaintiffs never acknowledge the existence of the CBA.

is operational.   And since long before this litigation commenced, citizens have had the opportunity to file internal affairs complaints regarding stops, frisks, or any other conduct that they believe is improper.  All such complaints are duly investigated, including but not limited to any allegations of racial bias or harassment.  Finally, as noted above, the PPD Disciplinary Code specifically prohibits racial discrimination and harassment, with the imposition of serious penalties for any such offense.  Because much of what Plaintiffs ask this Court to order is already in effect, Plaintiffs' motion should be denied on this basis as well.

Additionally, as this Court is aware, PPD is simultaneously conducting a host of internal audits and implementing wide-ranging reforms, some of which involve identical subjects and substantively overlap a great deal (i.e. various racial disparity/bias measures discussed above). By and large, the City and PPD have not been ordered by any court to adopt these measures, but are doing so voluntarily and in the interest of fairness to the community and improving police-community relations.  But with respect to this litigation, as the amount of reforms increases, Plaintiffs' demands appear to become more constant and wider-ranging.   While the City understands Plaintiffs' desire to see overhaul at a time when PPD and the City have demonstrated a willingness to take drastic steps, a police department that is constantly undertaking new reform measures cannot be expected to adequately implement those measures. Therefore, even assuming, *arguendo*, that Plaintiffs' proposals were all amenable to PPD, there is no basis by which PPD should be required to implement everything *at the same time*. Moreover, the confusion and uncertainty that multiple years of constantly evolving policies and protocols – with no time to focus on implementation or learning – could wreak on a police department could create a "chilling effect" on officers who are scared to do police work because they don't know what the consequences will be.  Particularly at a time when safety and security

is at such a premium in Philadelphia, Plaintiffs' constant demands risk undermining that which presently exists.

> ### 4. The City is Unaware of Any Precedent in which a Municipality has been Compelled to Impose a System by which it Assigns Findings of Bias to its Employees.

Plaintiffs seek a judicial finding that PPD can no longer manage its own affairs in the area of disciplining its police officers and should thus be required to implement yet another brand new disciplinary system, subject to the approval of Plaintiffs and this Court.  Not to punish officers for lateness, non-compliance with directives, or even use of force, but instead to declare them "racially biased."  As noted above, it goes without saying that such a finding has far greater and more lasting ramifications – both upon the individual officer(s) and the City itself – than nearly any Directive or policy violation.  Put differently, Plaintiffs now seek to supplant PPD's judgment and discretion in one of the most sensitive policing issues currently facing the City and the country at large.  This remedy – particularly in light of the wide-ranging efforts PPD is taking to address issues of disparity both within and outside of *Bailey* – is wholly unprecedented.

The Philadelphia Police Department is tasked with the duties of preserving the public peace, preventing and detecting crime, policing streets and highways, and enforcing traffic statutes, ordinances, and regulations related thereto.  Philadelphia City Code, Section 5-200(a).  "The primary function of [PPD] is law enforcement."  *Id.,* Annotation.  In furtherance of this function, PPD itself is responsible for training, equipping, maintaining, and disciplining PPD officers.  *See id.* at 5-200(b).

Pennsylvania law provides that police employees in First Class cities may not be suspended without pay, removed, or demoted except for the following reasons:

(1)   Physical or mental disability affecting their ability to continue their service;
(2)   Neglect or violation of any official duty;

    (3)     Violation of any law (felony or misdemeanor) of the Commonwealth;
    (4)     Inefficiency, neglect, intemperance, disobedience of orders or conduct unbecoming an officer;
    (5)     Intoxication while on duty;
    (6)     Engaging or participating in a political campaign while on duty or in uniform; or
    (7)     Engaging or participating in a political campaign for an incompatible public office under section 1401.

Pa. C.S. 55644 – Removals.

Additionally, the CBA provides for specific disciplinary provisions, and incorporates the PPD Disciplinary Code, which itself was bargained for. An employer cannot unilaterally change terms and conditions of employment outside of the express terms of a bargaining agreement among the parties. *See Chester Upland Sch. Dist. v. PA Labor Relations Board*, 150 A.3d 143, 153-54 (Pa. Commw. 2016). "Matters of employe[] discipline and disciplinary procedures in both the public and the private sector are generally regarded as mandatory subjects of bargaining." *Fairview Twp. Police Ass'n v. Fairview Twp.*, 31 PPER ¶ 31019 (Final Order, 1999).

