**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MAHARI BAILEY, et al.,** | : | |
| **Plaintiffs** | : | **No. 10-cv-5952** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants** | : | |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION TO MANDATE RACIAL BIAS REMEDIAL MEASURES**

## I.    Introduction

The City's Response to Plaintiffs' Motion for Racial Bias Remedial Measures provides

no basis in law or fact to deny the narrow and targeted relief sought by plaintiffs.  The requested

remedial measures, in conjunction with the measures on which the parties agree, are necessary to

address and rectify the systemic patterns of racial bias that exist in the stop and frisk practices of

the Philadelphia Police Department ("PPD").  The Response mischaracterizes the claims made

by plaintiffs, rejects the findings of its own statistical expert, and misstates the law governing

this Court's power to remedy violations of the Consent Decree and the Fourteenth Amendment.

This Reply will address each of the City's arguments, but we begin with a summary of the basic

flaws in the City's Response.

*First*, the City's argument that plaintiffs are seeking an Order of Contempt is baseless.

The proposed Order is fully authorized by the Consent Decree which states that the "Court has

the authority . . . to order specific policies, practices and/or other measures that are necessary or

appropriate to ensure compliance with constitutional standards."  ECF No. 16 at 6 (Settlement

Agreement, Class Certification, and Consent Decree ¶ IV(F)).  The Consent Decree provides for

a process by which remedial measures may be ordered separate and apart from any contempt

proceedings, and the current request for remedial measures is fully consistent with the approach that the parties have engaged in over the past ten years of monitoring the Consent Decree.

Further, this Motion seeks measures that are fully consistent with the findings of the experts for the plaintiff and the City identifying patterns of racial disparities and racial bias in stop and frisk policing and with this Court's Order of November 12, 2020 mandating a PPD "comprehensive internal review and investigation into *racial bias patterns* in stop and frisk practices."  ECF No. 120 ¶ 1 (emphasis added).  To be sure, there have long been grounds for contempt citations given the lack of full compliance with the Consent Decree requirements that stops and frisks be supported by reasonable suspicion and that they not be racially biased.  That plaintiffs have not sought contempt, but rather, as in the current Motion, have sought remedial measures without sanctions, shows just how far afield is the City's claim that plaintiffs are now acting in a precipitous manner.

*Second*, on the issue of quality of life stops ("QOL"), the City's argument that implementation of the proposed remedial measure will deprive the PPD of an essential "crime fighting tool" is far off the mark.  As we show, there is nothing even close to a causative relationship between QOL stops and shootings in Philadelphia.  The notion that requiring an officer, for example, to instruct a civilian to put away an open liquor container, stop littering, or cease annoying behavior before engaging in a forceful stop will increase the murder rate in Philadelphia defies empirical data and common sense.  It is not surprising, therefore, that the City's own expert has directly rejected this claim.

*Third,* the argument that the City lacks sufficient information, data, or benchmarks to develop disciplinary measures for proven patterns of racially disparate and biased policing ignores a wealth of data to the contrary and contravenes basic principles of command

responsibility and internal governance of police departments.  The City's position that *no* disciplinary system can presently be developed is a remarkable admission that the PPD disciplinary code that *prohibits bias and discrimination* in policing will not (or cannot) be enforced in the context of the stop and frisk program that has long been plagued by racial disparities.[1]

Fourth, the City's argument that no court has previously entered orders prohibiting racially discriminatory practices in policing or sanctioning police for such practices is a serious misrepresentation of legal precedent.  The United States Supreme Court and the lower federal courts have consistently provided remedial measures and sanctions for racially discriminatory practices, and the argument that an order for disciplinary action for proven patterns of racial bias is "draconian, unwarranted, and wholly unprecedented," ECF No. 131 (hereinafter "City Response") at 1, while strong on rhetoric, is extraordinarily weak on the law and the facts of this case.

## II.    The Factual Record on Racial Disparities and Bias and this Court's November 12, 2020 Order

The City's factual recitation is a study in misdirection.  It starts with a discussion of the separate matter, not at issue on this Motion, regarding *Fourth Amendment* requirements of the Consent Decree, and points to the progress in quality of stops and the overall reduction in the number of stops.  City Response at 2.  We agree that there have been some improvements on Fourth Amendment issues, but even on that matter, the City fails to recognize that *ten years* after the entry of the Consent Decree, there is still not compliance with Fourth or Fourteenth Amendment provisions.  Over the past year, both the City and plaintiffs have reported stops

---

[1]      The Disciplinary Code, Section 1-022-10, prohibits "[a]ny act . . . which objectively constitutes discriminating . . . behavior based on race, color, [or] gender."

without reasonable suspicion in the range of 15-20% of all stops, which means that thousands of stops continue to be made in violation of the Fourth Amendment and the Consent Decree. Moreover, frisks without reasonable suspicion have been steadily reported by plaintiffs to be in the 28-37% range, while the City reports frisks without reasonable suspicion in the 18-19% range.[2]

The City's historical recitation regarding the issue of racial disparities and racial bias is also inaccurate. There has never been a dispute in this case as to the *fact* of racial disparities in stop and frisk practices, as the PPD records show that racial minorities in the City are stopped and frisked out of proportion to their population in Philadelphia. *See* Reports of Plaintiffs and the City on Fourteenth Amendment Issues. What has been disputed is whether these racial disparities are explained by non-racial factors. Accordingly, over the years, the experts on both sides have engaged in court-approved "benchmark" assessments, including regression analysis, comparison of stops without reasonable suspicion by race, and patterns of policing in different districts and PSAs. Plaintiffs' expert, Professor David Abrams, has consistently reported evidence of unexplained racial disparities on one or more of these benchmarks, while the City's experts have disputed these findings. *See* Reports of Plaintiffs and the City on Fourteenth Amendment Issues. But whatever may be true for previous years, in 2020, based on a

---

[2]     These reports have been shared between the parties, but not filed with the Court. However, with still unacceptable rates of stops and frisks without reasonable suspicion, the City agreed that disciplinary measures were necessary to achieve compliance and on July 9, 2019, this Court entered an Order mandating discipline for repeated Fourth Amendment violations. ECF No. 96. The City's claim that this constituted a "massive overhaul" of the disciplinary system, City's Response at 2, is somewhat of an overstatement, but its assertion that "the roll-out of this platform has not been without issue," *id.* at 3, is seriously understated. In fact, it has taken almost a year and half for the PPD to implement the disciplinary process. We do not burden the Court with documentary evidence of this delay, but we can provide the relevant information if requested.