The relief Plaintiffs seek would implicate not only the current CBA but Pennsylvania law and the Philadelphia Code as well. PPD and the City would thus be required to develop a system to label officers with racial bias, without adequate standards to do so and with no local or even national precedent to rely on, that could somehow manage to withstand a robust labor challenge. Although the Consent Decree of course contemplates judicial intervention under certain circumstances, nowhere is it contemplated therein that PPD would lose the ability to manage its own affairs in an area so fundamental as discipline, particularly on such a sensitive subject with such wide-ranging implications. Furthermore, Plaintiffs reference no situation – and the City is separately aware of none – in which a court has required a police department to take action of this nature, whether pursuant to a Consent Decree or otherwise.

    5.    <u>The Incentive System Alluded to by Plaintiff is Unprecedented and Outside the Scope of this Consent Decree</u>

Finally, although Plaintiffs' Memorandum is focused nearly entirely on discipline, Plaintiffs also wish to see PPD "incentiviz[ing] [] policing practices consistent with the *Bailey* Consent Decree provisions."  Pl. Proposed Order, at 2.  Plaintiffs propose no specific incentive program.  Nor do Plaintiffs reference any incentive program which has been ordered by a court, or separately which has been successful in reducing racial disparities – or racial biases for that matter – by any police department in any scenario.

While Plaintiffs' proposal in this regard may be more innocuous than their others, it still constitutes an unjustified overreach into internal PPD affairs, especially absent any showing whatsoever as to what such program would look like or even any mention of *how* it would in fact reduce any racial disparity or bias.  And similar to the imposition of discipline, incentive and rewards systems trigger potential CBA issues and as a general matter cannot simply be adopted without the potential for negotiation and challenges.  Moreover, neither the City nor PPD is convinced at this time that rewarding police officers for *not* exhibiting racial bias in policing sends the right message.

Plaintiffs' attempts to substitute their own judgment for that of the PPD on issues that pertain to police officer morale and performance, while presumably well-intended, are not based in any authority or contemplated by the language of this Consent Decree.  PPD should not be required to impose an incentive or reward system if its command personnel have determined it is not in the Department's best interest to do so at this time.  Nonetheless, as has been the case throughout this litigation, if Plaintiffs share data regarding incentive systems that have been successful in the past, or propose specific plans of their own, the City will evaluate them in good faith and respond accordingly.

IV.     **CONCLUSION**

As noted by Plaintiffs, all parties have agreed to the entry of an Order setting forth items 4-8 in Plaintiffs' Proposed Order.  For the reasons set forth herein, however, the City opposes items 1-3 of that same Order.  Plaintiff's Motion to Enforce, insofar as it pertains to items 1-3, should be denied because Plaintiff has failed to demonstrate, by clear and convincing evidence, the City's non-compliance with the Consent Decree.


Date:   April 5, 2021                                    Respectfully Submitted,


                                                         _/s/ Craig M. Straw_____
                                                         Craig M. Straw, Esquire
                                                         First Deputy City Solicitor


                                                         _/s/ Jonathan Cooper_____
                                                         Jonathan Cooper
                                                         Deputy City Solicitor
                                                         Pa. Attorney ID No. 316374
                                                         City of Philadelphia Law Dept.
                                                         1515 Arch Street, 14th Floor
                                                         Philadelphia, PA 19102
                                                         (215) 683-5448
                                                         jonathan.cooper@phila.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Mahari Bailey, et al.,** | : | |
| **Plaintiffs** | : | **C.A. No. 10-5952** |
| | : | |
| **v.** | : | |
| | : | |
| **City of Philadelphia, et al.,** | : | |
| **Defendants** | : | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date below, the City of Philadelphia's Response in Opposition to Plaintiff's Motion to Enforce was filed via the Court's electronic filing system and is available for downloading.

Date:  April 5, 2021                                  Respectfully submitted,


                                                            <u>/s/ Jonathan Cooper</u>
                                                            Jonathan Cooper
                                                            Deputy City Solicitor
                                                            Pa. Attorney ID No. 316374
                                                            City of Philadelphia Law Dept.
                                                            1515 Arch Street, 14th Floor
                                                            Philadelphia, PA 19102
                                                            215-683-5448 (phone)
                                                            jonathan.cooper@phila.gov