sophisticated multi-year analysis of racial data, Professor Abrams and the City's expert, Dr. Robert Kane, agreed that there were significant and substantial patterns of racial bias in stop and frisk practices.[3]

Remarkably, the City asserts that these unequivocal findings by the experts only "*appeared* [to show] racial disparity that was not explained by crime rates or other factors," City Response at 3 (emphasis added), and that the data shows only "racial disparities," and not "systemic" patterns of racial bias. *Id.* at 5-6. Yet, in its official responses to Plaintiffs' Tenth Report on Fourteenth Amendment Issue, the City did not contest Professor Abrams' findings of racially biased patterns in stops and frisks. *See* Reports of June 17, 2020 (ECF No. 112-1) and July 17, 2020 (ECF No. 113). Dr. Kane's June 17 Report explicitly noted that it would be "difficult to dispute" the findings of racial bias on the benchmark of stops without reasonable suspicion by race of the suspect, ECF No. 112-1 at 15-16, and he agreed as well that Black suspects were "overly represented in PSAs based on racial composition, as well as 'out of place' stops." ECF No. 112-1 at 16. The July 17 Report stated that Dr. Kane had replicated Professor Abrams' regressions and in so doing had *confirmed* the statistically significant findings of the relationship "between detainee race (African American) and the likelihood of being stopped." ECF No. 113.[4]

---

[3]     The detailed findings of Professor Abrams on the relevant racial benchmarks are summarized in Plaintiffs' Memorandum of Law in Support of Racial Bias Remedial Measures, ECF No. 130-2.

[4]     These filings were not the only statements of the City agreeing that there was racial bias in stop and frisk practices. On June 12, 2020, in testimony before City Council, then City Solicitor Marcel Pratt stated:

> *I support the elimination of unconstitutional stop and frisk, including the targeting of Black men and other members of protected classes*. We know that the truth is that some police do

Dr. Kane pointed to two other racial bias patterns in stop and frisk practices: (1) In seven *largely* Black populated PSAs (or over 10% of all PSAs), Dr. Kane found that the number of stops were "unusually high," thus evidencing racial bias in these geographical areas, and (2) in six PSAs with relatively *few* Black residents, there was a significantly higher stop rate for Blacks, a pattern that Dr. Kane characterized as evidence of stops of Blacks for being "out of place." ECF No. 112-1 (Kane Report, June 17, 2020) at 6, 8. Of course, because the Fourteenth Amendment protects every resident of Philadelphia from racially biased policing, these PSAs were more than mere "outliers," and Professor Abrams found that highly disparate racial policing was evident in over half of the City's PSAs. *See* ECF No. 114 (Plaintiffs' Reply Report on Fourteenth Amendment Issues).

Based on these findings, plaintiffs requested measures to remedy the violations of the Consent Decree and the Fourteenth Amendment. In response, the City acknowledged the finding of racially discriminatory patterns, but it proposed a "root cause analysis" of the reasons for this racial discrimination. Plaintiffs agreed to this process and the parties jointly submitted a proposed Order that this Court approved on November 12, 2020, requiring the Philadelphia Police Department ("PPD") to conduct a "comprehensive internal review and investigation into ***racial bias patterns** in stop and frisk practices.*" ECF No. 120 at 1 (emphasis added).

---

target people of color, particularly Black men for stop and frisk. *And I think if you deny that, you are intellectually dishonest or something else.* It's easy to corroborate. You know, the supporting empirical data, anecdotal data and as we saw earlier, some of us who can do it through personal experience.

Hearing, June 12, 2020, at 80 (emphasis added).

Dr. Kane was tasked by the City to lead this root cause analysis and "based on a wealth of data," City Response at 3, Dr. Kane reiterated the earlier findings that he and Professor Abrams had made on racially biased patterns in stop and frisk practices.[5]  Dr. Kane also concluded that the more discretionary the grounds for a stop and the more that stops were conducted by tactical units as opposed to local district officers, racial disparities increased.  ECF No. 130-2 (Action Plan) at 14.

The City downplays Dr. Kane's findings and ignores several core findings.  For example, the City suggests that the Action Plan reflected what might be expected in a stop and frisk program: higher rates of stops of Blacks in majority Black PSAs, while in majority White PSAs, "mostly White individuals [were] stopped." City Response at 4.  This assertion fails to appreciate the extraordinary impact of what Dr. Kane has correctly labeled the "out of place" factor in stops of Blacks in majority White PSAs, including data that shows that in predominantly White PSAs, Blacks were stopped at rates *up to 15% higher than Whites.*  In PSA 12, for example, with a Black population of 3%, Blacks comprised 42% of the stops.  *See* ECF No. 114 at 21 (Table 4). For a full accounting of the overwhelming evidence relied upon by Dr. Kane and Professor Abrams, *see* Plaintiffs' Memorandum of Law in Support of Motion, ECF No. 130-2 at 3-5.

In any event, rather than accepting the findings of its own Action Plan, the City re-characterizes the Action Plan as "a starting point" and unilaterally requested the Police Advisory Commission ("PAC") to "further ascertain pertinent information . . . to make *evidence-based* recommendations about how the [PPD] might create new policies and/or directives to reduce racial disparities in stops and frisks."  City Response, at 5 (emphasis in original).  The City fails

---

[5]     Dr. Kane's Action Plan is attached as Exhibit A to the Memorandum of Law in Support of Plaintiffs' Motion to Mandate Racial Bias Remedial Measures.  ECF No. 130-2 at 18-38.

to explain the nature of this "pertinent information" or to explain what data Dr. Kane might have lacked in preparing the Action Plan.  Still, as we stated in our Motion, we have no objection to further studies by PAC, and Professor Abrams stands ready to engage with the PAC, but not at the cost of additional delays.

The City's professed "willingness to make massive, wide-ranging overhauls in the area of stop-and-frisk," City Response at 5, is difficult to credit, when it continues to postpone the implementation of critical remedial measures.  Our proposals are fully "evidence-based" on the relevant findings of Dr. Kane and Professor Abrams and the City's court-ordered Action Plan and there is no justification for further delay in addressing the issue.[6]  And it is ironic, that after ten years of monitoring and continuing lack of compliance with the Consent Decree, that the City now blames plaintiffs for their supposed refusal "to wait *for anything*, even when the relief they seek is simply unsupported by any historical precedent within the United States, or any case law whatsoever." *Id.* (emphasis in original).

As we now show, the requested relief is hardly the product of baseless loss of patience with current violations of the Consent Decree, and the remedial measures are narrowly targeted and supported by the very "evidence" that the City states is necessary as a predicate to such relief.

---

[6]     There are questions concerning what progress, if any, the PAC has made in this process. At a minimum, the City should immediately report to the Court what data has been provided, what reviews and analysis are being conducted, and the target date for a final report.

III.        **Argument**

A.        **The Court's Authority to Order Remedial Measures**

The argument that this Court does not have the power to enter orders to remedy racial

discrimination in stop and frisk policing is wholly without foundation.[7]  The Consent Decree

specifically authorizes the Court to order "specific policies, practices and/or other measures that

are necessary or appropriate to ensure compliance with constitutional standards."  ECF No. 16 at

6 (Settlement Agreement, Class Certification, and Consent Decree ¶ IV(F)).  Further, with

specific reference to the issue before this Court, the Consent Decree states that "[n]on-

compliance under the Fourth Amendment and Pennsylvania Constitution may be found where

the evidence proves that there are significant racial disparities that are not explained by non-

racial factors for such disparities . . ."  *Id.* ¶ IV(H).  It is precisely this standard that the experts

have applied in finding patterns of racial disparities and racial bias.

Courts have also long recognized that injunctive relief is appropriate to correct

discriminatory practices and in so doing have overridden state statutes and administrative

practices that authorized discrimination.  *See Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402

U.S. 1, 15 (1971) ("[T]he scope of a district court's equitable powers to remedy past wrongs is

broad, for breadth and flexibility are inherent in equitable remedies."); *Hunter v. Underwood*,

471 U.S. 222, 227 (1985) (heightened scrutiny of state practices on a showing of racially

discriminatory practices); *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013)

(broad remedial orders for both Fourth and Fourteenth Amendment violations in stop and frisk

practices).  Where "there is a persistent pattern of police misconduct, injunctive relief is

---

[7]        The argument that plaintiffs are in effect requesting a finding of contempt, City Response
at 6-7, is patently inaccurate.  As discussed, there is no request for a contempt finding or for
sanctions, even though such a motion would be fully supported.

appropriate." *Allee v. Medrano*, 416 U.S. 802, 815 (1974).  Further, statistical evidence "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

These principles have led to court intervention in a variety of policing practices, including in stop and frisk programs.  In *Rodriguez v. California Highway Patrol*, 89 F. Supp. 2d 1131, 1141 (N.D. Cal. 2000), plaintiffs properly stated an Equal Protection claim by statistical evidence and other facts that proved discriminatory intent of the California Highway Patrol.  The court determined that the agency refused to address racially discriminatory practices on the part of their officers.  Similarly, in *Maryland State Conf. NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 566 (D. Md. 1999), the court relied on statistical evidence to support a ruling of discriminatory differential treatment of minority motorists sufficient to provide notice to supervisors of stops, detentions, and searches made on the basis of race.  *See also, National Congress for Puerto Rican Rights by Perez v. City of New York*, 191 F.R.D. 52, 54 (S.D.N.Y. 1999) (court found a "regular policy of racial profiling by law enforcement agencies – that is, making law enforcement decisions on the basis of racial stereotypes" and that this pattern of stops constituted "a policy containing an express racial classification."); *United States v. Laymon*, 730 F. Supp. 332 (D. Colo. 1990) (statistical pattern and other evidence established unconstitutional racial targeting in stops and searches).

In *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013), as here, plaintiffs challenged an expansive stop and frisk program on Fourth and Fourteenth Amendment grounds. To prove racial discrimination, the plaintiffs relied heavily on statistical evidence showing large racial disparities in stops which by regression analysis were not explained by non-racial factors.

In selecting an appropriate benchmark for measuring racial bias in stops, the court adopted regression factors highly similar to those used by Professor Abrams and Dr. Kane, including local population demographics and local crime rates.  *Id.*, at 584.

The court ordered remedial measures to reform NYPD's discriminatory stop and frisk practices, including immediate changes to the NYPD's policies, a joint-remedial process to consider further reforms, and the appointment of an independent monitor to oversee compliance. *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013). The court made clear that "[e]nsuring that people are not seized and searched by the police on the streets of New York City without a legal basis is an important interest and that "[e]liminating the threat that blacks and Hispanics will be targeted for stops and frisks is also an important interest." *Floyd*, 959 F. Supp. 2d at 672.  Further, the court ruled that the public interest in liberty and dignity under the Fourth Amendment, and the public interest in equality under the Fourteenth Amendment, trumps whatever modicum of added safety might theoretically be gained by the NYPD making *unconstitutional* stops and frisks."  *Id*.

**B.     Quality of Life Stops**

Turning to the specific requested remedial measure of changes in practices involving QOL stops, the City's assertion that the plaintiffs seek "to strip PPD of a crime-fighting tool" at a time when crime in Philadelphia . . . is at an unprecedented level," City Response at 9, is flawed from every relevant perspective.  First, on the issue of alleged increases in crime, the City argues that there is "an inverse relationship between Qol enforcement and homicide rates."  City Response at 11.  According to this theory, the more stops that are made, "the fewer the shootings . . . in the City."  *Id*.; ECF No. 132-1 (Exhibits to City Response) at 4.

But the City has misrepresented the underlying data.  While homicides and shootings have increased in the period 2016-2020, for that same period other felonies have decreased.  *See* Exhibit A (In 2018, violent crimes were down a total of 5%.  In 2020, the year that the City claims shows the greatest relationship between crime and reduced proactive policing, rapes were down 18.8%, robberies *with a gun* down 15%, robbery without a gun down 20.1%, other aggravated assaults down 2.9%, and property crimes were down 2.7%.  The same trend holds for 2021, with total Part I crimes down 12.3% as of April 11, 2021).[8]

Moreover, the exhibits to the City Response show that there is hardly a straight-line correlation, much less a causative relationship, between shootings and pedestrian stops.  Thus, from 2016 to 2017, pedestrian stops *decreased by 35,000 stops, but the shooting rate also decreased*.  *See* ECF No. 132-1 at 2 (showing pedestrian stops dropping from 145,659 to 107,897) & 3 (showing shooting victims dropping from 1278 to 1223).  From 2017 to 2018 there was a decrease in pedestrian stops and a slight increase in shootings, but from 2018 to 2019 there was an increase in pedestrian stops, *yet the shooting rate increased as well.  See* ECF No. 132-1 at 2 (showing pedestrian stops increasing from 76,456 to 79,860) & 3 (showing shooting victims increasing from 1403 to 1465).

Moreover, last year's decrease in investigatory stops is almost certainly a product of fewer people out in public during the COVID-19 pandemic and observance of social distancing.[9] There was no change in PPD policies and practices in stop and frisk policing, and police officers

---

[8]     The charts contained in Exhibit A are available at https://www.phillypolice.com/crime-maps-stats/ (last visited April 16, 2021).

[9]     The City's chart on QOL enforcement, ECF No. 132-1 at 1, does not include all categories of QOL stops.  For example, the chart does not include open container, public urination, panhandling/solicitation, etc.  Regardless, since this chart is only used to show a decrease in quality of life stops, we need not address this difference at this time.

continued to make stops on a suspicion of possession of firearms or felony crimes. The increase in shootings in 2020, in Philadelphia and many other locations where policing tactics remained constant, has been tied to the pandemic, which worsened poverty, unemployment, and eroded social supports, all of which "are empirically tied" to violence.[10] It should also be noted that gun violence was on the rise before the pandemic, and a substantial increase in car stops – from an average of 21,000 stops per month in 2018 to 27,000 stops per month in 2019 – made no measurable impact on gun violence.[11]

The City's statistical approach is contradicted by its own Exhibits. Thus, in comparing VUFA arrests for illegal firearms and the rate of shootings and homicide, ECF No. 132-1 at 3, the data shows a *steady increase* in VUFA arrests from 2015 to 2019 and at the same time an increase in shootings. We assume that the City would not suggest that more arrests caused an increase in crime, but if that data relationship is not a reliable indicator of why homicides increased, the City's assertion that a decrease in proactive policing has caused the increase in shootings is equally false. The same is true for frisks or searches of cars for weapons. In each of six consecutive years from 2014 to 2019 searches of cars increased from 3,993 to 12,108. Exhibit B.[12] During that same period, homicides by guns increased as well. According to the

---

[10]     Beard JH, Jacoby SF, Maher Z, et al., *Changes in Shooting Incidence in Philadelphia, Pennsylvania, Between March and November 2020*, JAMA, published online February 10, 2021. doi:10.1001/jama.2021.1534

[11]     Since car stops are considered by the City to be part of "pro-active" policing, *see* ECF No. 132-1 at 2, we address that data as well.

[12]     Exhibit B was assembled by the Defender Association of Philadelphia as part of a presentation on car stops in Philadelphia, using data from the Philadelphia Police Department.

City's theory, this increase in proactive policing would be considered a cause of the increase in homicides.[13]

Importantly, Dr. Kane found that QOL stops are at the same time far less likely to yield seizures of firearms and result in greater racial disparities than other stops.  As we noted in our Memorandum of Law, it is the rarest of cases in which a QOL stop results in a seizure of an illegally possessed weapon, which is not surprising and reflects the common sense understanding that having police address most quality of life stops by ordering the person to refrain, for example, from carrying an open liquor container, before making a forcible stop, would have no impact on the number of shootings in Philadelphia.   It is significant that the City makes no attempt to explain or rebut this powerful data point.

Further, as a legal matter, the fact that QOL stops are generally made consistently with Fourth Amendment standards does not justify racially disparate and biased stops.  *See Wren v. United States*, 571 U.S. 806 (1996) (ruling that a stop made with probable cause does not violate the Fourth Amendment, but if the stop is motivated by the race of the suspect there would be a Fourteenth Amendment violation).  The City is also wrong in characterizing plaintiffs' proposal as a "blanket prohibition" on QOL stops that would "eliminate police discretion."  City Response at 10.  If the person does not agree to refrain from the prohibited conduct, police are permitted to engage in a forcible stop.  Indeed, as much as the City protests this approach, officers regularly engage in "mere encounters" to address the conduct.  Moreover, stops would also be permitted as the first response in exigent circumstances, including those where the person may be armed or threatens criminal conduct, or where the person has shown non-compliance as a repeat offender.

---

[13]     As we detailed in our Memorandum of Law in Support of Motion for Remedial Measures, ECF No. 130-2 at 11-13, the high and unexplained racial disparities in car stops is powerful corroborating evidence of racial bias in pedestrian stops.

Finally, there is an even more elementary flaw in the City's statistical analysis. The City makes claims about the relationship between "proactive policing" and shootings that are not justified by data or logic and its cherry-picked data fails to make the fundamental distinction between correlation and causation.  The City proffers a "causal" relationship between the decline in QOL stops and the rise in homicides and shootings over the past 4-5 years, and especially in the second half of 2020, but the statistical errors in this argument are manifest.

First, we repeat the fundamental point that correlation does not equal causation.[14]  Here, were the City to plot ice cream consumption and homicides by month of the year, it would find two curves that sharply peak in summer months.  Of course, this does not mean that a ban on ice cream would solve the homicide problem, as there are other variables – in this case, temperature, length of day, school attendance, that are correlated with both ice cream consumption and homicides, and they impact both.  Social scientists use many approaches to attempt to distinguish causation the least of which is to include control variables likely to impact the data.  There are other approaches in making this distinction, for example, the use of natural experiments, regression discontinuity, or instrumental variables, but the city has not taken this first, basic step.

Second, if a true causal relationship exists between two variables, it should persist even when removing one or two data points.  In this case, if there is a causal relationship between "proactive policing" and shootings, it should persist when examining the full period 2008 – 2019, and not just the beginning and end years that the city examined.  When this is done, the

---

[14]     For basic understanding of analyzing the existence of causal relationships through statistical analysis, *see*, *generally*, David Freeman, Robert Pisani, Rover Purves, *Statistics*, 4th Edition (2007); Joshua D. Angrist, Jorn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (2009).

supposed negative relationship between proactive policing and shootings disappears, and there is no statistically significant relationship.

Third, the City defines "proactive policing" as the sum of pedestrian stops (QOL and all others) and vehicle stops.  Given the large number of vehicle stops (which account for 60% of the overall number of all stops, and over 80% in some years), QOL stops, which according to Dr. Kane made up approximately 45% of all pedestrian stops in the first quarter, 2020, constitute only 7% of the City's index over the time period examined, and under 4% in the most recent years.  A data set that is made up primarily of irrelevant stops (vehicles and pedestrian stops other than QOL stops) cannot reliably show any causal impact on homicide rates by a reduction in QOL stops.

The City has long argued that data as to racial disparities in stop and frisk policing does not prove racial bias, as non-racial factors may explain the disparities, and thus the necessity for rigorous regression analysis and other racial bias benchmarks.  But if raw data on racial disparities is insufficient to show racial bias, how can raw data on rates of stops and shootings be the controlling standard on the causes of increases in homicides in Philadelphia absent the same rigorous regressions that the City has insisted be used on racial disparities?

The City's final argument, that because residents of the City have allegedly made more complaints about crime and other conditions in their neighborhood, there should be no changes in QOL policing, is similarly without factual or legal support.  First, as a factual matter, much of what the District Captains reported in terms of resident calls have nothing to do with QOL offenses.  For example, as shown in on the exhibits to the City's Response, ECF No. 132-2 at 1, in the 1st District, complaints include reckless operations of ATVs and dirt bikes, illegal parking,

short dumping, speakeasies, drug *sales*, and graffiti, none of which are addressed by QOL stops. Interventions on those issues would not be impacted by plaintiffs' remedial measure.

Second, there is no evidence that persons who complain of these matters care *how* the City responds, as long as it is done effectively. Thus, if a resident complains of a person with an open liquor container or a homeless person causing some problem in the neighborhood, whether the issue is resolved with an instruction to "move on," or by means of a forcible stop and detention is not the resident's concern, or for that matter, her choice. Further, since QOL stops are racially disparate and biased, whether some residents and/or the PPD believe that forcible stops are necessary policing measures, the Consent Decree and the Fourteenth Amendment flatly override these practices. That basic point is ignored in the welter of the City's otherwise failed arguments.[15]

It is hardly surprising, therefore, that Dr. Kane's Action Plan finds higher rates of racial disparities in QOL stops than in other categories of stops and that QOL policing is an "ineffective" policing practice in Philadelphia. On both points, the empirical data overwhelmingly rebuts the City's position on this issue. There is no basis for further delay on QOL stops. The City does not detail what data or analysis by the PAC could impact the findings already made by the experts on both sides, and to the extent that the City is looking to other police departments for examples of adjustments in QOL policing, there are numerous examples

---

[15]    Nor does the City take issue with our findings of a significant number of investigations in which officers have engaged in "mere encounters" as a first step, which is the process we suggest. And the City is silent as well on the implications of the 3d District Captain's Memorandum to his officers urging them to "avoid the issue we have with the Bailey Agreement," by making more car stops if necessary. ECF 130-2 at 13, Exhibit C. Perhaps the City is not concerned with a police Captain urging officers to engage in policing that gets around the *Bailey* Consent Decree, but this Court should make clear that such directives will not be tolerated.

of departments excluding categories of stops, including QOL stops, from police responses, and addressing the issues with responses by mental health, crisis intervention, and homeless advocate professionals.  *See* ECF No. 130-2 at 8 fn.5

### C.    Discipline and Incentives

The City argues that plaintiffs' proposed disciplinary and incentive measures should be rejected on the grounds that (1) they are impossible to implement due to the lack of any "workable benchmark or metric by which *racial bias* can reliably be assigned to individual police officers on the basis of quantitative data analysis," (2) they lack judicial precedent or comparable actions by other police departments, and (3) they contravene PPD protocols and procedures and the collective bargaining agreement with the FOP.  City Response at 13.  None of these arguments are grounded in current law or practice and they reflect an admission that the PPD is unable and unwilling to enforce its own policies and directives that prohibit racially discriminatory policing by discipline or incentives.

With respect to the assertion that there are *no* known metrics or benchmarks for assessing racially biased policing, the City makes the extraordinary claim that the enormous data set that has been generated over the years on racial disparities in stop and frisk practices, and which have been applied by Dr. Kane in the City's Action Plan, provide no guidelines or standards for assessing whether an officer or Commander has engaged in or ignored patterns of racial bias in stop and frisk policing.  Perhaps, having written so boldly, the City immediately realized that such a position could not possibly justify lack of accountability of officers and Commanders for the gross racial disparities in stops and frisk, and therefore, in the very next breath (the next paragraph), the City qualifies its stance, stating that "[o]f course none of that is to say that police officers should *not* be disciplined when they exhibit racial bias."  City Response at 14.

According to the City, any measures must be the result of a process that is "searching and methodical, not abrupt and reactionary." *Id.*

We fully agree and that is why the parties jointly proposed, and the Court adopted, the provisions of the November 12, 2020 Order.  The parties agreed to the root cause analysis process to ensure that remedial measures would respond to what are the causes of the large racial disparities (unexplained by non-racial factors) documented by Dr. Kane and Professor Abrams. This process resulted in an Action Plan that is "searching and methodical" in its identification of the causes of these racial disparities, and which also provide workable metrics for a fair and effective disciplinary system.  The City may have been disappointed by the findings of its own expert, but that hardly makes his recommendations and our proposed remedial measures, "abrupt" or "reactionary."  Moreover, in seeking another audit by the PAC, the City provides no details regarding the PAC process, and surely noting that supports the assertion that PAC will "get closer to the heart of the same issues," and will produce *evidence-based* recommendations on reducing racial disparities.  City Response at 14 (emphasis in original).[16]

On the critical question of whether plaintiffs have proposed workable metrics and benchmarks for developing disciplinary and incentive protocols, the City ignores the direct relationship between data on patterns of racial disparities and bias and the metrics that can be applied to determine which officers and Commanders should be held accountable for proven acts

---

[16]     The City also mentions its enlistment of the MacArthur Foundation to analyze racial patterns in policing, its project on implicit racial bias, its policies on racial discrimination, the assignment of Accountability Officers in pilot Districts, and a Body Worn Camera pilot project, to show its good faith efforts to reduce racial disparities in stops and frisks.  We endorse these efforts (indeed, they are reflected in the Proposed Order) as well of the work of the PAC.  If they produce data or suggested interventions that can further inform a disciplinary process for racial bias, plaintiffs welcome those insights.  We note, however, that the City's assertion that the MacArthur project is focused on racial disparities in pedestrian stops is inaccurate, as the data analysis of that project is focused on *arrest patterns* in Philadelphia.

of biased policing or for a failure to correct these racially disparate patterns.  That the metrics on this issue are different from those that have been implemented on discipline for Fourth Amendment violations (where a specific stop can be determined to be in accord with or in violation of the Fourth Amendment based on the reasons provided for the stop) does not mean that the PPD lacks reliable metrics for determining which officers and Commanders are responsible for the *patterns* of racially biased policing.

For example, if the data show that Officer A has stopped 50 suspects, 25 White and 25 Black, but that the stops of Blacks are almost always made without reasonable suspicion and those of Whites are made with reasonable suspicion, there would be strong evidence of racial bias.  Hence, discipline should be considered for both Fourth and Fourteenth Amendment violations.  Similarly, if the frisk data for an officer shows that the hit rates for White suspects was far greater than for Black suspects, discipline would be appropriate for racial bias. [17]  These metrics would be even stronger evidence of individual officer bias if the data set shows that other officers in the PSA or Police District do not have similar racial disparities in their recorded stops. And, as with other disciplinary measures, sanctions would be progressive in severity, based on previous infractions.

Discipline for Commanders and other supervisors is even more important as *patterns* (as opposed to individual incidents) of racial bias are the best measure of the extent of racial bias in stop and frisk policing.  Accordingly, metrics for Commanders should include those we have suggested for individual officers, but on an aggregate level of the police district or division.  For example, a Commander's failure to properly supervise or discipline an officer with a proven

---

[17]     Dr. Kane and Professor Abrams found strong evidence of these types of racial patterns. *See Plaintiffs Memorandum of Law*, ECF. No. 130-2, at 3-5.

record of biased policing should be the subject of discipline or other corrective measures in the

same way that the current disciplinary system for Sergeants requires sanctions for failures to

correct officers who stop or frisk without the requisite reasonable suspicion.  In addition,

Commanders should be held accountable where their districts or divisions have higher

unexplained rates of racially disparate or otherwise racially biased stops or frisks in comparison

to other districts with similar relevant characteristics such as violent crime rates, the race of the

residents, and social and economic conditions.  These metrics closely reflect CompStat standards

by which Commanders are currently held accountable for crime rates in their divisions and

districts.  Surely, if comparative data on crime rates, adjusted for relevant factors, can inform the

Department's evaluations and assignments of Commanders, policing data can inform the

evaluation and possible discipline for similar supervisory actions (or inactions).

     The agreement between the parties, ECF No. 130 (Motion) ¶ 4, for a pilot project

involving "Accountability Officers" reflects an understanding by the City that the metrics

discussed above can be developed from the data analysis in which they will engage.  Under the

terms of this remedial measure, accountability officers are "charged with the responsibility of

using real time data in evaluating and addressing patterns of stops and frisks without reasonable

suspicion and evaluating and addressing racial disparities and racial bias in stops and frisks

within their areas of command.  The accountability officer's review will include (a) the racial

breakdown of stops by officer in comparison to other officers in the district or division

(including officers in tactical squads or units); (b) the racial breakdown by stops and frisks

with and without reasonable suspicion by all officers in the district or division, including

tactical squads and units; (c) officers with very high numbers of stops (and their racial

breakdown); and (d) stops for QOL offenses."  The City's assignments of these officers would

make no sense if the factors that they must consider in the accountability process are not reliable metrics for determining racially biased patterns in stop and frisk policing.

Given all of these factors, the City's assertion that these "categories of information" cannot be used for internal accountability since the "plaintiffs never explain *how* this information could fairly be extrapolated into findings of actual *racial bias* against individual police officers and supervisors," City Response at 18 (emphasis in original), ignores the basic point that data that show unexplained racial disparities, as with any other patterns of misconduct, provide workable metrics for a disciplinary system.

The proposed remedial disciplinary measures do not mandate any specific set of metrics or benchmarks, much less a schedule for sanctions; rather, they require the PPD to assess the data already widely available (and any other data later found to be relevant) to establish the metrics for disciplinary accountability for racially biased stop and frisk policing. We have provided specific examples of workable metrics (notably, these will also guide the efforts of the accountability officers), but our proposed remedial measure leaves the initial drafting of disciplinary rules and metrics to the PPD. In this context, the City's assertion that we seek to "punish the Police Department, rather than [making] an effort to reach the heart of the issue," City Response at 19, ignores the current collaborative efforts at reform, and fails to recognize plaintiffs' patience (which is not endless) in a process that will achieve compliance with the Consent Decree.

Finally, the argument that there is no legal precedent for accountability measures for a Commander's failure to properly supervise and discipline its officers for constitutional violations contradicts decades of decisions of the Supreme Court and the lower federal courts. In *Monell v. Department of Social Services,* 436 U.S. 658 (1978), the Court made clear that municipalities

and police departments are constitutionally accountable for policies, practices, and customs that violate the Constitution. The Court further explained the rationale for this system of accountability in *Owen v. City of Independence*, 445 U.S. 622, 652 (1980), where it stated that municipal liability will "encourage those in policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights," and in "preventing those 'systemic' injuries that result from . . . behavior of several governmental officials . . ."

More specifically, the Court has ruled that a police department's failure to supervise, train and discipline officers with deliberate indifference to the risk of resulting constitutional violations is itself grounds for judicial sanctions. *City of Canton v. Harris*, 489 U.S. 378 (1989). The Third Circuit has issued numerous decisions applying these settled principles and holding governmental entities liable for violations of rights caused by a lack of oversight, supervision, and discipline. *See, e.g., Forrest v. Parry*, 930 F.3d 93 (3d Cir. 2019) (*Monell* liability established by failure of the police department to properly supervise and discipline officers); *Estate of Roman v. City of Newark*, 914 F.3d 789 (3d Cir. 2019) (failure to train and discipline officers on Fourth Amendment search violations); *Beck v. City of Pittsburgh,* 89 F.3d 966 (3d Cir. 1996) (investigative and disciplinary process "must have some teeth;" and "formalism is often the last refuge of scoundrels").

In the face of this controlling authority, the City's assertion that is lacks the tools or metrics for a disciplinary system to ensure accountability for racial bias, is nothing short of an admission that its policies prohibiting racially biased policing are "aspirational" only and will not be enforced by a disciplinary process. Moreover, the argument that the PPD is limited in fashioning disciplinary and incentive protocols to promote equality in stop and frisk policing by

reason of state law and its collective bargaining agreement with the FOP lacks factual or legal support. As a factual matter, as the City itself acknowledges, City Response at 21-22, state law permits a police department to discipline any officer for "neglect or violation of an official duty." Surely, racially biased policing, or deliberate indifference to such policing by the Department or its Commanders, is a neglect or violation of an official duty. Nor does the City cite to any CBA provision that would preclude such discipline. Even more to the point, as our review of the Consent Decree provisions on racial disparities and of the relevant Fourteenth Amendment court decisions, *supra*, plainly demonstrate, that this Court has the power to remedy violations of the Equal Protection Clause, notwithstanding state statutes or labor agreements to the contrary.

Finally, the reasons that support a robust disciplinary system also support a system for incentives for non-discriminatory policing by officers and supervisors. The City protests that it makes no sense to reward legal policing as that is expected of all officers and supervisors, but as this case shows, stop and frisk policing has long violated Constitutional norms and, therefore, measures that would not be required where police act consistently with legal restriction, are now required. Further, the PPD regularly considers officer and supervisor performance in assignments and promotions. This management prerogative is available on the critical performance metric of non-discriminatory policing prong, and incentives or rewards in the context of assignments, promotions, and employee evaluations that reflects fidelity to racial equality should be required.

## IV.    Conclusion

In its objections to the plaintiffs' motion, the City misstates the history of this case and the findings of their own expert, misapplies basic causation analysis to their own data, and misapprehends the authority of this Court to order remedial measures addressing the pattern of

racially biased stops and frisks in Philadelphia.  For the reasons in the plaintiffs' original motion, memorandum of law and the instant reply, we request that the Court enter the Proposed Order as a first, but essential, step in ensuring compliance with the Consent Decree and the Constitution.

Respectfully submitted,

*/s/ David Rudovsky*_____
David Rudovsky
Paul Messing
Susan Lin
Kairys, Rudovsky, Messing, Feinberg & Lin, LLP

Mary Catherine Roper
ACLU of Pennsylvania

Counsel for Plaintiffs

# EXHIBIT A

# PHILADELPHIA POLICE DEPARTMENT
## MAJOR CRIMES - CITYWIDE - AS REPORTED TO P.P.D. FOR 2018

### INCIDENT SECTION

YEAR TO 12/31

| VIOLENT CRIME | 2017 | 2018 | % Change |
|---|---|---|---|
| Homicide | 314 | 344 | 10% |
| Rape | 1151 | 1048 | -9% |
| Robbery/Gun | 2449 | 2163 | -12% |
| Robbery/Other | 3547 | 3066 | -14% |
| Aggravated Assault/Gun | 2207 | 2327 | 5% |
| Aggravated Assault/Other | 5377 | 5325 | -1% |
| TOTAL VIOLENT CRIME OFFENSES | 15045 | 14273 | -5% |

| PROPERTY CRIME | 2017 | 2018 | % Change |
|---|---|---|---|
| Burglary/Residential | 5163 | 5072 | -2% |
| Burglary/Commercial | 1399 | 1401 | 0% |
| Theft of Motor Vehicle Tag | 1906 | 1630 | -14% |
| Theft from Person | 608 | 524 | -14% |
| Theft from Auto | 11396 | 11939 | 5% |
| Theft | 14449 | 15419 | 7% |
| Retail Theft | 7743 | 7407 | -4% |
| Auto Thefts | 5694 | 5997 | 5% |
| TOTAL PROPERTY OFFENSES | 48358 | 49389 | 2% |
| TOTAL PART ONE OFFENSES | 63403 | 63662 | 0% |

**Note: All figures presented are based on preliminary Philadelphia Police Department crime data.**
**This crime data is subject to reclassification upon further investigation.**

This report was executed on: 12/28/2020 12:37:54 PM




**PHILADELPHIA POLICE DEPARTMENT**
**Major Crimes as reported to PPD**

**CITYWIDE**
**2020 52 (12/21/2020 to 12/27/2020)**

Note: All figures presented are based on preliminary Philadelphia Police Department crime data.
This crime data is subject to reclassification upon further investigation.

| INCIDENT SECTION¹ | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **LAST TWO WEEKS** | | **LAST 28 DAY PERIOD** | | | **YEAR TO 12/27** | | |
| **Violent Crime** | **Week 51** | **Week 52** | **(11/02/2020 to 11/29/2020)** | **(11/30/2020 to 12/27/2020)** | **% Change** | **2019** | **2020** | **% Change** |
| Homicide² | 8 | 3 | 36 | 29 | -19.4% | 346 | 469 | 35.5% |
| Rape | 10 | 14 | 54 | 53 | -1.9% | 1011 | 821 | -18.8% |
| Robbery/Gun | 56 | 54 | 195 | 248 | 27.2% | 2169 | 1844 | -15.0% |
| Robbery/Other | 35 | 37 | 190 | 157 | -17.4% | 3461 | 2766 | -20.1% |
| Aggravated Assault/Gun | 74 | 86 | 349 | 304 | -12.9% | 2599 | 3798 | 46.1% |
| Aggravated Assault/Other | 76 | 57 | 386 | 272 | -29.5% | 5555 | 5393 | -2.9% |
| TOTAL VIOLENT CRIME OFFENSES | 259 | 251 | 1210 | 1063 | -12.1% | 15141 | 15091 | -0.3% |

| **Property Crime** | **Week 51** | **Week 52** | **(11/02/2020 to 11/29/2020)** | **(11/30/2020 to 12/27/2020)** | **% Change** | **2019** | **2020** | **% Change** |
|---|---|---|---|---|---|---|---|---|
| Burglary/Residential | 46 | 62 | 278 | 260 | -6.5% | 4727 | 3571 | -24.5% |
| Burglary/Commercial | 39 | 41 | 155 | 146 | -5.8% | 1339 | 3255 | 143.1% |
| Theft of Motor Vehicle Tag | 54 | 37 | 198 | 188 | -5.1% | 1695 | 2403 | 41.8% |
| Theft from Person | 1 | 5 | 31 | 24 | -22.6% | 580 | 335 | -42.2% |
| Theft from Auto | 154 | 182 | 804 | 737 | -8.3% | 11435 | 10328 | -9.7% |
| Theft | 206 | 223 | 896 | 912 | 1.8% | 15329 | 12506 | -18.4% |
| Retail Theft | 182 | 172 | 531 | 775 | 46.0% | 8814 | 7740 | -12.2% |
| Auto Theft³ | 182 | 118 | 821 | 762 | -7.2% | 6894 | 9295 | 34.8% |
| TOTAL PROPERTY CRIME OFFENSES | 864 | 840 | 3714 | 3804 | 2.4% | 50813 | 49433 | -2.7% |
| **TOTAL PART ONE OFFENSE** | **1123** | **1091** | **4924** | **4867** | **-1.2%** | **65954** | **64524** | **-2.2%** |
| Shooting Incidents | 68 | 50 | 374 | 274 | -26.7% | 2339 | 3884 | 66.1% |
| Shooting Victims | 38 | 49 | 206 | 166 | -19.4% | 1446 | 2222 | 53.7% |

**Notes:**

**1** Incidents are counted using dispatch dates, except for those noted below

**2** Homicides are counted using assault dates; FBI UCR uses case assigned dates and these counts using different dates may not match

**3** Auto theft counts on CompStat sheet shows the number of vehicles stolen, not the number of incidents

**4** Shooting victim counts use date of occurrence

**X** Shooting incidents are any incident with a firearm discharge, with or without a victim struck, as determined by detective investigation

This report was executed on: 4/12/2021 7:47:43 AM




**PHILADELPHIA POLICE DEPARTMENT**
**Major Crimes as reported to PPD**

**CITYWIDE**

**2021 15 (04/05/2021 to 04/11/2021)**

Note: All figures presented are based on preliminary Philadelphia Police Department crime data.
This crime data is subject to reclassification upon further investigation.

| INCIDENT SECTION¹ | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **LAST TWO WEEKS** | | **LAST 28 DAY PERIOD** | | | **YEAR TO 04/11** | | |
| **Violent Crime** | **Week 14** | **Week 15** | **(02/15/2021 to 03/14/2021)** | **(03/15/2021 to 04/11/2021)** | **% Change** | **2020** | **2021** | **% Change** |
| Homicide² | 5 | 9 | 32 | 28 | -12.5% | 100 | 125 | 25.0% |
| Rape | 13 | 11 | 67 | 60 | -10.4% | 255 | 232 | -9.0% |
| Robbery/Gun | 34 | 40 | 126 | 144 | 14.3% | 576 | 588 | 2.1% |
| Robbery/Other | 29 | 17 | 172 | 115 | -33.1% | 886 | 597 | -32.6% |
| Aggravated Assault/Gun | 85 | 115 | 287 | 352 | 22.6% | 748 | 1108 | 48.1% |
| Aggravated Assault/Other | 60 | 47 | 348 | 286 | -17.8% | 1430 | 1152 | -19.4% |
| TOTAL VIOLENT CRIME OFFENSES | 226 | 239 | 1032 | 985 | -4.6% | 3995 | 3802 | -4.8% |

| **Property Crime** | **Week 14** | **Week 15** | **(02/15/2021 to 03/14/2021)** | **(03/15/2021 to 04/11/2021)** | **% Change** | **2020** | **2021** | **% Change** |
|---|---|---|---|---|---|---|---|---|
| Burglary/Residential | 52 | 51 | 247 | 225 | -8.9% | 1055 | 868 | -17.7% |
| Burglary/Commercial | 19 | 13 | 115 | 67 | -41.7% | 388 | 333 | -14.2% |
| Theft of Motor Vehicle Tag | 17 | 0 | 203 | 108 | -46.8% | 469 | 649 | 38.4% |
| Theft from Person | 5 | 7 | 17 | 24 | 41.2% | 144 | 83 | -42.4% |
| Theft from Auto | 144 | 176 | 693 | 700 | 1.0% | 3185 | 2579 | -19.0% |
| Theft | 231 | 196 | 859 | 838 | -2.4% | 3751 | 3035 | -19.1% |
| Retail Theft | 107 | 96 | 664 | 505 | -23.9% | 3026 | 2429 | -19.7% |
| Auto Theft³ | 66 | 23 | 668 | 364 | -45.5% | 2282 | 2269 | -0.6% |
| TOTAL PROPERTY CRIME OFFENSES | 641 | 562 | 3466 | 2831 | -18.3% | 14300 | 12245 | -14.4% |
| **TOTAL PART ONE OFFENSE** | 867 | 801 | 4498 | 3816 | -15.2% | 18295 | 16047 | -12.3% |
| Shooting Incidents | 31 | 48 | 211 | 152 | -28.0% | 732 | 828 | 13.1% |
| Shooting Victims | 29 | 48 | 149 | 145 | -2.7% | 389 | 546 | 40.4% |

**Notes:**

**1** Incidents are counted using dispatch dates, except for those noted below

**2** Homicides are counted using assault dates; FBI UCR uses case assigned dates and these counts using different dates may not match

**3** Auto theft counts on CompStat sheet shows the number of vehicles stolen, not the number of incidents

**4** Shooting victim counts use date of occurrence

**X** Shooting incidents are any incident with a firearm discharge, with or without a victim struck, as determined by detective investigation

# EXHIBIT B

## Vehicle Searches and Firearm Homicides

